UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

KONINKLIJKE PHILIPS ELECTRONICS
N.V. and U.S. PHILIPS CORPORATION,

     Plaintiffs,

     v.

ENTERTAINMENT DISTRIBUTION
COMPANY (USA) LLC;
ENTERTAINMENT DISTRIBUTION
COMPANY; UNIVERSAL MUSIC
GROUP, INC.; UMG MANUFACTURING
& LOGISTICS, INC.; JAMES CAPARRO,
an Individual; JORDAN COPLAND, an
Individual; and John Does No. 1 through
100,

     Defendants.



Case No. 08-cv-4070 (SCR)

## FIRST AMENDED COMPLAINT

Plaintiffs Koninklijke Philips Electronics N.V. and U.S. Philips Corporation allege as

follows based upon knowledge as to their own acts, and upon information and belief as to all

other allegations:

1.    This is an action for breach of contract under the laws of the State of New York and, in

the alternative, patent infringement under 35 U.S.C. 271 *et seq.*

### The Parties

2.    Plaintiff Koninklijke Philips Electronics N.V. is a corporation organized under the laws

of The Netherlands with its principal place of business in Amsterdam, The Netherlands. Plaintiff

U.S. Philips Corporation is a corporation organized under the laws of Delaware with a principal

place of business at 3000 Minuteman Road, M/S 109, Andover, MA 01810, and an office at 345

Scarborough Rd., Briarcliff Manor, New York.  Plaintiffs Koninklijke Philips Electronics N.V. and U.S. Philips Corporation are collectively referred to as "Philips."

3.     Defendant Entertainment Distribution Company (USA) LLC ("EDC LLC") is a limited liability company organized under the laws of Delaware with a principal place of business at 825 8th Avenue, New York, New York.

4.     Defendant Entertainment Distribution Company ("EDC") is a company organized under the laws of Delaware with a principal place of business at Kings Mountain, Grover, North Carolina.

5.     Defendant James Caparro ("Caparro") was previously the Chief Executive Officer of EDC, at 825 8th Avenue, 23rd Floor, New York, New York 10019.

6.     Defendant Jordan Copland ("Copland") is currently the acting Chief Executive Officer of EDC, at 825 8th Avenue, 23rd Floor, New York, New York 10019.

7.     Defendant Universal Music Group, Inc. ("UMG") is a corporation organized under the laws of Delaware with a principal place of business at 10 Universal City Plaza, Universal City, California.

8.     Defendant UMG Manufacturing & Logistics ("UMGML") is a company organized under the laws of Delaware with a principal place of business at 10 Universal City Plaza, Universal City, California.

9.     UMG is the largest customer of EDC.

10.    EDC LLC and EDC are sometimes collectively referred to in this Complaint as the "EDC Defendants."   The EDC Defendants and UMGML are sometimes collectively referred to in this Complaint as the "Replicator Defendants."

11.    Defendants John Doe No. 1 through John Doe No. 100 inclusive are or may be entities related to the Replicator Defendants, or customers of the Replicator Defendants, the identities of which are unknown at this time.

### Jurisdiction and Venue

12.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), and 1367(a), and 35 U.S.C. §§ 271 and 281.

13.    Venue in this Court is proper under 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

14.    This Court has personal jurisdiction over the Replicator Defendants, Caparro, and Copland under the New York Long Arm Statute, N.Y. C.P.L.R. 301, 302, 317 (McKinney 2007) and Fed. R. Civ. P. 4(e)(1).

15.    The Replicator Defendants and UMG have committed acts of patent infringement in this judicial district.

16.    Caparro was actively involved in the control and management of the EDC Defendants during times relevant to this Complaint.

17.    Caparro has committed acts of patent infringement in this judicial district, including but not limited to directing and controlling patent infringement by the EDC Defendants.

18.    Copland is actively involved in the control and management of the EDC Defendants.

19.    Copland has committed acts of patent infringement in this judicial district, including but not limited to directing and controlling patent infringement by the EDC Defendants.

20.    The Replicator Defendants have irrevocably waived any objections to the jurisdiction, process, and venue of this Court, and to the effectiveness, execution, and enforcement of any order or judgment (including a default judgment) with respect to the Agreements and Side Letters identified in ¶¶ 31, 33, and 34 of this Complaint.

21.    The Replicator Defendants, UMG, Caparro, and Copland are subject to personal jurisdiction in this district because they purposefully engaged in activities that gave rise to this claim for patent infringement, which were directed at the residents of New York and this judicial district.

22.    The Replicator Defendants, UMG, Caparro, and Copland voluntarily placed unlicensed CD-Discs (as defined in ¶ 36) into the stream of commerce, conscious that New York and this judicial district were the likely destination of a substantial quantity of those unlicensed CD-Discs.

### Facts Related to Philips

23.    Philips and its related companies have engaged for many years in research and development ("R&D") of systems in which signals encoded in digital form and stored on a disc are read and reproduced by means of devices using an optical read-out beam.

24.    One of the achievements of such R&D efforts was a revolutionary high-fidelity sound storage and reproduction system, known as the Compact Disc Digital Audio System ("CD-Audio System").

25.    Philips and Sony Corporation ("Sony") developed the Compact Disc Data System ("CD-ROM System") from the CD-Audio System.

26.    Philips and Sony also developed a multi-session CD system, known as the Enhanced Music Compact Disc System ("Enhanced Music CD System" or "CD Extra System").

27.    The CD-Audio System, CD-ROM System, and CD Extra System are referred to collectively in this Complaint as the "CD Systems".

28.    U.S. Philips Corporation is the owner by assignment of all right, title, and interest in U.S. Patent No. 5,068,846, entitled "Reflective, Optical Record Carrier," relating to the CD Systems ("the '846 patent"). The '846 patent was duly and legally issued by the U.S. Patent and

4

Trademark Office on November 26, 1991, after full and fair examination, and is valid and subsisting in the United States. A true copy of the '846 patent is attached as **Exhibit A**.

29.    The CD Systems are defined by "Standard Specifications", namely, the CD-Audio Standard Specifications, CD-Audio Maxi-Single Standard Specifications, CD-ROM Standard Specifications, CD-ROM-XA Specifications, and the Enhanced Music CD Standard Specifications.

## Facts Related to the Replicator Defendants

30.    Effective January 1, 1998, U.S. Philips Corporation and Universal Music and Video Distribution, Inc. ("UMVD") entered into a "Comprehensive-CD Disc License Agreement" whereby U.S. Philips Corporation granted UMVD rights under certain patents related to CD Systems for the territory of the United States, its territories, and possessions (the "UMVD Agreement") (**Exhibit B**).

31.    Effective July 1, 2002, Philips and UMGML entered into a "CD Disc Patent License Agreement" whereby Philips granted UMGML worldwide rights under certain Philips and Sony patents related to CD Systems, including for the territory of the United States, its territories, and possessions (the "UMGML Agreement") (**Exhibit C**).

32.    Effective July 1, 2002, Philips and UMGML entered into a "Side Letter" that "constitutes a legally binding and integral part" of the UMGML Agreement. Under the Side Letter, the UMGML Agreement supersedes and replaces the UMVD Agreement.

33.    Effective February 5, 2003, Philips and UMGML entered into a letter agreement that amended the UMGML Agreement (the "UMGML Letter Agreement") (**Exhibit D**).

34.    Effective January 3, 2007, Philips and EDC LLC entered into a "CD Disc Patent License Agreement" whereby Philips granted EDC LLC worldwide rights under certain Philips patents

related to CD Systems, including for the territory of the United States, its territories, and possessions (the "EDC LLC Agreement") (**Exhibit E**).

35.    In 2005, EDC acquired the CD-Disc manufacturing operations of UMGML and began to pay royalties to Philips under the UMGML Agreement.  To the extent that UMGML has any independent existence, it is liable for its own acts and omissions that form the basis of Philips' claims set forth in this Complaint.  As UMGML's successor in interest, EDC is liable for UMGML's acts and omissions that form the basis of Philips' claims set forth in this Complaint. EDC is also liable for its own acts and omissions that form the basis of Philips' claims set forth in this Complaint.

36.    The UMGML Agreement and the EDC LLC Agreement identify the Standard Specifications for CD System discs, specifically, "CD-Audio Discs", "CD-Audio Maxi-Singles", "CD-ROM Discs", and Enhanced Music CD Discs/CD Extra Discs.  The EDC LLC Agreement also identifies the Standard Specifications for "CD-ROM Disc mode 1",  "CD-ROM Disc mode 2", "CD-ROM XA Disc sub-mode 1", "CD-ROM XA Disc sub-mode 2", "CD Extra Discs", "CD Extra Discs sub-mode 1", and "CD Extra Discs sub-mode 2".  Such CD System discs are referred to collectively in this Complaint as "CD-Discs".

37.    Paragraph 1.15 of the UMGML Agreement defines "Licensed Product" as "a CD-Audio Disc, a CD-Audio Maxi-Single, a CD-ROM Disc and/or a CD Extra Disc, as correspond with the Licensed Patents selected by Licensee pursuant to Article 1.16, manufactured and/or sold in accordance with the provisions hereof, which has been duly reported and on which the royalties due hereunder are paid in accordance with the provisions of this Agreement."

38.    Paragraph 1.16 of the UMGML Agreement defines "Licensed Patents" as "the patents listed in the relevant Exhibits as selected by Licensee pursuant to" five "Options", Options A1

6

through A5. Each Option corresponds to a different type of CD-Disc defined in ¶¶ 1.02 through

1.05 of the UMGML Agreement, made in compliance with the Standard Specifications for each

type of CD-Disc defined in ¶¶ 1.06 through 1.09 of the UMGML Agreement. Option A1 states

that "Licensee chooses the essential patents listed in Exhibit E1, for the use of any one or more

of these patents, exclusively for the manufacture and/or sale of CD-Audio Discs and/or CD-

Audio Maxi Singles, which conform to the CD-Audio Standard Specifications." Using identical

language, Options A2 and A3 cover:

> Option A2:  Exhibits E1 and E2 for CD-ROM Discs conforming to the CD-ROM
>
> Standard Specifications;
>
> Option A3:  Exhibits E1, E2, and E3 for CD Extra Discs conforming to the Enhanced
>
> Music CD Standard Specifications.

Option A4 states that "Licensee chooses, in addition to Option A1 and/or A3 the essential patents

listed in Exhibit E4, for the use of any one or more of these patents, exclusively for the

manufacture and/or sale of CD-Discs, excluding CD-ROM Discs, containing CD Text

information." Option A5 states that "Licensee chooses the non-essential patents listed in Exhibit

E5, for the use of any one or more of these patents, exclusively for the manufacture and/or sale

of CD Extra Discs."

39.    Under ¶ 1.16 of the UMGML Agreement, Licensed Patents identified in Exhibit E1 cover

all CD-Discs under Options A1 through A4.

40.    Paragraph 1.23 of the EDC LLC Agreement defines "Licensed Patents" as "any one or

more of the essential patents for the manufacture and/or sale of the various types of CD-Discs",

breaks out such patents into Categories I through III, and incorporates the specific patents listed

in Annexes A1 through A8. Under ¶ 1.23 of the EDC LLC Agreement, Licensed Patents identified in Annex A1 cover all CD-Discs, in Categories I through III.

41.    Paragraph 1.22 of the EDC LLC Agreement defines "Licensed Product(s)" by eleven "Options", Options A through K, "as selected by Licensee, manufactured and/or sold in accordance with the provisions hereof, which are duly reported and on which the royalties due hereunder are paid in accordance with the provisions of this Agreement." Each Option corresponds to a different type of CD-Disc defined in ¶¶ 1.2 through 1.11 of the EDC LLC Agreement, made in compliance with the Standard Specifications for each type of CD-Disc defined in ¶¶ 1.12 through 1.16 of the EDC LLC Agreement. For example, Option A is "CD-Audio Discs and/or CD-Audio Maxi Singles" defined in ¶¶ 1.2 and 1.3, respectively, made in compliance with the ¶¶ 1.12 and 1.13 Standard Specifications, and Option C is "CD-ROM Discs mode 1" defined in ¶ 1.5, made in compliance with the ¶ 1.14 Standard Specifications.

42.    The '846 patent was listed in Exhibit E1 of the UMGML Agreement and Annex A1 of the EDC LLC Agreement when the Replicator Defendants signed the UMGML Agreement and the EDC LLC Agreement and is currently listed in Exhibit E1 of the UMGML Agreement and Annex A1 of the EDC LLC Agreement, and therefore is a Licensed Patent applicable to all CD-Discs manufactured and/or sold by the Replicator Defendants as defined in Options A1 through A4 of the UMGML Agreement and Options A through K of the EDC LLC Agreement.

43.    Under ¶ 1.16 of the UMGML Agreement and ¶ 1.23 of the EDC LLC Agreement, Philips and the Replicator Defendants agreed that Philips would commission an independent expert to review the patents listed in Exhibits E1 through E4 of the UMGML Agreement and Annexes A1 through A8 of the EDC LLC Agreement to confirm that each patent is "essential" to the manufacture and sale of CD-Discs made according to the Standard Specifications. Philips did so.

44.    Under ¶ 1.16 of the UMGML Agreement and ¶ 1.23 of the EDC LLC Agreement, the term "essential" as used in relation to Licensed Patents means "patents, the use of which is necessary (either directly or as a practical matter) for compliance with the Standard Specifications defining the relevant CD System(s)."

45.    The independent expert commissioned by Philips determined that the '846 patent is an essential patent and is properly listed in Exhibit E1 of the UMGML Agreement and Annex A1 of the EDC LLC Agreement.

46.    The Replicator Defendants selected the following Options:

    a. UMGML: A5
    b. EDC LLC:  Options B-J

47.    The Replicator Defendants have paid royalties for the manufacture and sale of CD-Audio Discs that conform to the CD-Audio Standard Specifications, even though they did not select Option A1 in the UMGML Agreement or Option A in the EDC LLC Agreement.

48.    Under ¶ 2.01 of the UMGML Agreement and ¶ 2.1 of the EDC LLC Agreement, Philips granted to the Replicator Defendants "a non-exclusive, non-transferable license under the Licensed Patents" (listed in the Exhibits and Annexes corresponding to the Options selected by the Replicator Defendants) "to manufacture Licensed Products" "in accordance with the . . . Standard Specifications" set forth in ¶¶ 1.06 through 1.09 of the UMGML Agreement and ¶¶ 1.12 through 1.16 of the EDC LLC Agreement, within the United States and its territories and possessions, "and to sell or otherwise dispose of" "Licensed Products so manufactured in all countries of the world."

49.    Under ¶ 5.02 of the UMGML Agreement, UMGML promised to "pay to Philips a royalty on each Licensed Product sold by Licensee, in which any one or more of the Licensed Patents is

(are) used, irrespective of whether such Licensed Patent(s) is (are) used in the country of manufacture, sale or other disposal."

50.    The '846 patent is and must be used in the United States by the Replicator Defendants to make Licensed Products, and/or CD-Discs that conform to the Standard Specifications.

51.    Under ¶ 5.2 of the EDC LLC Agreement, EDC LLC promised to "pay to Philips a royalty for each CD-Disc sold or otherwise disposed of by Licensee, any of Licensee's Associated Companies [as defined in ¶ 1.25] or an agent of Licensee, in any country where at least one of the Licensed Patents or Non-Asserted Patents [as defined in ¶ 1.24] essential to the type(s) of CD-Discs as selected by Licensee . . . exists."

52.    The '846 patent exists in the United States, and has existed at all times relevant to this action.

53.    Paragraph 5.02 of the UMGML Agreement sets a "Standard Rate" of 3 cents (3¢) royalty per CD-Audio Disc or CD-ROM Disc with an outer diameter greater than 90 mm, 2 cents (2¢) per CD-Audio Disc or CD-ROM Disc with an outer diameter smaller than 90 mm, and 4.5 cents (4.5¢) per CD Extra Disc with an outer diameter greater than 90mm.

54.    Paragraph 5.2 of the EDC LLC Agreement sets a "Standard Rate" of 2 cents (2¢) royalty per CD-Audio Disc or CD-ROM Disc with an outer diameter greater than 90 mm, 1.35 cents (1.35¢) per CD-Audio Disc or CD-ROM Disc with an outer diameter smaller than 90 mm, and 3 cents (3¢) per CD Extra Disc with an outer diameter greater than 90mm.

55.    With respect to CD-Discs sold on or after July 1, 2002, ¶ 5.02 of the UMGML Agreement and the UMGML Letter Agreement set a "Compliance Rate" of 1.75 cents (1.75¢) royalty per CD-Audio Disc or CD-ROM Disc with an outer diameter greater than 90 mm, 1.15 cents (1.15¢) per CD-Audio Disc or CD-ROM Disc with an outer diameter smaller than 90 mm,

and 1.75 cents (1.75¢) per CD Extra Disc with an outer diameter greater than 90mm, provided that UMGML meets the "Compliance Requirements" specified in the UMGML Agreement and the EDC LLC Agreement, and relevant Side Letters, as the case may be.

56.    With respect to CD-Discs sold on or after July 1, 2002, ¶ 5.2 of the EDC LLC Agreement sets a "Compliance Rate" of 1.5 cents (1.5¢) royalty per CD-Audio Disc or CD-ROM Disc with an outer diameter greater than 90 mm, 1 cent (1¢) per CD-Audio Disc or CD-ROM Disc with an outer diameter smaller than 90 mm, and 1.5 cents (1.5¢) per CD Extra Disc with an outer diameter greater than 90mm, provided that EDC LLC meets the "Compliance Requirements".

57.    Paragraph 5.02 of the UMGML Agreement and ¶ 5.2 of the EDC LLC Agreement further provide that "[i]n the event that Licensee fails to comply at any time with any of its obligations" under such Agreements, "the Standard Rates, as applicable, shall apply to Licensee's manufacture and sale of CD-Discs instead of the Compliance Rates, as applicable, with immediate effect from":

    a.    UMGML Agreement: "the moment of such non-compliance until such moment that Licensee's non-compliance will have been remedied in full."

    b.    EDC LLC Agreement: "the first day of the reporting period to which the occurrence of non-compliance relates until such moment that Philips confirms in writing to Licensee that Licensee's non-compliance has been remedied in full."

58.    Paragraphs 5.03 and 5.10 of the UMGML Agreement and ¶¶ 5.3 and 5.10 of the EDC LLC Agreement require the Replicator Defendants to submit quarterly "Royalty Reporting Forms" to Philips listing all CD-Discs that they manufacture and sell, and to keep complete and accurate books and records relating to the Replicator Defendants' manufacture and sale or other disposal of CD-Discs.

## Facts Relating to Breach of Contract Claim

59.    The Replicator Defendants selected the following Options:

a. UMGML: A5
b. EDC LLC:  Options B-J

To be Licensed Products, selected CD-Discs must be manufactured and sold in compliance with the corresponding Standard Specifications and the provisions of the UMGML Agreement and the EDC LLC Agreement, such sales must be reported to Philips, and royalties for the sale of such CD-Discs must be paid to Philips.  For example, a CD-Audio Disc is defined by ¶ 1.02 of the UMGML Agreement and ¶ 1.2 of the EDC LLC Agreement to "mean a Disc [as defined in ¶ 1.01 of the UMGML Agreement and ¶ 1.1 of the EDC LLC Agreement] comprising audio information encoded in digital form, which is optically readable by a CD-Audio Player [as defined in ¶ 1.11 of the UMGML Agreement and ¶ 1.18 of the EDC LLC Agreement] and which conforms to the CD-Audio Standard Specifications [as defined in ¶ 1.06 of the UMGML Agreement and ¶ 1.12 of the EDC LLC Agreement]."   Paragraph 1.06 of the UMGML Agreement and ¶ 1.12 of the EDC LLC Agreement defines the CD-Audio Standard Specifications to "mean the specifications for the CD-Audio System [as defined in the second "Whereas" clause of the UMGML Agreement and the EDC LLC Agreement], including" "the Subcode/Control and Display System, Channels R .. W, chapter 5.8, the CD-TEXT mode, as made available, modified or extended from time to time."

60.    Under ¶ 2.01 of the UMGML Agreement and ¶ 2.1 of the EDC LLC Agreement, the Replicator Defendants are licensed only to manufacture selected Licensed Products "**in accordance with the relevant CD Standard Specifications** and to sell or otherwise dispose of" "Licensed Products **so manufactured** in all countries of the world." (Emphasis added.)

61.    Because the '846 patent is essential and therefore must be used to make CD-Discs that conform to the Standard Specifications, and exists in the United States, under ¶ 5.02 of the UMGML Agreement and ¶ 5.2 of the EDC LLC Agreement, the Replicator Defendants must pay Philips either the Standard rates or the Compliance Rates for each selected CD-Disc sold or otherwise disposed of by the Replicator Defendants in the U.S.

62.    Beginning in or about the following calendar quarters, the Replicator Defendants began paying royalties under the UMGML Agreement and the EDC LLC Agreement, according to the Compliance Rates, for the manufacture and sale of selected CD-Discs in the United States:

    a. UMGML: 3Q 2002
    b. EDC LLC: 1Q 2007

63.    After the end of the 2Q 2005, when EDC acquired CD-Disc manufacturing operations from UMGML, UMGML ceased reporting and paying royalties to Philips under the UMGML Agreement.

64.    Beginning with the month of June 2005, EDC began reporting and paying royalties to Philips under the UMGML Agreement and supplying CD-Discs to UMG.

65.    After 1Q 2006, the Replicator Defendants have failed to report and pay royalties for all CD-Discs made and sold in the U.S.

66.    After the calendar quarter identified in ¶ 63 of this Complaint, the Replicator Defendants have continued to make and sell at least 350 million CD-Discs in the U.S., without providing royalty reports and/or paying royalties to Philips for all CD-Discs that they manufacture and/or sell.

67.    The CD-Discs made and sold by the Replicator Defendants after they stopped paying royalties to Philips have been and are available for purchase on the open market in the U.S., and within the district.

68.    The Replicator Defendants do not contest that the CD-Discs they have made and sold in the U.S. after they stopped paying royalties to Philips comply with the relevant Standard Specifications.

69.    The Replicator Defendants have failed to submit quarterly "Royalty Reporting Forms" to Philips listing all CD-Discs that they manufacture and sell, and/or to keep complete and accurate books and records, relating to the Replicator Defendants' manufacture and sale or other disposal of all CD-Discs in the U.S., as required by ¶¶ 5.03 and 5.10 of the UMGML Agreement and ¶¶ 5.3 and 5.10 of the EDC LLC Agreement.

### Facts Relating to Patent Infringement Claim

70.    The CD-Discs made and sold by the Replicator Defendants, UMG, Caparro, and Copland in the U.S. fall within the claims of the '846 patent.

71.    The Replicator Defendants' license to make and sell selected CD-Discs in the U.S. is contingent upon the Replicator Defendants' payment of royalties to Philips.

72.    Because the Replicator Defendants have not paid royalties to Philips and are in material breach of the UMGML Agreement and the EDC LLC Agreement, as set forth in this Complaint, the selected CD-Discs made and sold by the Replicator Defendants and UMG since the breach began are not Licensed Products, and are not licensed, under the '846 patent.

73.    EDC has never been licensed by Philips to make, have made, sell, or import CD-Audio Discs.

74.    As set forth in this Complaint, the Replicator Defendants, UMG, Caparro, and Copland are also making and selling CD-Discs covered by the '846 patent in the U.S. without a license and/or without paying royalties to Philips.

75.     Caparro personally, actively, and knowingly controlled and directed the EDC Defendants in making and selling CD-Discs covered by the '846 patent in the U.S. without paying royalties to Philips. Caparro knew that his actions would induce the EDC Defendants to make and sell CD-Discs covered by the '846 patent.

76.     Caparro intended to avoid personal liability for his acts of patent infringement by acting as the EDC Defendants in making and selling CD-Discs covered by the '846 patent. Caparro was the alter ego of the EDC Defendants.

77.     Copland personally, actively, and knowingly controlled and directed the EDC Defendants in making and selling CD-Discs covered by the '846 patent in the U.S. without paying royalties to Philips. Copland knew that his actions would induce the EDC Defendants to make and sell CD-Discs covered by the '846 patent.

78.     Copland intended to avoid personal liability for his acts of patent infringement by acting as the EDC Defendants in making and selling CD-Discs covered by the '846 patent. Copland is the alter ego of the EDC Defendants.


79.     The John Doe Defendants are making and/or selling CD-Discs covered by the '846 patent in the U.S. without a license from Philips under the Licensed Patents, and/or without paying royalties to Philips.

**Count I**
**Breach of Contract**
**Asserted Against All Defendants**

80.     Plaintiff repeats and realleges each and every allegation set forth in this Complaint.

81.     The UMGML Agreement and Side Letter and the EDC LLC Agreement are valid and subsisting agreements under New York law between Philips and the Replicator Defendants.

15

Such Agreements and Side Letter are supported by adequate consideration. Neither Philips nor the Replicator Defendants have terminated the UMGML Agreement or Side Letter or the EDC LLC Agreement.

82.     In ¶ 13.06 of the UMGML Agreement and ¶ 12.7 of the EDC LLC Agreement, Philips and the Replicator Defendants agreed that New York law controls the construction of such Agreements.

83.     The Replicator Defendants have materially breached the UMGML Agreement and Side Letter and the EDC LLC Agreement by failing to pay royalties on their manufacture and sale of selected CD-Discs, as set forth in this Complaint.

84.     UMG, Caparro, and Copland intentionally induced EDC LLC to breach the EDC LLC Agreement.

85.     UMGML assigned the UMGML Agreement to EDC without Philips' consent, as required by ¶ 11.01 of the UMGML Agreement. Such unauthorized assignment was a material breach of the UMGML Agreement.

86.     The Replicator Defendants have materially breached the UMGML Agreement and the EDC LLC Agreement and Side Letters in other ways, the details of which are unknown at this time.

87.     In view of the Replicator Defendants' breach of the UMGML Agreement and Side Letter and the EDC LLC Agreement, Philips is entitled to receive royalties for the Replicator Defendants' manufacture and sale in the U.S. of CD-Discs beginning in the Quarter identified in ¶ 63 at the Standard Rates.

88.     The Replicator Defendants have materially breached the UMGML Agreement and Side Letter and EDC LLC Agreement by failing to provide accurate audit statements to Philips listing

all CD-Discs that they manufacture and sell, failing to submit quarterly "Royalty Reporting Forms" to Philips, and/or failing to keep complete and accurate books and records relating to the Replicator Defendants' manufacture and sale or other disposal of CD-Discs in the U.S., in breach of ¶ 5.02, 5.03, 5.05, and/or 5.10 of the UMGML Agreement and ¶ 5.2, 5.3, 5.5, and/or 5.10 of the EDC LLC Agreement.

89.    Under ¶ 5.07 of the UMGML Agreement and ¶ 5.7 of the EDC LLC Agreement, Philips is entitled to interest on all unpaid royalties owed to Philips by the Replicator Defendants, accruing at the rate of 2% (two percent) per month, or the maximum amount permitted by applicable law, whichever is lower.

90.    Under ¶ 13.04 of the UMGML Agreement and ¶ 12.5 of the EDC LLC Agreement, the Replicator Defendants agreed that neither Philips' failure nor delay in enforcing any provision of such Agreements shall constitute a waiver of such provision or of Philips' right to enforce any provision of such Agreements.

91.    Philips has suffered monetary and other damages, in an as-yet undetermined amount, as the direct and proximate result of the Replicator Defendants' material breach of the UMGML Agreement and Side Letter and the EDC LLC Agreement.

92.    Philips has suffered monetary and other damages, in an as-yet undetermined amount, as the direct and proximate result of the inducement to breach the EDC LLC Agreement by Caparro and Copland.

**Count II**
**Patent Infringement**
**Asserted Against All Defendants**

93.    Plaintiff repeats and realleges each and every allegation set forth in this Complaint.

94.    In the alternative, the Replicator Defendants, UMG, Caparro and/or Copland have infringed and are continuing to infringe, literally and/or under the doctrine of equivalents, the '846 patent by practicing one or more claims of the '846 patent in their manufacture, use, offering for sale, sale, and/or importation of products, and/or by inducing or contributing to the infringement of the '846 patent without a license and/or without paying royalties to Philips, under 35 U.S.C. § 271, including without limitation CD-Audio Discs.

95.    The John Doe Defendants have infringed and are continuing to infringe, literally and/or under the doctrine of equivalents, the '846 patent by practicing one or more claims of the '846 patent in their manufacture, use, offering for sale, sale, and/or importation of products, and/or by inducing or contributing to the infringement of the '846 patent, under 35 U.S.C. § 271.

96.    The '846 patent is valid and subsisting and is entitled to a presumption of validity under 35 U.S.C. § 282.

97.    U.S. Philips Corporation is the assignee of all rights, title, and interest in and to the '846 patent and possesses all rights of recovery under the '846 patent.

98.    A Reexamination Request for the '846 patent was filed in the U.S. Patent and Trademark Office on December 8, 2004.  Ex Parte Reexamination Certificate No. US 5,068,846 C1 (the "Reexamination Certificate"), confirming the patentability of claims 1 through 7 of the '846 patent, was issued by the U.S. Patent and Trademark Office on September 19, 2006.  A true copy of the Reexamination Certificate is attached as **Exhibit F**.

99.    The Replicator Defendants, UMG, Caparro, and Copland have had knowledge of the '846 patent at all times relevant to this action.

100.    The infringement of the '846 patent by the Replicator Defendants, UMG, Caparro, and Copland has been and continues to be willful, and therefore Philips is entitled to treble damages under 35 U.S.C. § 284.

101.    · Philips has suffered monetary and other damages in an as-yet undetermined amount, and irreparable injury, as the direct and proximate result of the  infringement of the '846 patent by the Replicator Defendants, UMG, Caparro, and Copland.  Philips has no adequate remedy at law. Unless enjoined, the Replicator Defendants, UMG, Caparro, and Copland will continue to infringe and to damage Philips irreparably.

### Prayer for Relief

Wherefore, Philips requests that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief, including but not limited to a judgment and order as follows:

A.    holding the Replicator Defendants jointly and severally liable for breach of contract;

B.    in the alternative, holding the Replicator Defendants and/or UMG jointly and severally liable for patent infringement;

C.     holding the John Doe Defendants jointly and/or severally liable for patent infringement;

D.    holding Caparro and Copland personally liable for actively inducing the EDC Defendants to infringe under 35 U.S.C. § 271(b);

E.    holding that the EDC Defendants were merely the alter ego of Caparro and Copland, and holding Caparro and Copland personally liable for direct infringement under 35 U.S.C. § 271(a);

F.    directing the Replicator Defendants, UMG, Caparro, and/or Copland to pay to Philips its actual damages for:

a.    the Replicator Defendants' breach of contract; and/or

b. the Replicator Defendants, UMG, Caparro, and/or Copland's patent infringement, under 35 U.S.C. § 284;

G. directing the John Doe Defendants to pay to Philips its actual damages for patent infringement, under 35 U.S.C. § 284;

H. directing the Replicator Defendants, Caparro, and Copland to pay unpaid royalties at the Standard Rates;

I. directing the Replicator Defendants, UMG, Caparro, Copland, and/or the John Doe Defendants to pay Philips' other damages, including but not limited to direct, consequential, indirect, compensatory, and punitive damages;

J. directing the Replicator Defendants, Caparro, and Copland to pay interest on all unpaid royalties;

K. holding that the Replicator Defendants', UMG's, Caparro's, Copland's, and/or the John Doe Defendants' patent infringement has been and continues to be willful, and trebling Philips' damages;

L. enjoining the Replicator Defendants, UMG, Caparro, Copland, and/or the John Doe Defendants from making, having made, using, importing, or selling CD-Discs under 35 U.S.C. § 283;

M. directing the Replicator Defendants, UMG, Caparro, Copland, and/or the John Doe Defendants to pay Philips' attorneys' fees and costs under 35 U.S.C. § 285;

N. directing the Replicator Defendants, UMG, Caparro, Copland, and/or the John Doe Defendants to pay prejudgment and post-judgment interest;

O. providing such other and further relief as this Court deems just and appropriate.

## Jury Trial

Philips demands a jury trial on all claims set forth in this Complaint.

Date:   June 10, 2008

Edward D. Johnson
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, California 94306-2112
Tel: (650) 331-2000
Fax: (650) 331-2060

Christopher J. Houpt
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
Tel: (212) 506-2380
Fax: (212) 849-5830

Vince P. Kovalick
John F. Hornick
Samuel C. Bass
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
Tel: (202) 408-4000
Fax: (202) 408-4400

*Attorneys for Plaintiffs*
*Koninklijke Philips Electronics N.V. and*
*U.S. Philips Corporation*

# EXHIBIT A

# United States Patent [19]

## Kramer

[11] **Patent Number:** **5,068,846**

[45] **Date of Patent:** **Nov. 26, 1991**

[54] **REFLECTIVE, OPTICAL RECORD CARRIER**

[75] Inventor: **Pieter Kramer**, Eindhoven, Netherlands

[73] Assignee: **U.S. Philips Corporation**, New York, N.Y.

[21] Appl. No.: **858,550**

[22] Filed: **Apr. 23, 1988**

### Related U.S. Application Data

[63] Continuation of Ser. No. 146,554, May 5, 1980, abandoned, which is a continuation of Ser. No. 949,919, Oct. 10, 1978, abandoned, which is a continuation of Ser. No. 772,914, Feb. 28, 1977, abandoned, which is a continuation of Ser. No. 344,867, Mar. 26, 1973, abandoned.

[30] **Foreign Application Priority Data**

Sep. 2, 1972 [NL] Netherlands .................... 7211999

[51] Int. Cl.⁵ ........................... G11B 7/24; H04N 5/85
[52] U.S. Cl. ................................. 369/275.1; 358/342; 369/275.5; 369/109
[58] Field of Search ............... 358/342; 365/113, 120; 369/275, 109, 93–94, 125, 107, 111, 275.1, 275.4, 275.5, 275

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 1,898,040 | 2/1933 | Eldred . |
| 1,967,882 | 7/1934 | Hammond . |
| 2,092,892 | 9/1937 | Runge . |
| 2,595,670 | 5/1952 | Goehner ............................ 369/125 |
| 3,174,140 | 3/1965 | Hagopian et al. . |
| 3,430,966 | 3/1969 | Gregg . |
| 3,518,442 | 6/1970 | Johnson . |
| 3,534,166 | 10/1970 | Korpel ................................ 358/129 |
| 3,626,386 | 12/1971 | Feinleib . |
| 3,636,526 | 1/1972 | Feinleib . |
| 3,665,425 | 5/1972 | Feinleib . |
| 3,665,483 | 5/1972 | Becker et al. .................... 369/275.5 |
| 3,696,344 | 10/1972 | Feinleib et al. . |

| | | |
|---|---|---|
| 3,764,759 | 10/1973 | Herriger et al. . |
| 3,795,902 | 3/1974 | Russell . |
| 3,833,769 | 9/1974 | Compaan et al. ................. 369/44.24 |
| 3,838,401 | 9/1974 | Graf et al. ........................... 369/109 |
| 3,848,095 | 11/1974 | Wohlmut et al. . |
| 3,876,841 | 4/1975 | Kramer et al. .................... 369/44.24 |
| 3,876,842 | 4/1975 | Bouwhuis ......................... 369/44.37 |
| 3,999,009 | 12/1976 | Bouwhuis . |
| 4,010,317 | 3/1977 | Bouwhuis ......................... 369/44.24 |
| 4,041,530 | 8/1977 | Kramer et al. . |

#### FOREIGN PATENT DOCUMENTS

1038593 8/1966 United Kingdom .

#### OTHER PUBLICATIONS

"Long Play Video Disc with Optical Scanning", Funk Technik, No. 19, pp. 692–694, Oct. 1972.
"Philips TV Disk, Read by Light Beam, Could Shape Market", Electronics, Sep. 11, 1972, pp. 29–30.
Rice et al., An Experimental Television Recording and Playback System Using Photographic Discs, Journal of the SMPTE, vol. 79, No. 11, 11/70, pp. 997–1002.

*Primary Examiner*—Robert Weinhardt
*Attorney, Agent, or Firm*—Algy Tamoshunas; Leroy Eason

[57] **ABSTRACT**

A record carrier for information, for example video and/or audio information, in the form of a disk-shaped carrier substrate provided with an optical structure in accordance with the information is described. By making the optical structure radiation-reflecting and the substrate radiation-transmitting, whilst the surface of the substrate more remote from the optical structure forms both the entrance face and the exit face for the read radiation, and by coating a surface of the optical structure more remote from the substrate with an additional layer, a simple record carrier is obtained which is well protected against dust particles and damage.

**7 Claims, 3 Drawing Sheets**





# Fig.1



# Fig. 2



## Fig.3



## Fig.4



# FIG. 5

5,068,846

# REFLECTIVE, OPTICAL RECORD CARRIER

This application is a continuation of Ser. No. 146,554, filed May 5, 1980, which is a continuation of Ser. No. 949,919, filed Oct. 10, 1978, which is a continuation of Ser. No. 772,914, filed Feb. 28, 1977, which is a continuation of Ser. No. 344,867, filed Mar. 26, 1973, all such prior applications having been abandoned. This application is, further, a continuation-in-part of Ser. No. 229,285, filed Feb. 25, 1972, abandoned, which was continued as application Ser. No. 396,399, filed Sept. 12, 1973, abandoned, which was continued as application Ser. No. 618,215, filed Sept. 30, 1975, and issued as U.S. Pat. No. 4,041,530, dated Aug. 9, 1977.

The invention relates to a record carrier for information, for example video and/or audio information, in the form of a disk-shaped carrier substrate on which an optical structure is provided in accordance with the information, which record carrier is intended to be read by means of optical radiation. The invention also relates to an apparatus for reading the record carrier.

Such a record carrier and read apparatus are known and are described, inter alia, in "Journal of the S.M.P.T.E." 79(November 1970) pages 997–1002. In the known record carrier the information is stored in analog form, for example in the form of areas which have different absorption coefficients and are arranged in tracks. This registration carrier is read in the transmission mode in which a read beam enters the carrier on the side of the optical structure and emerges from it on the opposite side. In its passage through the carrier the beam is modulated by the structure in accordance with the information stored in it. The modulated beam is converted into an electric signal by a radiation-sensitive detector.

Because a large amount of information is stored on the record carrier, the details of the optical structure are very small, if, for example, a video program having a duration of 45 minutes is stored on a disk record carrier having an outer diameter of 30 cm, the side of the details will be of the order of 1 μm. Reading such a fine structure is highly susceptible to dust particles, fluff and the like. If these small objects lie on the optical structure, they may cover a large number of adjacent tracks and details in these tracks, preventing the latter from being read. In addition there is a very real possibility that, for example when the record carrier is handled or placed in the read apparatus, scratches and the like are made in the optical structure. Because the record carrier is intended to be played back in non-ideal circumstances, for example in the living room, provisions must be made to render the optical structure more or less unsusceptible to dust and damage.

The aforementioned paper proposes to coat the optical structure with an additional transparent layer. This is done to ensure that dust particles screen off only part of the read beam focussed on the optical structure of the record carrier. However, this requires the protective layer to have a minimum thickness of the order of many times the depth of focus of the lens used, for example a thickness of 100 μm. Moreover, the protectice layer must intimately engage the optical structure, preventing the occurrence of local air bubbles between the optical structure and the protective layer.

In the known apparatus it is attempted to maintain the focus of the objective which focusses the read beam on the optical structure by causing the objective to "fiont"

on an air cushion on the record carrier. This pre-supposes, however, that the thickness of the protective layer is constant throughout the entire surface, or at least that it contains no variations in excess of the depth of focus of the objective, which is of the order of 1 μm. Consequently the protective layer has to satisfy exacting requirements.

It is an object of the present invention to provide a record carrier in which the optical structure is protected against dust particles and damage without the use of a protective layer which is required to satisfy stringent requirements. For this purpose the record carrier according to the invention is characterized in that the optical structure is a radiation-reflecting structure and the carrier substrate is radiation-transmitting, the surface of the carrier substrate more remote from the optical structure forming both the entrance face and the exit face for the read radiation. In this record carrier the carrier substrate itself ensures that dust particles are sufficiently spaced away from the optical structure.

According to a further feature of a record carrier according to the invention, the surface of the optical structure more remote from the carrier substrate is provided with an additional layer. Because the optical structure is completely embedded between two layers, it cannot readily be damaged.

The optical structure is read in the reflection mode, which means that the read beam is modulated by reflection at the optical structure. The additional layer is not traversed by the read beam and is only required to protect the optical structure from damage. Hence this layer need not satisfy exacting requirements. It need not be radiation-transmissive and need not have a constant thickness throughout its surface. In addition, it need not accurately engage the optical structure. It may, for example, be a plate which is secured to the carrier substrate along the edge.

The reflecting optical structure may be in the form of co-planar radiation-reflecting regions and intermediate areas, the areas having a coefficient of reflection different from that of the regions. Preferably, however, the optical structure consists of regions and intermediate areas having equally high reflection coefficients but situated at different levels.

The record carrier according to the invention differs from the known record carrier not only in construction but also in the manner in which during reading the read beam is maintained in focus on the optical structure. The flatness of the carrier substrate also which is required when employing the known method (an objective supported by an air cushion) can only be achieved by painstaking polishing. This greatly increases the cost of the disk. Optical determination according to the invention of the deviation between the plane of the optical structure and the plane in which the beam of radiation is focussed enables the range of permissible thickness variations over the carrier substrate to be extended to, for example, 300 μm.

Embodiments of the invention will now be described, by way of example, with reference to the accompanying diagrammatic drawings, in which:

FIG. 1 is a plan view of a record carrier not coated with an additional layer,

FIG. 2 is a cross-sectional view of an embodiment of a record carrier according to the invention,

FIG. 3 is a known apparatus for reading the record carrier,

3

FIG. 4 is a cross-sectional view of a second embodiment of a record carrier according to the invention, and

FIG. 5 shows an arrangement for detecting focusing errors during reading of information from the record carrier.

FIG. 1 is a plan view of a circular record carrier. The carrier may contain a spiral structure comprising a plurality of quasi-concentric tracks. As an alternative, the tracks may be concentric, as is shown in FIG. 1. Only parts of two adjacent tracks denoted by 12 and 13 are shown. Each of the tracks contains, for example, a crenellated structure comprised of depressions which are spaced apart by intermediate areas or lands in the track direction, the dimensions of which are shown greatly exaggerated in FIG. 2, which is a tangential sectional view of a record carrier according to the invention. The spacings between, and the length of, the upper surfaces 3 and 5, 5 and 7, and so on of the merlons are different. Their heights 4, 6, and so on are equal to one another and, preferably, to about one quarter wavelength of the radiation used for reading. Instead of perpendicular leading and trailing edges the optical structure may alternatively have smooth transitions between the upper and lower surfaces.

The carrier substrate 1 transmits the radiation used for reading. The optical structure is provided on the upper surface of the disk, whilst the lower surface acts both as the entrance surface for the unmodulated beam and as the exit surface for the modulated beam. The faces of the optical structure have been made highly reflecting, for example in that after the structure has been pressed in the substrate a metal layer is deposited on it from vapour. The thickness of this metal layer is not of importance. A protective layer 10 is provided on top of the optical structure. The only purpose of this layer is to protect the optical structure of the record carrier against damage. Hence any layer which provides protection against rough handling of the carrier may be used. As FIG. 2 shows, the layer may be a thin disk which is spaced from the optical structure and is secured to the substrate along the edge only. In addition, a sheet of paper or a foil of a synthetic material provided with an adhesive on one surface may be stuck onto the optical structure. As an alternative, as is shown in FIG. 4, the layer, for example a sprayed layer of lacquer, may be provided on and between the merlons, in which case the thickness of the layer must be greater than the height of the merlons. Because the optical structure lies between the substrate 1 and the layer 10 it is fairly capable of withstanding rough handling.

A read beam (15) is modulated in phase by the crenellated structure shown in FIG. 2. As an alternative, the upper surface 9 of the substrate may be provided with a structure of radiation-reflecting regions and radiation-absorbing intermediate areas, causing the read beam to be modulated in amplitude.

When the disk record carrier shown in FIG. 1 is to be read, it is rotated at a speed of, for example, 1500 revolutions per minute by means of a driving spindle 24, as is shown in FIG. 3. In this Figure the record carrier is shown in radial section. A read beam 30 emitted by a source of radiation 25 is reflected to the record carrier by a half-silvered mirror 26. The beam passes through the carrier substrate 1 to be reflected at the optical structure (shown as tracks 2) on the upper surface of the disk. An objective 27 forms an image of the source on the optical structure, the size of this image being of the order of the smallest detail of the structure.

4

During rotation of the record carrier the read beam is modulated in time in accordance with the sequence of, for example, the merlons in a track. The modulated read beam 31 passes through the half-silvered mirror 26 to be intercepted by a radiation-sensitive detector 28. At the output of the detector an electric signal is produced which corresponds to the information stored in the record carrier. The detector 28 may be connected to known electronic means for converting the output signal of the detector into picture and sound.

The advantages of reading in reflection will be clear from FIG. 3. All the optical elements and the electronic processing devices are disposed on one side of the record carrier, permitting the carrier to be readily placed in the read apparatus. Moreover the elements may be incorporated so as to be well protected. Furthermore the number of optical elements may be reduced, because some elements are used twice. The reduced number of elements results in a reduced likelihood of relative oscillations.

Also, the record carrier may be read in a non-dustfree room, for example a living room, for dust particles deposited on the layer 10 have no effect, because the read beam does not pass through this layer. A dust particle on the lower surface 8 of the substrate may reduce the intensity of the radiation incident on the optical structure. However, a reduction in intensity is not highly inconvenient, because the information is recorded in digital form. A dust particle cannot entirely intercept the beam, because the beam has a comparatively large diameter in the plane of the dust particle. This is due to the fact that the substrate by nature has a certain thickness, inter alia because of the desired rigidity.

If the record carrier is to be suitable for manufacture by mass production methods, the flatness of the substrate should not have to satisfy exacting requirements. However, because the depth of focus of the objective 27 is of the order of 1 $\mu$m, variations in the thickness of the substrate may cause parts of the optical structure to become located outside the focussed light spot at the sites of these variations. These thickness variations, which cannot be compensated for by an objective floating on an aircushion, may cause the detector to receive not only radiation from the track part to be read, but also radiation from the surroundings of this part. As a result, the modulation depth of the output signal from the detector is reduced, while moreover, because not one track only but adjacent tracks are also illuminated, crosstalk may occur.

According to the invention the record carrier described may be used to advantage if during reading an optical focussing detection method is employed. For this purpose read apparatuses provided with focussing detection systems described in the patents identified below may be used. The use of the apparatuses for reading the record carrier according to the invention described in these patents means that the possibilities of the apparatuses described therein are particularly efficiently utilized.

One such arrangement is illustrated in FIG. 5 wherein a screen 34 is disposed in the path of the reflected beam 31 at a position such that the detectors 35' and 35'' receive equal amounts of radiation when the beam is properly focused on the reflective optical structure. If, on the other hand, the plane of the optical structure shifts from the desired position, the screen will intercept the rays which travel to one of the detectors

5,068,846

| 5 | 6 |

so that said one detector will receive less radiation than the other. The amount and direction that the plane of the reflective optical structure deviates from the desired position can thus be determined by comparison of the output signals from the detectors 35' and 35".

An optical determination of the deviation between the plane of the optical structure and the plane in which the read beam is focussed may be effected by imaging a grating constituted by adjacent tracks of the optical structure on two physical gratings spaced from the record carrier by different distances. The difference between the output signals of the detectors disposed behind the gratings indicates the magnitude and the direction of any deviation. A read apparatus including such focussing detection is described in U.S. Pat. No. 3,833,769.

A second possibility is offered by the apparatus described in U.S. Pat. No. 4,010,317 in which two detectors are arranged side by side, viewed in the direction of length of the track. The detectors intercept two different parts of the modulated beam.

As an alternative, the deviation between the plane of the optical structure and the plane in which the read beam is focussed may be detected without using the details in the optical structure, in contradistinction to the two aforementioned apparatuses. In such a method the optical structure is used only as a reflecting face, as is described in U.S. Pat. No. 3,876,841 and U.S. Pat. No. 3,876,842. By means of, inter alia, this face an image of an object is formed, the location of this image being determined by the location of the plane of the reflecting optical structure.

FIG. 4 shows a second embodiment of a record carrier according to the invention. Two substrates 1 and 1' which each have an optical structure on one surface 9 and 9' respectively are combined with an intermediate layer 10 to form an integral unit. Such a record carrier may be manufactured by methods known from the technology of disk-shaped sound records. The structures on the surfaces 9 and 9' are read by means of beams in opposite directions. In this embodiment the layer 10 is only required to separate the optical structures and need not protect them against external influences.

In the record carrier shown in FIG. 4 the two halves of one program may be stored in the two optical structures.

The record carrier shown in FIG. 4 is eminently suitable to realize a further inventional idea. According to this idea information about the same colored pictures is stored in different color codes in two optical structures of one record carrier. In one of these optical structures the program may be recorded, for example, according to the PAL-standard and in the other optical structure according to the Secam-standard or the NTSC-standard. The advantage is that the same information on one record carrier may be used in a large geographic area in spite of the fact that different apparatuses are used for rendering pictures and sound visible and audible respectively.

What is claimed is:

1. A record carrier containing information which is readable by a beam of radiation, said record carrier comprising a disc-shaped, radiation-transmitting substrate having a pair of planar surfaces on opposite sides thereof, a non-transmissive, radiation reflecting optical structure on one of said planar surfaces of said substrate, said optical structure comprising a plurality of adjacent, circular tracks extending about the center of said sub-

strate and defining turns of a spiral or concentric circles spaced from each other in the radial direction, each circular track having a plurality of depressions in said one surface of said substrate, said depressions being spaced apart in the track direction by intermediate areas, and a reflective layer extending over said intermediate areas and said depressions so that upon illumination by a convergent beam of radiation which is projected on and enters through the other of said planar surfaces and which passes through said substrate and is focussed on said optical structure to a spot of a size of the order of the smallest detail of said optical structure, the radiation is modulated by said depressions and intermediate areas in accordance with the sequence thereof and the modulated radiation is reflected by said reflective layer towards and exists through said other planar surface, said substrate defining a substantially rigid support for said optical structure and having a thickness such that in the plane of said other surface, which forms the entrance and exit faces for the radiation, the diameter of the beam is sufficiently larger than the diameter of said spot so that dust particles, scratches and the like on said other surface, do not interfere with readout of information by the convergent beam focussed to said spot on said optical structure, and an additional layer secured to the side of said substrate remote from said other surface, said optical structure being disposed between said substrate and said additional layer so that it is protected from damage during handling.

2. The record carrier according to claim 1 wherein said depressions are pressed into said one surface of said substrate and said reflective layer is metallic and is deposited on said one surface.

3. The record carrier according to claim 1 or 2 wherein the thickness of said additional layer is substantially smaller than the thickness of said substrate.

4. The record carrier according to claim 2 wherein said reflective, metallic layer is deposited on said one surface from vapour.

5. The record carrier according to claim 4 wherein said additional layer is a layer of lacquer sprayed on said optical structure.

6. An apparatus for reading information stored on a record carrier having a disk-shaped radiation transmitting substrate with a pair of parallel, planar surfaces on opposite sides thereof and a non-transmissive, radiation reflecting optical structure disposed on one of said planar surfaces, said optical structure comprising a plurality of adjacent, circular tracks extending about the center of the substrate and defining turns of a spiral or concentric circles spaced from each other in the radial direction, each circular track having a plurality of depressions spaced apart by intermediate areas in the track direction, said apparatus comprising means for supporting the record carrier for rotation about the center of the substrate in a plane parallel to the plane of said one surface, means positioned on the side of said substrate remote from said optical structure for producing a beam of radiation which is projected onto the other surface of said substrate so that the radiation passes through said substrate and is incident on said reflective optical structure, an objective system for focusing said beam to a spot on said optical structure so that the radiation is modulated by said optical structure in accordance with information stored thereby and the modulated radiation is reflected by said optical structure back through said other surface and passes through said objective system, said substrate having a thickness such that in the plane

5,068,846

7

of said other surface the diameter of the beam is sufficiently larger than the diameter of said spot so that dust particles, scratches and the like on said other surface do not interfere with readout of information by the beam focussed to said spot on said optical structure, radiation-sensitive means for converting the modulated radiation into an electrical signal, said radiation sensitive means being disposed in the path of the modulated radiation reflected by the optical structure, and means for deriving from the radiation a signal indicative of a deviation of the plane of the optical structure from the plane at which the radiation is focused by said objective system for correcting the focusing.

7. A record carrier containing information which is readable by a beam of radiation, said record carrier comprising a pair of disc-shaped, radiation-transmitting substrates each having a pair of planar surfaces on opposite sides thereof, a non-transmissive, radiation reflecting optical structure on one of said planar surfaces of each substrate, said optical structures each comprising a plurality of adjacent, circular tracks extending about the center of said substrate and defining turns of spiral or concentric circles spaced from each other in the radial direction, each circular track having a plurality of depressions which are spaced apart in the track direc-

8

tion by intermediate areas, said substrates being disposed in a superposed relationship with said optical structures being adjacent each other so that upon illumination of said one optical structure by a beam of radiation which is projected on and enters through the other of said planar surfaces of the associated substrate and which passes through said associated substrate and is focussed on said one optical structure to a spot of a size of the order of the smallest detail of the optical structure, the radiation is modulated by said depressions and intermediate areas in accordance with the sequence thereof and the modulated radiation is reflected by said other planar surface of said associated substrate, each substrate defining a substantially rigid support for the respective optical structure and having a thickness such that in the plane of said other surface, which forms the entrance and exit faces for the radiation, the diameter of the beam is sufficiently larger than the diameter of said spot so that dust particles, scratches and the like on said other surface, do not interfere with readout of information by the convergent beam focussed to said spot on said optical structure.

*  *  *  *  *

# EXHIBIT B

# COMPREHENSIVE-CD DISC
# LICENSE AGREEMENT

AGREEMENT, having an effective date of January 1, 1998 by and between U.S. Philips Corporation having its principal office at 580 White Plains Road, Tarrytown, New York 10591 (hereinafter referred to as "USPC") and Universal Music and Video Distribution, Inc., having its principal office at 10 Universal City Plaza, Suite 400, Universal City, California 91608,(hereinafter referred to as "Licensee").

WHEREAS, the Philips' Group of Companies (hereinafter referred to as "Philips") has for many years been engaged in research and development of systems, in which signals encoded in digital form and stored on a disc are read and reproduced by means of devices using an optical read out beam, and has obtained valuable know-how and experience thereby;

WHEREAS, one of the achievements of such research and development efforts was a new and revolutionary high-fidelity sound storage and reproduction system, which was further developed and defined in a cooperation with Sony Corporation of Japan and has been jointly presented under the name "Compact Disc Digital Audio System" (CD-A);

WHEREAS, on the basis of this "Compact Disc Digital Audio System" three further systems have been defined in a cooperation with Sony Corporation of Japan and have been

1

jointly presented under the names "Compact Disc Data System" (CD-ROM);"CDV System" (CDV) and "Compact Disc Interactive System" (CD-I);

WHEREAS, a multi-session CD system has been defined by Philips and Sony and jointly presented under the name "Enhanced Music Compact Disc System", which system is capable of storing sound and data respectively in two sessions on an optical disc;

WHEREAS, Licensee desires the right to manufacture and sell discs utilizing any or all of the above CD-A, CD-ROM, CDV, CD-I and Enhanced Music CD Systems (jointly hereinafter referred to as "CD Systems"), and wishes such discs to be interchangeable with the discs manufactured and sold by the Philips' Group of Companies and others utilizing such CD-Systems;

WHEREAS, USPC owns and/or controls the right to license patent rights pertinent to the CD-Systems and owns additional patent rights pertinent to optical disc manufacturing in general;

WHEREAS, USPC has been authorized by Sony to license patents owned by Sony and indicated on the Exhibits hereto under the terms and conditions specified herein, while Sony retains the right to also license such patents;

WHEREAS, Licensee understands that USPC is willing to license any one or more patents owned by it for optical disc manufacturing, whether within or outside of the Standard

Specifications defining the CD Systems on reasonable terms and conditions; and

WHEREAS, in furtherance of Licensee's efforts to manufacture and sell discs which are interchangeable within the respective CD-Systems, Licensee has requested USPC for a license under patent rights pertinent to the CD-Systems, which USPC has the free right to license, and, in addition, has requested USPC to disclose and make available certain basic information on the CD-Systems;

NOW, THEREFORE, in mutual consideration of the premises and the faithful performance of the mutual covenants hereinafter set forth, the parties hereto have agreed as follows:

<u>Article I - DEFINITIONS</u>

As used in this Agreement the following terms shall have the following meanings, unless the context clearly requires otherwise:

1.01  <u>Disc</u> - any non-recordable, reflective, disc-shaped information carrier comprising any kind of information such as, but not limited to, audio/video/text/data related information, which information is irreversibly stored in a layer during and as an integral part of the manufacturing process of the disc, in a form which is optically readable by playback devices.

1.02  <u>CD-Audio Disc</u> - any Disc comprising audio information

encoded in digital form, which is optically readable by a
CD-Audio-Player (as hereinafter defined) and conforms
to the CD-Audio Standard Specifications (as hereinafter
defined).

1.03 CD-ROM Disc - any Disc comprising information encoded
in digital form, which is optically readable by a CD ROM
Player (as hereinafter defined) and conforms to either the
CD-ROM Standard Specifications (as hereinafter defined) or
the CD-ROM(XA) Standard Specifications (as hereinafter
defined).

1.04 CD-I Disc - any Disc comprising any kind of information
such as, but not limited to audio, video, text and data
related information, encoded in digital form, which is
optically readable by a CD-I Player (as hereinafter
defined) and conforms to the CD-I Standard Specifications
(as hereinafter defined).

1.05 CDV-Disc - any Disc comprising television picture
information consisting of analog video information with
digital audio information, and with or without additional
information to be used for control, retrieval, educational
and/or instructional purposes in relation to the visual
display of said television picture information, which is
optically readable by a CDV Player (as hereinafter
defined) and conforms to the CDV-Standard Specifications
(as hereinafter defined).

1.06 <u>Enhanced Music CD Disc</u> - any disc comprising any kind of information such as, but not limited to, audio, video, text and data related information encoded in digital form and which conforms to the Enhanced Music CD-Standard Specifications (as hereinafter defined).

1.07 <u>CD-Audio Standard Specifications</u> - the specifications for the CD-Audio-Disc/Player parameters as made available, modified or added to from time to time in accordance with the provisions of Article III hereof.

1.08 <u>CD-ROM Standard Specifications</u> - the specifications for the CD-ROM Disc/Player parameters as made available, modified or added to from time to time in accordance with the provisions of Article III hereof.

1.09 <u>CD-ROM(XA) Standard Specifications</u> - the specifications for the CD-ROM(XA)Disc/Player parameters as made available, modified or added to from time to time in accordance with the provisions of Article III hereof.

1.10 <u>CI-i Standard Specifications</u> - the specifications for the CI-i Disc/Player parameters (as hereinafter defined) as made available, modified or added to from time to time in accordance with the provision of Article III hereof.

1.11 <u>CDV-Standard Specifications</u> - the NTSC and/or PAL specifications for the CDV-Disc/Player parameters as made available, modified or added to from time to time in accordance with the provisions of Article III hereof.

1.12 <u>Enhanced Music CD-Standard Specifications</u> - the
specifications for the Enhanced Music CD-Disc/Player
parameters as made available, modified or added to from
time to time in accordance with the provisions of Article
III hereof.

1.13 <u>Player</u> - any playback device for optically reading
information stored on a Disc and converting such
information into electrical signals for reproduction
purposes.

1.14 <u>CD-Audio Player</u> - a Player which is designed and
manufactured solely for the reproduction of information
stored on a CD-Audio Disc and conversion of such
information, which is bit-encoded according to the CD
Audio Standard Specifications, into electrical signals by
means prescribed in the CD-Audio Standard Specifications,
which electrical signals are directly capable and intended
to be used for sound reproduction through amplifiers and
loudspeakers.

1.15 <u>CD-ROM Player</u> - a Player which is designed and
manufactured solely for the reproduction of information
stored on a CD-ROM Disc and conversion of such
information, which is bit-encoded according to the CD-ROM-
Standard Specifications, into electrical signals by means
prescribed in the CD-ROM Standard Specifications, which
electrical signals are directly capable and intended to be

NYBK AX 9BXAUBKR

used for reproduction of computer-related-data through data handling and/or data processing apparatus.

1.16 <u>CD-I Player</u> - a Player which is designed and manufactured solely for the reproduction of any kind of information stored on a CD-I Disc and as defined in the CD-I Standard Specifications, and conversion of such information, which is bit-encoded according to said CD-I Standard Specifications, into electrical signals by means as prescribed in the CD-I Standard Specifications, which electrical signals are directly capable and intended to be used for reproduction of such information.

1.17 <u>CDV-Player</u> - a Player which is designed and manufactured solely for the reproduction of information stored on a CDV-Disc and conversion of such information, which is encoded according to the CDV-Standard Specifications, into electrical signals by means as prescribed in the CDV-Standard Specifications, which electrical signals are directly capable and intended to be used for visual reproduction through standard television receivers and/or standard television monitors.

1.18 <u>Enhanced Music CD-Player</u> - a Player which is designed and manufactured solely for the reproduction of information stored on an Enhanced Music CD Disc and conversion of such information, which is bit-encoded according to the Enhanced Music CD Standard Specifications, into electrical

signals by means as prescribed in the Enhanced Music CD
Standard Specifications, which electrical signals are
directly capable and intended to be used for the
reproduction of audio, video, text and data related
information through data handling and/or data processing
apparatus.

1.19 <u>Combi Player</u> - a Player which is any combination of a
CD-Audio Player, a CD-ROM Player, a CD-I Player, a CDV-
Player and an Enhanced Music CD Player.

1.20 <u>Licensed Product</u> - any CD-Audio Disc, CD-ROM Disc, CD-I
Disc, CDV-Disc or Enhanced Music CD Disc.

1.21 <u>Licensed Patents</u> - shall mean the patent rights listed in
accordance with one of the following license options to be
selected by the Licensee:

(circle type of Licensed Product and Exhibit list of
patents on each option chosen, whether A or B, for each
type of Disc)

I. Option A: Licensee, at its option, chooses from one or
more of the U.S. Patents listed on Exhibit I (CD-Audio
Disc), Exhibit III (CD-ROM Disc), Exhibit V (CD-I Disc),
Exhibit VII (CDV Disc), and/or Exhibit IX (Enhanced Music
CD), and defined herein as Licensed Patents;

OR

II. Option B: Licensee chooses, at its option, all of the
U.S. Patents listed on Exhibit II (CD-Audio Disc), Exhibit

N BK AXIMBKAUBKR

IV (CD-ROM Disc), Exhibit VI (CD-I Disc), Exhibit VIII (CDV Disc), and/or Exhibit X (Enhanced Music CD Disc), and defined herein as Licensed Patents.

By _____     Date _____

1.22 <u>Associated Company</u> - any corporation or other legal entity, in which a party hereto, Philips Electronics North America Corporation, Philips Electronics. N.V. (PENV) of the Netherlands or Sony Corporation of Japan, now or hereafter controls, directly or indirectly, more than fifty percent (50%) of the shares entitled to vote for the election of directors or persons performing similar functions, but any such company or other legal entity shall be deemed an Associated Company only for as long as such control exists.

1.23 <u>Territory</u> - United States of America, its territories and possessions.

## Article II - LICENSES

Subject to the terms and conditions of this Agreement:

2.01 USPC hereby grants to Licensee and its Associated Companies a non-exclusive, non-transferable license under Licensed Patents to make, use and sell or otherwise dispose of Licensed Products in the Territory, but not to have Licensed Products made for the Licensee by third parties except as provided in Article IV.

2.02 USPC and Sony further agree for a period of ten (10) years

NYRK AX15BKALBKR

from the effective date of this Agreement, to grant
Licensee and its Associated Companies a non-exclusive,
non-transferable license on reasonable, non-discriminatory
terms comparable to those set forth herein, to make, use,
sell or otherwise dispose of Licensed Products in the
Territory, under any patent rights not yet licensed
hereunder which are essential to the manufacturing, use or
sale of Licensed Products, as to which, and to the extent
to which, USPC or Sony, have, or may hereafter acquire,
the free right to grant licenses to Licensee and its
Associated Companies and which patent rights were first
filed in any country of the world after December 31, 1982.
It is expressly understood that in respect of the patent
rights to be licensed pursuant to this paragraph 2.02 of
Article II, paragraph 5.02 of Article V will not be
applicable and that royalties payable may have to be paid
over and above the royalties due on the basis of the use
of Licensed Patents pursuant to paragraph 2.01 of this
Article II

2.03 Finally, USPC and Sony agree for a period of ten (10)
years from the date of this Agreement to grant Licensee
and its Associated Companies upon their request and on
reasonable, non-discriminating royalty rates and
conditions to be agreed upon from case to case, a non-
exclusive, non-transferable license to make, use, sell or

otherwise dispose of CD-Audio Players, CD-ROM Players, CD I Players, CDV-Players and Combi-Players in the Territory, under any or all present and future patent rights essential to the manufacture, use or sale of such Players, as to which, and to the extent to which, USPC or Sony may now have, or may hereafter acquire, the free right to grant licenses to Licensee and its Associated Companies for the manufacture, use and sale of such Players. It is expressly understood that paragraphs 5.01 and 5.02 of Article V shall not in any way be applicable to licenses pursuant to this paragraph 2.03 of Article II

2.04 In consideration of the undertakings set forth in paragraphs 2.01, 2.02 and 2.03 and similar undertakings by third party licensees of USPC or PENV, for a period of ten (10) years from the effective date of this Agreement, Licensee, agrees to grant to USPC, Philips Electronics North America Corporation, PENV, Sony Corporation of Japan and their respective Associated Companies, and no other third parties who have similarly entered, or will enter, into a license agreement with USPC, PENV or an Associated Company thereof concerning Licensed Products and who have elected to accept or will accept a similar undertaking as contained in this paragraph 2.04, on reasonable, non-discriminating conditions comparable to those set forth herein, non-exclusive, non transferable licenses to

manufacture, use, sell or otherwise dispose of Licensed
Products under any or all present and future patent rights
which are essential to the manufacturing, use or sale of
Licensed Product, as to which, and to the extent to which,
Licensee or its Associated Companies may now have or may
hereafter acquire the right to grant licenses.

2.05 In consideration of the undertakings set forth in
paragraphs 2.01, 2.02 and 2.03 and similar undertakings by
third party licensees of USPC or PENV, for a period of ten
(10) years from the effective date of this Agreement,
Licensee agrees to grant to USPC, Philips Electronics
North America Corporation, PENV, Sony Corporation of Japan
and their respective Associated Companies, and to other
third parties who have entered or will enter into a
license agreement with USPC, PENV or an Associated Company
thereof concerning Players and who have accepted or will
accept a similar undertaking as contained in this
paragraph 2.05, on reasonable, non-discriminating
conditions to be agreed upon from case to case, non
exclusive, non-transferable licenses to manufacture, use,
sell or otherwise dispose of CD-Audio, CD-ROM, CD-I, CDV,
Enhanced Music CD and/or Combi-Players under any or all
present and future patent rights which are essential to
the manufacture, use or sale of such Player, as to which,
and to the extent to which, Licensee or its Associated

Companies may now have or may hereafter acquire the right to grant licenses.

2.06 To the extent a dispute exists between USPC, Licensee and/or Sony regarding whether any patent is "essential" or whether any license offered by Licensee, USPC, or Sony pursuant to this Article II is under "reasonable... conditions" as those words are used in this Article II then USPC, Sony and/or Licensee shall submit such dispute to binding arbitration under the 1992 Patent Arbitration Rules of the American Arbitration Association ("AAA"). Such arbitration shall be held before a panel of three arbitrators and shall take place in New York, New York. Licensee, USPC and/or Sony each shall choose one arbitrator who shall be unaffiliated with the parties and who shall have been a member of the bar of the United States Court of Appeals for the Federal Circuit for at least the preceding five years. The two arbitrators chosen by USPC, Licensee and/or Sony shall then choose a third arbitrator who shall also have been a member of the bar of the Federal Circuit for at least the preceding five years and who shall serve as chairperson of the panel. If the arbitrators chosen by USPC, Licensee and/or Sony are unable to agree on a chairperson of the panel within sixty days of their designation by USPC, Licensee and/or Sony then such third arbitrator shall be chosen in accord with

version of the respective Standard Specifications,
together with such information as is in USPC's reasonable
opinion is required for the interpretation of such then
current Standard Specifications.

3.02 If USPC in its reasonable opinion determines
that an addition or modification to any of the Standard
Specifications should be made, Licensee shall be so
notified in writing and be furnished with information to
assist Licensee in the interpretation of such addition
and/or modification.

3.03 Insofar as USPC has a free and legal right to do so, USPC
further agrees to make available to Licensee upon
Licensee's request and for use by Licensee and its
Associated Companies in accordance with the terms of this
Agreement, such other information, data and material as
are, in USPC's reasonable opinion, strictly required to
manufacture Licensed Products, which are interchangeable
with Licensed Products made and/or sold by Philips.

Article IV - HAVE MADE

The licenses and rights granted to Licensee and its
Associated Companies pursuant to Article II and the right to
use the information pursuant to Article III, include the right
for Licensee and its Associated Companies to have third parties
manufacture for Licensee's or its Associated Companies' use and
account with due regard to what has been provided hereinbefore.

such Licensed Products as Licensee and/or its Associated Companies require in and for their sale of Licensed Products, provided that such third parties agree to use the information obtained by Licensee pursuant to Article III only for the manufacture of Licensed Products ordered by Licensee and its Associated Companies and also agree to observe the secrecy obligations accepted by Licensee hereunder. As and when the information supplied by USPC to Licensee pursuant to Article III is supplied by Licensee or an Associated Company of Licensee to a third party supplier to have such third party supplier manufacture Licensed Products for Licensee and/or its Associated Companies, Licensee will notify USPC of the name of such third party supplier and of the fact that such third party supplier has agreed in writing to the restrictions on the use of the USPC supplied information to be observed by it.

### Article V - ROYALTIES, REPORTS AND PAYMENTS

5.01 Upon execution of this Agreement, Licensee will make a non-refundable payment of twenty five thousand ($25,000) US dollars to USPC. Said payment of twenty five thousand dollars shall not be credited against royalties payable hereunder pursuant to paragraph 5.02 of this Article V.

5.02 (A) In the case where Licensee has chosen Option A to define Licensed Patents - In consideration of the patent licenses granted hereunder by USPC to Licensee, Licensee agrees to pay to USPC royalties as follows:

16

(a) seven point five U.S. cents ($0.075) for each CDV Disc with an outer diameter greater than 130mm;

(b) two U.S. cents ($0.02) for each CD Audio Disc with an outer diameter smaller than 90mm; and

(c) four point five US cents ($0.045) for:

-each CD-ROM Disc;

-each CD-I Disc;

-each Enhanced Music CD Disc;

-each CDV Disc with an outer diameter equal to, or smaller than, 130mm; and

-each CD-Audio Disc with an outer diameter equal to, or greater than, 90mm;

which is made, used, sold or otherwise disposed of by Licensee or an Associated Company of Licensee, and in which a Licensed Patent is utilized.

5.02(B)  _In the case where Licensee has chosen Option B to define Licensed Patents_ - In consideration of the patent licenses granted hereunder by USPC to Licensee, Licensee agrees to pay to USPC royalties as follows:

(a) eight U.S. cents ($0.08) for each CDV Disc with an outer diameter greater than 130mm;

(b) two point two U.S. cents ($0.022) for each CD-Audio Disc with an outer diameter smaller than 90mm; and

(c) four point eight US cents ($0.048) for:

-each CD-ROM Disc;

-each CD-I Disc;

-each Enhanced Music CD Disc;

-each CDV Disc with an outer diameter equal to, or

smaller than, 130mm; and

-each CD-Audio Disc with an outer diameter equal to,

or greater than, 90mm.

which is made, used, sold or otherwise disposed of by Licensee or an Associated Company of Licensee, and in which a Licensed Patent is utilized.

5.03 A Licensed Product shall be considered sold when invoiced, or if not invoiced, when delivered to a party other than the manufacturer

5.04 Within thirty (30) days after the 31st March, the 30th June, the 30th September and the 31st December of each year during the period this Agreement shall be in force and effect, Licensee shall submit to USPC, even if there are no sales, a statement in writing, duly certified by an officer of the Licensee, setting forth with respect to the preceding quarterly period:

(I)   The quantities of Licensed Products sold by Licensee and its Associated Companies, specifying the quantities for each of the following individual type of Licensed Products:

(a)   CD Audio Discs with an outer diameter smaller than 90 mm;

     (b)   CD-Audio Discs with an outer diameter equal to, or greater than 90 mm;

     (c)   CDV Discs with an outer diameter equal to, or greater than 130 mm;

     (d)   CDV Discs with an outer diameter smaller than 130 mm;

     (e)   CD-ROM Discs;

     (f)   CDI1 Discs;

     (g)   Enhanced Music CD Discs;

and

     (ii)   the royalty payable to USPC as calculated under the terms of this Agreement.

Licensee shall pay to USPC the royalty due hereunder in U.S. dollars concurrently with submission of the above mentioned statement.

5.05 Royalties shall be due and payable on all Licensed Products manufactured prior to, but remaining in stock with Licensee and its Associated Companies at the date of expiration or termination of this Agreement. Certified reports on the number of Licensed Products in stock at the time of expiration or termination of this Agreement shall be submitted to USPC within thirty (30) days after such expiration or termination. For the purpose of royalty computation it shall be assumed that all Licensed Products in stock will be sold, leased or otherwise disposed of in

the same countries and in proportionally the same
quantities as in the last full six (6) months period
reported on during the term of this Agreement. Payment of
royalties due shall be effected concurrently with the
submission of said certified report.

5.06 All payments which are not made on the dates specified
herein, shall accrue interest at the rate of two percent
(2%) per month or the maximum permitted by applicable law,
whichever is less.

5.07 All costs, such as stamp duties, taxes and other similar
levies originating from or in connection with the
conclusion of this Agreement shall be borne by Licensee.
However, in the event that the government of a country
imposes any income taxes on payments hereunder by Licensee
to USPC and requires Licensee to withhold such tax from
such payments, Licensee may deduct such tax from such
payments. In such event, Licensee shall promptly furnish
USPC with tax receipts issued by appropriate tax
authorities so as to enable USPC to support a claim for
credit against income taxes which may be payable by USPC
and/or its Associated Companies in the Netherlands.

5.08 In order that the royalties and reports provided for in
this Article V may be verified, Licensee agrees to ensure
that full, complete and accurate books and records shall
be kept covering all sales or other disposals of Licensed

Products by Licensee and/or its Associated Companies, for a period of three (3) years following such sales or other dispositions. It is agreed that the books and records of Licensee and/or its Associated Companies may be audited from time to time, but not more than once in each calendar year, by an independent certified public accountant appointed by USPC and reasonably acceptable to Licensee, to the extent necessary to verify the accuracy of the aforementioned statements and payments. Such inspection shall be completed at USPC's own expense provided that if any discrepancy or error exceeding three percent (3%) of the money actually due is found in connection with the computation, the cost of such inspection shall be borne by Licensee.

5.09 Notwithstanding the provisions of paragraph 5.08 of this Article V, Licensee shall furnish whatever additional information as USPC may reasonably request from time to time to enable USPC to ascertain which products sold, leased or put into use by Licensee and/or its Associated Companies are subject to the payment of royalties to USPC hereunder, the patent rights which have been utilized in connection with such products, and the amount of royalties payable.

5.10 Licensee shall pay as remuneration for past use of Licensed Patents an amount equal to $3,771,755.

21

This amount is in addition to and is not a substitute for any other payment due, in whole or in part, under this Agreement. Payment of this amount shall accompany submission of the Agreement for execution by USPC.

### Article VI - MOST FAVORABLE CONDITIONS

If under otherwise substantially the same conditions as contained in this Agreement, licenses under the patent rights referred to and licensed pursuant to Article II should be granted for Licensed Products to any third party at a royalty rate more favorable than the rate payable by Licensee under this Agreement, Licensee shall be entitled to have the royalty rate applicable to it modified to such extent that the same shall be as favorable as that available to such third party, provided always that such obligation shall not apply in respect of cross-license agreements and other agreements, in which the consideration for such licenses shall not be wholly expressed in payment of royalties and shall also not apply to licenses or other arrangements made pursuant to a court decision or a settlement of a dispute between USPC and a Licensee or between USPC and a third party.  Without limiting the foregoing, this Article VI shall not apply to terms entered into in settlement of a filed court action regardless of the nature of such action or settlement terms.

## Article VII - DISCLAIMER

USPC warrants that it shall furnish the information to be supplied by it to the best of its ability, but it makes no representation or warranty as to the value of the information transmitted or the ability of Licensee to make use thereof to secure interchangeability. USPC makes no warranty whatsoever that the use of information supplied by USPC does not infringe or may not cause infringement of patent rights owned or controlled by third parties, or of patent rights owned or controlled by USPC or an Associated Company of USPC not licensed pursuant to Article II.

In further certainty the parties of this Agreement recognize that third parties own patent rights in the field of Licensed Products and Licensee accepts that USPC makes no warranty whatsoever that any manufacture, use, sale, lease or other disposition of Licensed Product will be free from infringement of any patent other than Licensed Patents.

## Article VIII - SECRECY

Licensee agrees that, subject to what has been provided for in Article IV of this Agreement, Licensee and its Associated Companies shall not disclose to any third party information relative to the manufacture and sale of Licensed Products acquired from USPC or USPC's Associated Companies. This obligation, which shall run for the period of this Agreement and for a period of three (3) years thereafter, shall

not apply to the extent information so acquired:

(a)    was known to Licensee or its Associated Companies prior to
       the date said information was acquired from USPC or its
       Associated Companies, as shown by records of Licensee or
       any  Company of Licensee or otherwise demonstrated to
       Philips' satisfaction;

(b)    is or has become available to the public in general
       through no fault of Licensee or its  Associated Companies;

(c)    was or is received from a third party who was free and had
       a legal right to disclose the same.

       In protecting information acquired from USPC or their
Associated Companies pertaining to Licensed Products, Licensee
has agreed that Licensee and its  Associated Companies will
take all necessary measures and precautions, including, but not
limited to, measures requiring their present and future
employees to give suitable undertakings of secrecy both for the
period of their employment and thereafter, and that in general
such information will be treated in the same manner and with
the same degree of care as Licensee applies and has applied to
its own information of a sensitive or confidential nature.

## Article IX - PATENT MARKINGS AND LOGO

9.01 If requested by USPC, Licensee shall place appropriate
     patent markings on an exposed surface of the Licensed
     Products made, used, sold and/or otherwise disposed of
     hereunder. The content, form, location and language used

24

in such markings shall be in accordance with the laws and practices of the country, where such markings are used.

9.02 In addition, Licensed Products may be provided with respective logos in accordance with the instructions laid down in the CD Logo Guide which is available from USPC on request (hereinafter referred to as "the Logo"). In advertisements and sales literature with respect to Licensed Products sold by Licensee and/or its Associated Companies the Logo may similarly be used and applied.

9.03 USPC grants Licensee and its Associated Companies a royalty free, non-exclusive, non-transferable, indivisible right to use the Logo on and with respect to Licensed Products manufactured by or for Licensee and/or its Associated Companies in accordance with the instructions laid down in Exhibit AA.

9.04 Licensee understands and agrees that USPC makes no warranty whatsoever that any use of the Logo will be free from infringement of intellectual property rights owned by third parties.

## Article X  ASSIGNMENT

This Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective assigns. It may not be assigned in whole or in part by Licensee without the prior consent in writing of USPC except to the surviving corporation of a merger, consolidation or other

transfer of all or substantially all the assets of Licensee and except that Licensee may assign this Agreement to one of its Associated Companies provided that Licensee remains liable hereunder and the transferee has the capability to perform all obligations to be performed hereunder.

### Article XI - TERM AND TERMINATION

11.01  This Agreement shall be effective from the date first written above, if and unless otherwise terminated shall remain in force for a period of ten (10) years from the effective date of this Agreement.  Notwithstanding the foregoing, this Agreement shall expire on the expiration date of the last to expire of the Licensed Patents licensed and referred to in Article II.

11.02  Either party may terminate this Agreement at any time on thirty (30) days notice to the other party in the event that the latter shall fail to perform any obligation under this Agreement and such default is not remedied within thirty (30) days after receipt of a notice specifying the nature of the default. Such right of termination shall not be exclusive of any other remedies or means of redress to which the non-defaulting party may be lawfully entitled, it being intended that all such remedies shall be cumulative. Any such termination shall not affect any payments, the rights to which may have fallen due under

this Agreement prior to such termination.  Notwithstanding anything to the contrary herein, USPC shall have the right, at its sole option and discretion, to terminate this Agreement without advance notice (but with written notice) in the event that Licensee shall fail to abide by the obligations as set forth in Article V hereof for three (3) consecutive quarters.

11.03 The obligations set forth in paragraphs 2.02, 2.03, 2.04, 2.05, 5.05, 12.05 and Article VIII shall survive termination of this Agreement.  Notwithstanding the foregoing, in the event termination is due to the breach of the Agreement by Licensee, paragraphs 2.02 and 2.03 shall not survive termination.

11.04 If Licensee should be dissolved or file a voluntary petition in bankruptcy or seek any court or governmental protection from creditors or make any assignment for creditors, or should an order be entered pursuant to any law relating to bankruptcy or insolvency appointing a receiver or trustee for Licensee, and if any such receivership is not terminated within sixty (60) days, then, in any of the events specified in this paragraph 11.04, USPC may give written notice to Licensee terminating this Agreement and this Agreement shall be terminated in accordance with the notice.

## Article XII - MISCELLANEOUS

12.01 This Agreement sets forth the entire agreement and understanding between the parties as to the subject matter hereof, releases Licensee from liability for past use subject to payment for same as provided under paragraph 5.10 of Article V and merges all prior discussions between the parties. Neither of the parties shall be bound by any conditions, definitions, warranties, waivers, releases or representations (either expressed or implied) with respect to the subject matter of this Agreement, other than expressly provided for herein, or as duly set forth on or subsequent to the date hereof in writing signed by a duly authorized representative of the party to be bound thereby.

12.02 Nothing contained in this Agreement shall be construed:

(a)   as imposing on either party any obligation to institute any suit or action for infringement of any of the patent rights licensed hereunder or to defend any suit or action brought by a third party which challenges or concerns the validity of any of such patent rights, it being expressly understood that Licensee shall have no right to institute any such suit or action for infringement of any of the patent rights licensed by USPC hereunder, nor the right to defend any such suit or action which challenges or

concerns the validity of any such USPC patent right;

(b)   as imposing any obligation to file any patent application or to secure any patent or to maintain any patent in force;

(c)   as conferring any license or right to copy or to simulate the appearance and/or design of any product of USPC or its  Associated Companies;

(d)   as conferring any license under the patent rights licensed pursuant to Article II hereof to manufacture, use, sell, lease or otherwise dispose of any product or device other than a Licensed Product.

12.03 If at any time a party shall elect not to assert its rights under any provision of this Agreement, such action or lack of action in that respect shall not be construed as a waiver of its rights under said provision or of any other provision of this Agreement.

12.04 Any notice or request required or permitted to be given under or in connection with this Agreement or the subject matter hereof shall be in writing and shall be deemed to have been sufficiently given when, if given to Licensee, it is addressed to:

Universal Music and Video Distribution, Inc.
10 Universal City Plaza
Suite 400
Universal City, California 91608

and in respect of USPC, to:

Intellectual Property Department
U.S. Philips Corporation
580 White Plains Road,
Tarrytown, New York 10591

and sent in each case by telecopy and Registered Mail, postage prepaid. The date of mailing shall be deemed to be the date on which such notice of request has been given. Either party may give written notice of change of address and, after notice of such change has been received, any notice or request required to be given shall thereafter be given to such party at such changed address in the manner as provided above.

12.05 This Agreement and all disputes, claims or controversies arising out of, or in any way relating to, this Agreement ("Dispute") shall be governed by and construed, and any claim or controversy arising with respect thereto shall be determined, in accordance with the laws and in the competent courts of the State of New York. The parties hereto consent to the personal jurisdiction of the competent courts of the State of New York for the purpose of prosecuting or resolving any such Dispute.

IN WITNESS WHEREOF, the parties hereof have caused this
Agreement to be signed on the date first above written.


U.S. PHILIPS CORPORATION          UNIVERSAL MUSIC AND VIDEO
                                  DISTRIBUTION, INC.


By _____       By _____
   Algy Tamoshunas                   Larry Kenswil


Title _Vice President_____       Title Executive Vice President
                                         Business and Legal Affairs


Date_____       Date __July 1, 1998_____

31

March 24, 1998

Exhibit 1
Option A - CD-Audio Disc
Page 1

Survey of Licensor's Patent Rights

| Licensor's Ref. No. PH | Priority Application/ Priority date | US Patent (PS) or Appln. No./ Expiration date | JP Ut. Model (UM) Prov. Publ. (U) Patent (PS) Publication (PUB) Prov. Publ. (PPU) or Appln. No./ Expiration date | Title |
|---|---|---|---|---|
| N 6493 | NL 7211999/ 09.02.1972 | PS 5,068,846/ 26.11.2008 | PS 905844/ 25.08.1992 | Optical disc with disc body acting as protection |
| N 8979 | NL 7713710/ 12.12.1977 | PS 4,188,433/ 20.07.1998 | | Optical disc with coating comprising U-V lacquer |
| N 9225 | NL 7809227/ 09.11.1978 | PS 4,230,915/ 26.12.1998 | PS 1630678/ 08.09.1999 | Depth of smooth pits in optical disc |
| P 12222 | P 53-47247/ 21.04.1978 | PS 4,355,392 Re 31,666/ 19.10.1999 | PUB 63-29451/ 21.04.1998 | Burst error correcting system |
| P 15688 | J 56-51678/ 04.10.1981 | PS 5,305,301/ 19.04.2011 | PPU 57-169938/ 04.10.2001 | Optical recording medium |
| Q 80007 P 16056 | NL 8004028/ 14.07.1980 | PS 4,501,000/ 19.02.2002 | PPU 57-488486/ 14.07.2001 | Signal modulation system |
| Q 80009 P 14539 | JP 55-67608/ 21.05.1980 | PS 4,413,340/ 20.05.2001 | PS 1872451/ 21.05.2000 | CIRC |
| S-SP038 | S 55-22605/ 25.02.1980 | PS 4,398,292/ 23.02.2001 | JP1.670009/ 25.02.2000 | Method and apparatus for encoding digital with two error correcting codes |

March 24, 1998

Exhibit II
Option B - CD-Audio Disc
Page 1

Survey of Licensor's Patent Rights

| Licensor's Ref. No. PH | Priority Application/ Priority date | US Patent (PS) or Appln. No./ Expiration date | JP Ut. Model (UM) Prov. Publ. (U) Patent (PS) Publication (PUB) Prov. Publ. (PPU) or Appln. No./ Expiration date | Title |
|---|---|---|---|---|
| N 6493 | NL 7211999/ 09.02.1972 | PS 5,068,846/ 26.11.2008 | PS 9058.14/ 25.08.1992 | Optical disc with disc body acting as protection |
| N 8979 | NL 7713710/ 12.12.1977 | PS 4,188,433/ 20.07.1998 | | Optical disc with coating comprising U-V lacquer |
| N 9076 | NL 7803069/ 22.03.1978 | PS 4,450,553/ 22.05.2001 | PS 1363333/ 22.03.1999 | Multi-layer optical disc |
| N 9225 | NL 7809227/ 09.11.1978 | PS 4,230,915/ 26.12.1998 | PS 1630678/ 08.09.1999 | Depth of smooth pits in optical disc |
| N 9258 | NL 7810163/ 19.10.1978 | PS 4,930,116/ 27.05.2007 | PS 1550033/ 19.10.1999 | Optical disc with deep pits in shallow v-shaped groove |
| N 9398 | NL 7902363/ 27.03.1979 | PS 4,499,574/ 12.02.2002 | PS 1694091/ 25.03.2000 | Adaption of track distance to pit frequency |
| N 9567 | | PS 4,325,135/ 13.04.1999 | | Optical record carrier and apparatus for reading it |
| N 9587 | | PS 4,310,916/ 12.01.99 | | Optical record carrier and apparatus for reading it |
| N 9725 | NL 8002039/ 08.04.1980 | PS 4,389,719/ 08.09.2000 | | Optical disc with PVC substrate covered cured lacquer |

March 24, 1998

Exhibit II
Option B - CD-Audio Disc
Page 2

## Survey of Licensor's Patent Rights

| | | | | |
|---|---|---|---|---|
| N 9732 | NL 8002411/ 25.04.1980 | PS 4,556,967/ 03.12.2002 | PS 7882422/ 12.01.2002 | Two phase information structure without cross-talk |
| N 9933 | NL 8100098/ 12.01.1981 | PS 4,423,502/ 09.11.2001 | PUB 63-29451/ 21.04.1998 | Optical disc with tracks at different levels |
| P 12222 | P 53-47247/ 21.04.1978 | PS 4,355,392/ 19.10.1999 Re 31,666/ 19.10.1999 | | Burst error correcting system |
| P 14768 | P 55-99252/ 18.07.1980 | PS 4,358,780/ 10.07.2001 | PPU 57-24038/ 18.07.2000 | Information recording medium |
| P 15688 | J 56-54678/ 04.10.1981 | PS 5,305,301/ 19.04.2011 | PPU 57-169938/ 04.10.1981 | Optical recording medium |
| Q 80007 P 16056 | NL 8004028/ 14.07.1980 | PS 4,501,000/ 19.02.2002 | PPU 57-488486/ 14.07.2001 | Signal modulation system |
| Q 80009 P 14539 | JP 55-67608/ 21.05.1980 | PS 4,413,340/ 20.05.2001 | PS 1872451/ 21.05.2000 | CIRC |
| S 8P038 | S 55-226035/ 25.02.1980 | PS 4,398,292/ 23.02.2001 | JPL 670009/ 25.02.2001 | Method and apparatus for encoding digital with two error correcting codes |

Exhibit III
Option A - CD-ROM Disc
Page 1

March 24, 1998

## Survey of Licensor's Patent Rights

| Licensor's Ref. No. PH | Priority Application/ Priority date | US Patent (PS) or Appln. No./ Expiration date | JP Ut. Model (UM) Prov. Publ. (U) Patent (PS) Publication (PUB) Prov. Publ. (PPU) or Appln. No./ Expiration date | Title |
|---|---|---|---|---|
| N 6493 | NL 7211999/ 09.02.1972 | PS 5,068,846/ 26.11.2008 | PS 905844/ 25.08.1992 | Optical disc with disc body acting as protection |
| N 8979 | NL 7713710/ 12.12.1977 | PS 4,188,433/ 20.07.1998 | | Optical disc with coating comprising U-V lacquer |
| N 9225 | NL 7809227/ 09.11.1978 | PS 4,230,915/ 26.12.1998 | PS 1630678/ 08.09.1999 | Depth of smooth pits in optical disc |
| P 12222 | P 53-47247/ 21.04.1978 | PS 4,355,392 Re 31,666/ 19.10.1999 | PUB 63-29451/ 21.04.998 | Burst error correcting system |

Exhibit III
Option A - CD-ROM Disc
Page 2

March 24, 1998

Survey of Licensor's Patent Rights

| ID | Description | | | |
|----|-------------|--|--|--|
| P 15688 | Optical recording medium | PPU 57-169938/ 04.10.2001 | PS 5,305,301/ 19.04.2011 | J 56-54678/ 04.10.1981 |
| P 18816 | Data transmitting system | PPU 59-162605/ 04.03.2003 | PS 4,707,818/ 17.11.2004 | JP 58-35459/ 04.03.1983 |
| Q 80007 P 16056 | Signal modulation system | PPU 57-488486/ 14.07.2001 | PS 4,501,000/ 19.02.2002 | NL 8004028/ 14.07.1980 |
| Q 80009 P 14539 | CIRC | PS 1872451/ 21.05.2000 | PS 4,413,340/ 20.05.2001 | JP 55-67608/ 21.05.1980 |
| Q 83025 P 19764 | Framing of data blocks on CD-ROM | PPU 60-52961/ 01.09.2003 | PS 4,641,295/ 27.08.2004 | JP 83-161514/ 01.09.1983 |
| Q 84008 P 21500 | CD-ROM error correction system A | PPU 60-201575/ 24.03.2004 | PS 4,680,764/ 22.03.2005 Re 33.462/ 22.03.2005 | JP 84-57595/ 24.03.1984 |
| Q 84009 P 21501 | CD-ROM error correction system B | PPU 60-201576/ 24.03.2004 | PS 4,680,764/ 22.03.2005 Re 33.462/ 22.03.2005 | JP 84-57596/ 24.03.1984 |
| S-8P038 | Method and apparatus for encoding digital with two error correcting codes | JPI. 670009/ 25.02.2000 | PS 4,398,292/ 23.02.2001 | S 55-22605/ 25.02.1980 |

Exhibit IV
Option B - CD-ROM Disc
Page 1

March 24, 1998

Survey of Licensor's Patent Rights

| Licensor's Ref. No. PH | Priority Application/ Priority date | US Patent (PS) or Appln. No./ Expiration date | JP Ut. Model (UM) Prov. Publ. (U) Patent (PS) Publication (PUB) Prov. Publ. (PPU) or Appln. No./ Expiration date | Title |
|---|---|---|---|---|
| N 6493 | NL 7211999/ 09.02.1972 | PS 5,068,846/ 26.11.2008 | PS 905844/ 25.08.1992 | Optical disc with disc body acting as protection |
| N 8979 | NL 771370/ 12.12.1977 | PS 4,188,433/ 20.07.1998 | | Optical disc with coating comprising U-V lacquer |
| N 9076 | NL 7803069/ 22.03.1978 | PS 4,450,553/ 22.05.2001 | PS 1363333/ 22.03.1999 | Multi-layer optical disc |
| N 9225 | NL 7809227/ 09.11.1978 | PS 4,230,915/ 26.12.1998 | PS 1630678/ 08.09.1999 | Depth of smooth pits in optical disc |

Exhibit IV
Option B - CD-ROM Disc
Page 2

March 24, 1998

## Survey of Licensor's Patent Rights

| N 9258 | NL 781463/ 19.10.1978 | PS 4,930,116/ 27.05.2007 | PS 1550033/ 19.10.1999 | Optical disc with deep pits in shallow v-shaped groove |
|---|---|---|---|---|
| N 9398 | NL 7902363/ 27.03.1979 | PS 4,499,574/ 12.02.2002 | PS 1694091/ 25.03.2000 | Adaption of track distance to pit frequency |
| N 9567 | NL 7906576 | PS 4,325,135/ 13.04.1999 | | Optical record carrier and apparatus for reading it |
| N 9587 | | PS 4,310,916/ 12.01.1999 | | Optical record carrier and apparatus for reading it |
| N 9725 | NL 8002039/ 08.04.1980 | PS 4,389,719/ 08.09.2000 | | Optical disc with PVC substrate covered cured lacquer |
| N 9732 | NL 8002411/ 25.04.1980 | PS 4,556,967/ 03.12.2002 | | Two phase information structure without cross-talk |

Exhibit IV
Option B - CD-ROM Disc
Page 3

March 24, 1998

Survey of Licensor's Patent Rights

| | | | | |
|---|---|---|---|---|
| N 9933 | NL 8100098/ 12.01.1981 | PS 4,423,502/ 09.11.2001 | PS 7882422/ 12.01.2002 | Optical disc with tracks at different levels |
| P 12222 | P 53-47247/ 21.04.1978 | PS 4,355,392 Re 31,666/ 19.10.1999 | PUB 63-29451/ 21.04.1998 | Burst error correcting system |
| P 14768 | P 55-99252/ 18.07.1980 | PS 4,358,780/ 10.07.2001 | PPU 57-24038/ 18.07.2000 | Information recording medium |
| P 15688 | J 56-54678/ 04.10.1981 | PS 5,305,301/ 19.04.2011 | PPU 57-169938/ 04.10.2001 | Optical recording medium |
| P 18816 | JP 58-35459/ 04.03.1983 | PS 4,707,818/ 17.11.2004 | PPU 59-162605/ 04.03.2003 | Data transmitting system |
| Q 80007 P 16056 | NL 8004028/ 14.07.1980 | PS 4,501,000/ 19.02.2002 | PPU 57-488486/ 14.07.2001 | Signal modulation system |
| Q 80009 P 14539 | JP 55-67608/ 21.05.1980 | PS 4,413,340/ 20.05.2001 | PS 1872451/ 21.05.2000 | CIRC |

March 24, 1998

Exhibit IV
Option B - CD-ROM Disc
Page 4

## Survey of Licensor's Patent Rights

| Q 83025/ P 19764 | JP 83-161514/ 01.09.1983 | PS 4,641,295/ 27.08.2004 | PPU 60-52961/ 01.09.2003 | Framing of data blocks on CD-ROM |
|---|---|---|---|---|
| Q 84008/ P 21500 | JP 84-57595/ 24.03.1984 | PS 4,680,764/ 22.03.2005 Re 33.462/ 22.03.2005 | PPU 60-201575/ 24.03.2004 | CD-ROM error correction system A |
| Q 84009/ P 21501 | JP 84-57596/ 24.03.1984 | PS 4,680,764/ 22.03.2005 Re 33.462/ 22.03.2005 | PPU 60-201576/ 24.03.2004 | CD-ROM error correction system B |
| S 8P038 | S 55-22605/ 25.02.1980 | PS 4,398,292/ 23.02.2001 | JPL 670000/ 25.02.2001 | Method and apparatus for encoding digital with two error correcting codes |

March 24, 1998

Exhibit V
Option A - CD-I Disc
Page 1

Survey of Licensor's Patent Rights

| Licensor's Ref. No. PH | Priority Application/ Priority date | US Patent (PS) or Appln. No./ Expiration date | JP Ut. Model (UM) Prov. Publ. (U) Patent (PS) Publication (PUB) Prov. Publ. (PPU) or Appln. No./ Expiration date | Title |
|---|---|---|---|---|
| B 33255 | GB 8609078/ 14.04.1986 | 4,868,764/ 06.04.2007 | | Enhanced resolution of CD-ROM stored TV-pictures |
| B 33335 | GB 8726961/ 24.12.1986 | 4,858,026/ 21.12.2007 | PPU 63-168781/ 24.12.2007 | Pyramid encoder with decoder in prediction channel |
| N 6493 | NL 7211999/ 09.02.1972 | PS 5,068,846/ 26.11.2008 | PS 905844/ 25.08.1992 | Optical disc with disc body acting as protection |
| N 8979 | NL 7713710/ 12.12.1977 | PS 4,188,433/ 20.07.1998 | | Optical disc with coating comprising U-V lacquer |
| N 9225 | NL 7809227/ 09.11.1978 | PS 4,230,915/ 26.12.1998 | PS 1630678/ 08.09.1999 | Depth of smooth pits in optical disc |
| N 11734 | NL 8600980/ 18.04.1986 | 4,914,515/ 15.04.2007 | PPU 62-256269/ 17.04.2007 | Partial updating of stationary pictures on CD-I |
| N 11753 | NL 8601182/ 12.05.1986 | 4,794,465/ 10.10.2006 | PPU 62-269584/ 11.05.2007 | Data driven action tagging in CD-I |

Exhibit V
Option A - CD-I Disc
Page 2

March 24, 1998

## Survey of Licensor's Patent Rights

| | | | | |
|---|---|---|---|---|
| P 12222 | P 53-47247/ 21.04.1978 | PS 4,355,392 Re 31,666/ 19.10.1999 | PUB 63-29451/ 21.04.1998 | Burst error correcting system |
| P 15688 | J 56-54678/ 04.10.1981 | PS 5,305,301/ 19.04.2011 | PPU 57-169938/ 04.10.2001 | Optical recording medium |
| P 19262 | JP 58-97687/ 01.06.1983 | A 700817/ | PS 1,864,908/ 01.06.2003 | Digital signal transmitting method |
| P 19263 | JP 58-97688/ 01.06.1983 | A 700817/ | PS 1,864,909/ 01.06.2003 | Digital signal transmitting method |
| P 19264 | JP 58-97689/ 01.06.1983 | A 700817/ | PS 1,782,167/ 01.06.2003 | Digital signal transmitting method |
| P 23912 | JP 60-51994/ 15.03.1985 | - | PPU 61-211728 15.03.2005 | Data processing apparatus |
| Q 80007/ P 16056 | NL 8004028/ 14.07.1980 | PS 4,501,000/ 19.02.2002 | PPU 57-488486/ 14.07.2001 | Signal modulation system |
| Q 80009/ P 14539 | JP 55-67608/ 21.05.1980 | PS 4,413,340/ 20.05.2001 | PPU 57-4629/ 21.05.2000 | CIRC |
| Q 86003/ P 30624 | NL 8600450/ 26.02.1986 | 4,802,169/ 24.02.2007 | PPU 62-217468/ 23.07.2007 | Real time format switching in CD-I |
| S-8P038 | S 55-22605/ 25.02.1980 | PS 4,398,292/ 23.02.2001 | JPL 670009/ 25.02.2000 | Method and apparatus for encoding digital with two error correcting codes |

Exhibit V1
Option B - CD-1 Disc
Page 1

March 24, 1998

## Survey of Licensor's Patent Rights

| Licensor's Ref. No. PH | Priority Application/ Priority date | US Patent (PS) or Appln. No./ Expiration date | JP Ut. Model (UM) Prov. Publ. (U) Patent (PS) Publication (PUB) Prov. Publ. (PPU) or Appln. No./ Expiration date | Title |
|---|---|---|---|---|
| B 33255 | GB 8609078/ 14.04.1986 | 4,868,764/ 06.04.2007 | | Enhanced resolution of CD-ROM stored TV-pictures |
| B 33335 | GB 8729261/ 24.12.1986 | 4,858,026/ 21.12.2007 | PPU 63-168781/ 24.12.2007 | Pyramid encoder with decoder in prediction channel |
| N 6493 | NL 7211999/ 09.02.1972 | PS 5,068,846/ 26.11.2008 | PS 905844/ 25.08.1992 | Optical disc with disc body acting as protection |
| N 8979 | NL 7713710/ 12.12.1977 | PS 4,188,433/ 20.07.1998 | | Optical disc with coating comprising U-V lacquer |
| N 9225 | NL 7809227/ 09.11.1978 | PS 4,230,915/ 26.12.1998 | PS 1630678/ 08.09.1999 | Depth of smooth pits in optical disc |
| N 9258 | NL 7810463/ 19.10.1978 | PS 4,930,116/ 27.05.2007 | PS 1550033/ 19.10.1999 | Optical disc with deep pits in shallow v-shaped groove |
| N 9398 | NL 7902363/ 27.03.1979 | PS 4,499,574/ 12.02.2002 | PS 1640911/ 25.03.2000 | Adaption of track distance to pit frequency |
| N 9567 | | PS 4,325,135/ 13.04.1999 | | Optical record carrier and apparatus for reading it |

March 24, 1998

Exhibit VI
Option B - CD-I Disc
Page 2

## Survey of Licensor's Patent Rights

| | | | | |
|---|---|---|---|---|
| N 9587 | | PS 4,310,916/ | | Optical record carrier and apparatus for reading it |
| N 9725 | NL 8002039/ 08.04.1980 | PS 4,389,719/ 08.09.2000 | | Optical disc with PVC substrate covered cured lacquer |
| N 9732 | NL 8002411/ 25.04.1980 | PS 4,556,967/ 03.12.2002 | | Two phase information structure without cross-talk |
| N 9933 | NL 8100098/ 12.01.1981 | PS 4,423,502/ 09.11.2001 | PS 7882422/ 12.01.2002 | Optical disc with tracks at different levels |
| N 11734 | NL 8600980/ 18.04.1986 | 4,914,515/ 15.04.2007 | PPU 62-256269/ 17.04.2007 | Partial updating of stationary pictures on CD-I |
| N 11755 | NL 8601182/ 12.05.1986 | 4,794,465/ 10.10.2006 | PPU 62-269584/ 11.05.2007 | Data driven action tagging in CD-I |
| P 12222 | P 53-47247/ 21.04.1978 | PS 4,355,392 Rc 31,666/ 19.10.1999 | PUB 63-29451/ 21.04.1998 | Burst error correcting system |
| P 14768 | P 55-99252/ 18.07.1980 | PS 4,358,780/ 10.07.2001 | PPU 57-24038/ 18.07.2000 | Information recording medium |
| P 15688 | J 56-54678/ 04.10.1981 | PS 5,305,301/ 19.04.2011 | PPU 57-169938/ 04.10.2001 | Optical recording medium |

Exhibit VI
Option B - CD-I Disc
Page 3

March 24, 1998

Survey of Licensor's Patent Rights

| | | | |
|---|---|---|---|
| P 19262 | JP 58-97687/ 01.06.1983 | A 7008117/ | PS 1,864,908/ 01.06.2003 | Digital signal transmitting method |
| P 19263 | JP 58-97688/ 01.06.1983 | A 7008117/ | PS 1,864,909/ 01.06.2003 | Digital signal transmitting method |
| P 19264 | JP 58-97689/ 01.06.1983 | A 7008117/ | PS 1,782,167/ 01.06.2003 | Digital signal transmitting method |
| P 23912 | JP 60-51994/ 15.03.1985 | - | PPU 61-211728 15.03.2005 | Data processing apparatus |
| Q 80007 P 16056 | NL 8004028/ 14.07.1980 | PS 4,501,000/ 19.02.2002 | PPU 57-488486/ 14.07.2001 | Signal modulation system |
| Q 80009 P 14539 | JP 55-67608/ 21.05.1980 | PS 4,413,340/ 20.05.2001 | PPU 57-4629 21.05.2000 | CIRC |
| Q 86003 P 3062-1 | NL 8600450/ 26.02.1986 | 4,802,169/ 24.02.2007 | PPU 62-217468/ 23.07.2007 | Real time format switching in CD-I |
| S-8P038 | S 55-22605/ 25.02.1980 | PS 4,398,292/ 23.02.2001 | JPI,670009/ 25.02.2000 | Method and apparatus for encoding digital with two error correcting codes |

Exhibit VII
Option A - CDV - Disc
Page 1

March 24, 1998

Survey of Licensor's Patent Rights

| Licensor's Ref. No. PH | Priority Application/ Priority date | US Patent (PS) or Appln. No./ Expiration date | JP Ut. Model (UM) Prov. Publ. (U) Patent (PS) Publication (PUB) Prov. Publ. (PPU) or Appln. No./ Expiration date | Title |
|---|---|---|---|---|
| N 6493 | NL 7211999/ 02.09.1972 | PS 5,068,846/ 26.11.2008 | PS 905844/ 25.08.1992 | Optical disc with disc body acting as protection |
| N 8717 | NL 7702874/ 17.03.1977 | PS 4417285/ 22.11.2000 | PS 1153514/ 25.09.1997 PS 1313142/ 16.03.1998 PS 1351132/ 16.03.1998 | Automatic field correction during VLP stop-motion |
| N 8979 | NL 7713710/ 12.12.1977 | PS 4,188,433/ 20.07.1998 | | Optical disc with coating comprising U-V lacquer |

Exhibit VII
Option A - CDV - Disc
Page 2

March 24, 1998

Survey of Licensor's Patent Rights

| N 9225 | NL 7809227/ 09.11.1978 | PS 1630678/ 08.09.1999 | PS 4,230,915/ 26.12.1998 | Depth of smooth pits in optical disc |
|---|---|---|---|---|
| N 10501 | NL 8305041/ 14.02.1983 | | PS 4660097/ 21.04.2004 | VLP with "Compact-Disc" audio . |
| N 10730 | NL 8302542/ 15.07.1983 | PS 1944768/ 14.02.2004 | PS 4642702/ 13.07.2004 | VLP with CD audio in underband |
| P 12222 | P 53-47247/ 21.04.1978 | PUB 63-29451/ 21.04.1998 | PS 4,355,392 Re 31,666/ 19.10.1999 | Burst error correcting system |
| P 15688 | J 56-54678/ 04.10.1981 | PPU 57-169938/ 04.10.2001 | PS 5,305,301/ 19.04.2011 | Optical recording medium |
| P 20779 | JP 58-226598/ 30.11.1983 | PPU 60-119670/ 30.11.2003 | PS 4893193/ 09.01.2007 | Disc type recording media |
| Q 80007 P 16056 | NL 8004028/ 14.07.1980 | PPU 57-488486/ 14.07.2001 | PS 4,501,000/ 19.02.2002 | Signal modulation system |
| Q 80009 P 14539 | JP 55-67608/ 21.05.1980 | PPU 57-4629/ 21.05.2000 | PS 4,413,340/ 20.05.2001 | CIRC |
| S-SP038 | S 55-22605/ 25.02.1980 | JPL 670009/ 25.02.2000 | PS 4,398,292/ 23.02.2001 | Method and apparatus for encoding digital with two error correcting codes |

Exhibit VIII
Option B - CDV - Disc
Page 1

March 24, 1998

Survey of Licensor's Patent Rights

| Licensor's Ref. No. PH | Priority Application/ Priority date | US Patent (PS) or Appln. No./ Expiration date | JP Ut. Model (UM) Prov. Publ. (U) Patent (PS) Publication (PUB) Prov. Publ. (PPU) or Appln. No./ Expiration date | Title |
|---|---|---|---|---|
| N 6493 | NL 7211999/ 09.02.1972 | PS 5,068,846/ 26.11.2008 | PS 905844/ 25.08.1992 | Optical disc with disc body acting as protection |
| N 8717 | NL 7702874/ 17.03.1977 | PS 4417285/ 22.11.2000 | PS 1153514/ 25.09.1997 PS 1313142/ 16.03.1998 PS 1351132/ 16.03.1998 | Automatic field correction during VLP stop-motion |
| N 8979 | NL 7713710/ 12.12.1977 | PS 4,188,433/ 20.07.1998 | | Optical disc with coating comprising U-V lacquer |
| N 9076 | NL 7803069/ 22.03.1978 | PS 4,450,553/ 22.05.2001 | PS 1363333/ 22.03.1999 | Multi-layer optical disc |
| N 9225 | NL 7809227/ 09.11.1978 | PS 4,230,915/ 26.12.1998 | PS 1630678/ 08.09.1999 | Depth of smooth pits in optical disc |

Exhibit VIII
Option B - CDV - Disc
Page 2

March 24, 1998

## Survey of Licensor's Patent Rights

| | | | | |
|---|---|---|---|---|
| N 9258 | NL 7810463/ 19.10.1978 | PS 4,930,116/ 27.05.2007 | PS 1550033/ 19.10.1999 | Optical disc with deep pits in shallow v-shaped groove |
| N 9398 | NL 7902363/ 27.03.1979 | PS 4,499,574/ 12.02.2002 | PS 1694091/ 25.03.2000 | Adaption of track distance to pit frequency |
| N 9587 | NL 7907180 | PS 4,310,916/ 12.01.1999 | PS 1637642 | Optical record carrier and apparatus for reading it |
| N 9725 | NL 8002039/ 08.04.1980 | PS 4,389,719/ 08.09.2000 | | Optical disc with PVC substrate covered cured lacquer |
| N 9732 | NL 8002411/ 25.04.1980 | PS 4,556,967/ 03.12.2002 | | Two phase information structure without cross-talk |
| N 9933 | NL 8100098/ 12.01.1981 | PS 4,423,502/ 09.11.2001 | PS 7882422/ 12.01.2002 | Optical disc with tracks at different levels |
| N 10591 | NL 8300541/ 14.02.1983 | PS 4660097/ 21.04.2004 | | VLP with "Compact-Disc" audio |
| N 10730 | NL 8302542/ 15.07.1983 | PS 4642702/ 13.07.2004 | PS 1944768/ 14.02.2004 | VLP with CD audio in underband |
| P 12222 | P 53-47247/ 21.04.1978 | PS 4,355,392 Re 31,666/ 19.10.1999 | PUB 63-29451/ 21.04.1998 | Burst error correcting system |
| P 14768 | P 55-99252/ 18.07.1980 | PS 4,358,789/ 10.07.2001 | PPU 57-24038/ 18.07.2000 | Information recording medium |
| P 15688 | J 56-54678/ 01.10.1981 | PS 5,305,301/ 19.04.2011 | PPU 57-169938/ 04.10.2001 | Optical recording medium |

Exhibit VIII
Option B - CDV - Disc
Page 3

March 24, 1998

## Survey of Licensor's Patent Rights

| | | | | |
|---|---|---|---|---|
| P 20779 | JP 58-226598/ 30.11.1983 | PS 4893193/ 09.01.2007 | PPU 60-119670/ 30.11.2003 | Disc type recording media |
| Q 80007 P 16056 | NL 8004028/ 14.07.1980 | PS 4,501,000/ 19.02.2002 | PPU 57-488486/ 14.07.2001 | Signal modulation system |
| Q 80009 P 14539 | JP 55-67608/ 21.05.1980 | PS 4,413,340/ 20.05.2001 | PPU 57-4629/ 21.05.2000 | CIRC |
| S-8P038 | S 55-22605/ 25.02.1980 | PS 4,398,292/ 23.02.2001 | JPL 670009/ 25.02.2000 | Method and apparatus for encoding digital with two error correcting codes |

March 24, 1998

Exhibit V
Option A - CD-I Disc
Page 1

Survey of Licensor's Patent Rights

| Licensor's Ref. No. PH | Priority Application/ Priority date | US Patent (PS) or Appln. No./ Expiration date | JP Ut. Model (UM) Prov. Publ. (U) Patent (PS) Publication (PUB) Prov. Publ. (PPU) or Appln. No./ Expiration date | Title |
|---|---|---|---|---|
| B 33255 | GB 8609078/ 14.04.1986 | 4,868,764/ 06.04.2007 | | Enhanced resolution of CD-ROM stored TV-pictures |
| B 33335 | GB 8726961/ 24.12.1986 | 4,858,026/ 21.12.2007 | PPU 63-168781/ 24.12.2007 | Pyramid encoder with decoder in prediction channel |
| N 6493 | NL 7211999/ 09.02.1972 | PS 5,068,846/ 26.11.2008 | PS 905844/ 25.08.1992 | Optical disc with disc body acting as protection |
| N 8979 | NL 7713710/ 12.12.1977 | PS 4,188,433/ 20.07.1998 | | Optical disc with coating comprising U-V laquer |
| N 9225 | NL 7809227/ 09.11.1978 | PS 4,230,915/ 26.12.1998 | PS 1630678/ 08.09.1999 | Depth of smooth pits in optical disc |
| N 11734 | NL 8600980/ 18.04.1986 | 4,914,515/ 15.04.2007 | PPU 62-256269/ 17.04.2007 | Partial updating of stationary pictures on CD-I |
| N 11753 | NL 8601182/ 12.05.1986 | 4,794,465/ 10.10.2006 | PPU 62-269584/ 11.05.2007 | Data driven action tagging in CD-I |

Exhibit V
Option A - CD-I Disc
Page 2

March 24, 1998

## Survey of Licensor's Patent Rights

| | | | | |
|---|---|---|---|---|
| P 12222 | P 53-47247/ 21.04.1978 | PS 4,355,392 Re 31,666/ 19.10.1999 | PUB 63-294151/ 21.04.1998 | Burst error correcting system |
| P 15688 | J 56-54678/ 04.10.1981 | PS 5,305,301/ 19.04.2011 | PPU 57-169938/ 04.10.2001 | Optical recording medium |
| P 19262 | JP 58-97687/ 01.06.1983 | A 700817/ | PS 1,864,908/ 01.06.2003 | Digital signal transmitting method |
| P 19263 | JP 58-97688/ 01.06.1983 | A 700817/ | PS 1,864,909/ 01.06.2003 | Digital signal transmitting method |
| P 19264 | JP 58-97689/ 01.06.1983 | A 700817/ | PS 1,782,167/ 01.06.2003 | Digital signal transmitting method |
| P 23912 | JP 60-51994/ 15.03.1985 | - | PPU 61-211728 15.03.2005 | Data processing apparatus |
| Q 80007 P 16056 | NL 8004028/ 14.07.1980 | PS 4,501,000/ 19.02.2002 | PPU 57-488486/ 14.07.2001 | Signal modulation system |
| Q 80009 P 14539 | JP 55-67608/ 21.05.1980 | PS 4,413,340/ 20.05.2001 | PPU 57-4629/ 21.05.2000 | CIRC |
| Q 86003 P 30624 | NL 8600450/ 26.02.1986 | 4,802,169/ 24.02.2007 | PPU 62-217468/ 23.07.2007 | Real time format switching in CD-I |
| S-8P038 | S 55-22605/ 25.02.1980 | PS 4,398,292/ 23.02.2001 | JPI. 670009/ 25.02.2000 | Method and apparatus for encoding digital with two error correcting codes |

Exhibit VI
Option B - CD-I Disc
Page 1

March 24, 1998

Survey of Licensor's Patent Rights

| Licensor's Ref. No. PH | Priority Application/ Priority date | US Patent (PS) or Appln. No./ Expiration date | JP Ut. Model (UM) Prov. Publ. (U) Patent (PS) Publication (PUB) Prov. Publ. (PPU) or Appln. No./ Expiration date | Title |
|---|---|---|---|---|
| B 33255 | GB 8609078/ 14.04.1986 | 4,868,764/ 06.04.2007 | | Enhanced resolution of CD-ROM stored TV-pictures |
| B 33335 | GB 8726961/ 24.12.1986 | 4,858,026/ 21.12.2007 | PPU 63-168781/ 24.12.2007 | Pyramid encoder with decoder in prediction channel |
| N 6493 | NL 7211999/ 09.02.1972 | PS 5,068,846/ 26.11.2008 | PS 905844/ 25.08.1992 | Optical disc with disc body acting as protection |
| N 8979 | NL 7713710/ 12.12.1977 | PS 4,188,433/ 20.07.1998 | | Optical disc with coating comprising U-V lacquer |
| N 9225 | NL 7809227/ 09.11.1978 | PS 4,230,915/ 26.12.1998 | PS 1630678/ 08.09.1999 | Depth of smooth pits in optical disc |
| N 9258 | NL 7810463/ 19.10.1978 | PS 4,930,116/ 27.05.2007 | PS 1550037/ 19.10.1999 | Optical disc with deep pits in shallow v-shaped groove |
| N 9398 | NL 7902363/ 27.03.1979 | PS 4,499,574/ 12.02.2002 | PS 1640911/ 25.03.2000 | Adaption of track distance to pit frequency |
| N 9567 | | PS 4,325,135/ 13.04.1999 | | Optical record carrier and apparatus for reading it |

Exhibit VI
Option B - CD-I Disc
Page 2

March 24, 1998

## Survey of Licensor's Patent Rights

| | | | |
|---|---|---|---|
| N 9587 | | PS 4,310,916/ | Optical record carrier and apparatus for reading it |
| N 9725 | NL 8002039/ 08.04.1980 | PS 4,389,719/ 08.09.2000 | Optical disc with PVC substrate covered cured lacquer |
| N 9732 | NL 8002411/ 25.04.1980 | PS 4,556,967/ 03.12.2002 | Two phase information structure without cross-talk |
| N 9933 | NL 8100098/ 12.01.1981 | PS 4,423,502/ 09.11.2001 — PS 7882422/ 12.01.2002 | Optical disc with tracks at different levels |
| N 11734 | NL 8600980/ 18.04.1986 | 4,914,515/ 15.04.2007 — PPU 62-256269/ 17.04.2007 | Partial updating of stationary pictures on CD-I |
| N 11755 | NL 8601182/ 12.05.1986 | 4,794,465/ 10.10.2006 — PPU 62-269584/ 11.05.2007 | Data driven action tagging in CD-I |
| P 12222 | P 53-47247/ 21.04.1978 | PS 4,355,392 Rc 31,666/ 19.10.1999 — PUB 63-29451/ 21.04.1998 | Burst error correcting system |
| P 14768 | P 55-99252/ 18.07.1980 | PS 4,358,780/ 10.07.2001 — PPU 57-24038/ 18.07.2000 | Information recording medium |
| P 15688 | J 56-54678/ 04.10.1981 | PS 5,305,301/ 19.04.2011 — PPU 57-169938/ 04.10.2001 | Optical recording medium |

Exhibit VI
Option B - CD-I Disc
Page 3

March 24, 1998

Survey of Licensor's Patent Rights

| | | | |
|---|---|---|---|
| P 19262 | JP 58-97687/ 01.06.1983 | A 700817/ | PS 1,864,908/ 01.06.2003 | Digital signal transmitting method |
| P 19263 | JP 58-97688/ 01.06.1983 | A 700817/ | PS 1,864,909/ 01.06.2003 | Digital signal transmitting method |
| P 19264 | JP 58-97689/ 01.06.1983 | A 700817/ | PS 1,782,167/ 01.06.2003 | Digital signal transmitting method |
| P 23912 | JP 60-51994/ 15.03.1985 | - | PPU 61-211728 15.03.2005 | Data processing apparatus |
| Q 80007 P 16056 | NL 8004028/ 14.07.1980 | PS 4,501,000/ 19.02.2002 | PPU 57-488486/ 14.07.2001 | Signal modulation system |
| Q 80009 P 14539 | JP 55-67608/ 21.05.1980 | PS 4,413,340/ 20.05.2001 | PPU 57-4629 21.05.2000 | CIRC |
| Q 86003 P 3062-4 | NL 8600450/ 26.02.1986 | 4,802,169/ 24.02.2007 | PPU 62-217468/ 23.07.2007 | Real time format switching in CD-I |
| S-8P038 | S 55-22605/ 25.02.1980 | PS 4,398,292/ 23.02.2001 | JPL 670009/ 25.02.2000 | Method and apparatus for encoding digital with two error correcting codes |

March 24, 1998

Exhibit VII
Option A - CDV - Disc
Page 1

Survey of Licensor's Patent Rights

| Licensor's Ref. No. PH | Priority Application/ Priority date | US Patent (PS) or Appln. No./ Expiration date | JP Ut. Model (UM) Prov. Publ. (U) Patent (PS) Publication (PUB) Prov. Publ. (PPU) or Appln. No./ Expiration date | Title |
|---|---|---|---|---|
| N 6493 | NL 7211999/ 02.09.1972 | PS 5,068,846/ 26.11.2008 | PS 905844/ 25.08.1992 | Optical disc with disc body acting as protection |
| N 8717 | NL 7702874/ 17.03.1977 | PS 4417285/ 22.11.2000 | PS 1153514/ 25.09.1997 PS 1313142/ 16.03.1998 PS 1351132/ 16.03.1998 | Automatic field correction during VLP stop-motion |
| N 8979 | NL 7713710/ 12.12.1977 | PS 4,188,433/ 20.07.1998 | | Optical disc with coating comprising U-V lacquer |

Exhibit VII
Option A - CDV - Disc
Page 2

March 24, 1998

Survey of Licensor's Patent Rights

| | | | | |
|---|---|---|---|---|
| N 9225 | NL 7800227/ 09.11.1978 | PS 4,230,915/ 26.12.1998 | PS 1630678/ 08.09.1999 | Depth of smooth pits in optical disc |
| N 10501 | NL 8300541/ 14.02.1983 | PS 4660097/ 21.04.2004 | | VLP with "Compact-Disc" audio . |
| N 10730 | NL 8302542/ 15.07.1983 | PS 4642702/ 13.07.2004 | PS 1944768/ 14.02.2004 | VLP with CD audio in underband |
| P 12222 | P 53-47247/ 21.04.1978 | PS 4,355,392 Re 31,666/ 19.10.1999 | PUB 63-29451/ 21.04.1998 | Burst error correcting system |
| P 15688 | J 56-54678/ 04.10.1981 | PS 5,305,301/ 19.04.2011 | PPU 57-169938/ 04.10.2001 | Optical recording medium |
| P 20779 | JP 58-226598/ 30.11.1983 | PS 4893193/ 09.01.2007 | PPU 60-119670/ 30.11.2003 | Disc type recording media |
| Q 80007 P 16056 | NL 8004028/ 14.07.1980 | PS 4,501,000/ 19.02.2002 | PPU 57-488486/ 14.07.2001 | Signal modulation system |
| Q 80009 P 14539 | JP 55-67608/ 21.05.1980 | PS 4,413,340/ 20.05.2001 | PPU 57-4629/ 21.05.2000 | CIRC |
| S-SP038 | S 55-22605/ 25.02.1980 | PS 4,398,292/ 23.02.2001 | JPL 670009/ 25.02.2000 | Method and apparatus for encoding digital with two error correcting codes |

March 24, 1998

Exhibit VIII
Option B - CDV - Disc
Page 1

Survey of Licensor's Patent Rights

| Licensor's Ref. No. PH | Priority Application/ Priority date | US Patent (PS) or Appln. No./ Expiration date | JP Ut. Model (UM) Prov. Publ. (U) Patent (PS) Publication (PUB) Prov. Publ. (PPU) or Appln. No./ Expiration date | Title |
|---|---|---|---|---|
| N 6493 | NL 7211999/ 09.02.1972 | PS 5,068,846/ 26.11.2008 | PS 905844/ 25.08.1992 | Optical disc with disc body acting as protection |
| N 8717 | NL 7702874/ 17.03.1977 | PS 4417285/ 22.11.2000 | PS 1153514/ 25.09.1997 PS 1313142/ 16.03.1998 PS 1351132/ 16.03.1998 | Automatic field correction during VLP stop-motion |
| N 8979 | NL 7713710/ 12.12.1977 | PS 4,188,433/ 20.07.1998 | | Optical disc with coating comprising U-V lacquer |
| N 9076 | NL 7803069/ 22.03.1978 | PS 4,450,553/ 22.05.2001 | PS 1363333/ 22.03.1999 | Multi-layer optical disc |
| N 9225 | NL 7809227/ 09.11.1978 | PS 4,230,915/ 26.12.1998 | PS 1630678/ 08.09.1999 | Depth of smooth pits in optical disc |

Exhibit VIII
Option B - CDV - Disc
Page 2

March 24, 1998

## Survey of Licensor's Patent Rights

| ID | NL | PS | PS | Description |
|---|---|---|---|---|
| N 9258 | NL 7810463/ 19.10.1978 | PS 4,930,116/ 27.05.2007 | PS 1550033/ 19.10.1999 | Optical disc with deep pits in shallow v-shaped groove |
| N 9398 | NL 7902363/ 27.03.1979 | PS 4,499,574/ 12.02.2002 | PS 1694091/ 25.03.2000 | Adaption of track distance to pit frequency |
| N 9587 | NL 7907180 | PS 4,310,916/ 12.01.1999 | PS 1637642 | Optical record carrier and apparatus for reading it |
| N 9725 | NL 8002039/ 08.04.1980 | PS 4,389,719/ 08.09.2000 | | Optical disc with PVC substrate covered cured lacquer |
| N 9732 | NL 8002411/ 25.04.1980 | PS 4,556,967/ 03.12.2002 | | Two phase information structure without cross-talk |
| N 9933 | NL 8100098/ 12.01.1981 | PS 4,423,502/ 09.11.2001 | PS 7882422/ 12.01.2002 | Optical disc with tracks at different levels |
| N 10591 | NL 8300541/ 14.02.1983 | PS 4660097/ 21.04.2004 | | VLP with "Compact-Disc" audio |
| N 10730 | NL 8302542/ 15.07.1983 | PS 4642702/ 13.07.2004 | PS 1944768/ 14.02.2004 | VLP with CD audio in underband |
| P 12222 | P 53-47247/ 21.04.1978 | PS 4,355,392 Re 31,666/ 19.10.1999 | PUB 63-29451/ 21.04.1998 | Burst error correcting system |
| P 14768 | P 55-99252/ 18.07.1980 | PS 4,358,789/ 10.07.2001 | PPU 57-24038/ 18.07.2000 | Information recording medium |
| P 15688 | J 56-54678/ 01.10.1981 | PS 5,305,301/ 19.04.2011 | PPU 57-169938/ 04.10.2001 | Optical recording medium |

Exhibit VIII
Option B - CDV - Disc
Page 3

March 24, 1998

## Survey of Licensor's Patent Rights

| | | | |
|---|---|---|---|
| P 20779 | JP 58-226598/ 30.11.1983 | PS 4893193/ 09.01.2007 | PPU 60-1119670/ 30.11.2003 | Disc type recording media |
| Q 80007 P 16056 | NL 8004028/ 14.07.1980 | PS 4,501,000/ 19.02.2002 | PPU 57-488486/ 14.07.2001 | Signal modulation system |
| Q 80009 P 14539 | JP 55-67608/ 21.05.1980 | PS 4,413,340/ 20.05.2001 | PPU 57-4629/ 21.05.2000 | CIRC |
| S-8P038 | S 55-22605/ 25.02.1980 | PS 4,398,292/ 23.02.2001 | JPI, 670009/ 25.02.2000 | Method and apparatus for encoding digital with two error correcting codes |

W-SE: 1CC

Exhibit IX
Option A - Enhanced Music CD - Disc
Page 1

March 24, 1998

## Survey of Licensor's Patent Rights

| Licensor's Ref. No. PH | Priority Application/ Priority date | US Patent (PS) or Appln. No./ Expiration date | JP Ut. Model (UM) Prov. Publ. (U) Patent (PS) Publication (PUB) Prov. Publ. (PPU) or Appln. No./ Expiration date | Title |
|---|---|---|---|---|
| D 86308 D 86313 D 86337 | DE 36.13.343/ 19.04.1986 DE 36.20.424/ 10.06.1986 DE 36.38.128/ 08.11.1986 | PS 4,825,285/ 15.04.2007 | A 63-001.183/ 20.04.2007 | DPCM encoder with 2-dimensional low pass filter |
| D 86327 D 86336 | DE 36.31.252/ 13.09.1986 DE 37.38.127/ 08.11.1986 | PS 4,901.075/ 11.09.2007 | A 63-132.530/ 14.09.2007 | Coefficient encoder in transform coding |

Exhibit IX
Option A - Enhanced Music CD - Disc
Page 2

March 24, 1998

## Survey of Licensor's Patent Rights

| | | | | |
|---|---|---|---|---|
| D 87091 D 87291 | DE 37 15.067/ 06.05.1987 DE 37.15.147/ 07.05.1987 DE 37.44.280/ 28.12.1987 DE 37.26.520 | PS 5,021,879/ 04.06.2008 | A 63-287.186/ 06.05.2008 | Motion estimation on superblocks of N transform blocks |
| F 89522 | FR 8908186/ 20.06.1989 | A 631,830/ | A 92-500.443/ 19.06.2010 | Selectable temporal/special subsampled pictures |
| F 89526 | FR 8903929/ 24.03.1989 | PS 5,079,631/ 06.03.2010 | A 02.028.596/ 23.03.2010 | Normalisation controlled by classification parameter |
| N 6493 | NL 7211999/ 09.02.1972 | PS 5,068,846/ 26.11.2008 | PS 905844/ 25.08.1992 | Optical disc with disc body acting as protection |
| N 8979 | NL 7713710/ 12.12.1977 | PS 4,188,433/ 20.07.1998 | | Optical disc with coating comprising U-V lacquer |
| N 9225 | NL 7809227/ 09.11.1978 | PS 4,230,915/ 26.12.1998. | PS 1630678/ 08.09.1999 | Depth of smooth pits in optical disc |

Exhibit IX
Option A - Enhanced Music CD - Disc
Page 3

March 24, 1998

## Survey of Licensor's Patent Rights

| N 13088 | NL 89-02358/ 21.09.1989 | PS 5,428,598/ 27.06.2012 PS 5,453,968/ 26.09.2012 | PPU 03-108,162/ 14.09.2010 | Copyright protection using alternating copy-bit |
|---|---|---|---|---|
| N 13257 | NL 900424/ 22.02.1990 | A 369,864 | A 04-216,288/ 20.02.2011 | Image data blocks with hierarchical encoding level |
| N 13409 | NL 9001771/ 06.08.1990 | A 07-707,527 A 08-269,941 | A 04-233,380/ 04.06.2011 | Sector and word offset in video block header |
| N 13661 | EP 91,200,764/ 02.04.1991 EP 91,201,005/ 26.04.1991 | PS 5,341,356/ 07.01.2012 | PPU 93-089,596/ 02.04.2012 | Recording of contact info in lead out |
| N 13685 | EP 91,200,764/ 02.04.1991 EP 91,201,005/ 26.04.1991 | PS 5,390,159/ 12.02.2012 A 08-328,307 A 08-371,644 | PPU 93-094,675/ 01.04.2012 | CD ROM-XA-WO |

Exhibit IX
Option A - Enhanced Music CD - Disc
Page 4

March 24, 1998

## Survey of Licensor's Patent Rights

| | | | | |
|---|---|---|---|---|
| N 13709 | GB 9012538/ 05.06.1990 | A 08-086,402 / A 08-299,027 | A 04-229,464/ 04.06.2011 | Decoder delay in coded videoframes on CD-I |
| P 12222 | P 53-47247/ 21.04.1978 | PS 4,355,392 Re 31,666/ 19.10.1999 | PUB 63-29451/ 21.04.1998 | Burst error correcting system |
| P 15688 | J 56-54678/ 04.10.1981 | PS 5,305,301/ 19.04.2011 | PPU 57-169938/ 04.10.2001 | Optical recording medium |
| Q 80007 P 16056 | NL 8004028/ 14.07.1980 | PS 4,501,000/ 19.02.2002 | PPU 57-488486/ 14.07.2001 | Signal modulation system |
| Q 80009 P 14539 | JP 55-67608/ 21.05.1980 | PS 4,413,340/ 20.05.2001 | PPU 57-4629/ 21.05.2000 | CIRC |
| S-SP038 | S 55-22605/ 25.02.1980 | PS 4,398,292/ 23.02.2001 | JPL 670009/ 25.02.2000 | Method and apparatus for encoding digital with two error correcting codes |
| S 82P040 | S 56-17,734 09.02.1981 | USP 4,456,905/ 08.02.2002 | JP 1,547,082/ 09.02.2001 | Method and apparatus for encoding binary data |

# EXHIBIT C

1

# CD DISC PATENT LICENSE AGREEMENT

This Agreement is entered into this __1st__ day of __July_____, 2002 by and between

KONINKLIJKE PHILIPS ELECTRONICS N.V., having its registered office in Eindhoven, The Netherlands, (hereinafter referred to as "Philips")

and

UNIVERSAL MUSIC GROUP MANUFACTURING & LOGISTICS, having its registered office in 10 Universal City Plaza, Suite 350, Universal City, CA 91608 (hereinafter referred to as "Licensee")

WHEREAS, the Philips' group of companies has for many years been engaged in research and development of systems, in which signals encoded in digital form and stored on a disc are read and reproduced by means of devices using an optical read-out beam, and has acquired valuable know-how and expertise therein;

WHEREAS, one of the achievements of such research and development efforts has been a revolutionary high-fidelity sound storage and reproduction system, of which the specifications have been further defined in a joint research and development co-operation with Sony Corporation of Japan ("Sony") and which has been presented under the name "Compact Disc Digital Audio System" (CD-Audio System);

WHEREAS, on the basis of the CD-Audio System Philips and Sony have developed a further system, which has been presented under the name "Compact Disc Data System" (CD-ROM System);

WHEREAS, Philips and Sony have developed an additional multi-session CD system, which has been presented under the name "Enhanced Music Compact Disc System" ("Enhanced Music CD System" or "CD Extra System" (the CD-Audio System, the CD-ROM System and the CD Extra System together are referred to as "the CD Systems");

WHEREAS, Philips and Sony own certain patents relating to the CD Systems;

WHEREAS, Philips has been authorized by Sony to grant licenses under certain patents relating to the CD Systems, which are owned or controlled by Sony and its Associated Companies (as hereinafter defined), as well as such patents relating to the CD Systems which are jointly owned by Philips and Sony, while Philips and Sony each retain the right also to license their respective patents relating to the CD Systems separately, so that interested manufacturers may opt to take out separate licenses under the relevant patents of each of Philips and Sony, instead of a combined license;

WHEREAS, Licensee has requested from Philips a license under the relevant patents of Philips and Sony relating to CD-Discs and wishes such CD-Discs to be compatible with CD-Players conforming to the Standard Specifications for any of the relevant CD Systems; and

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\universal music and video\cd disc-joint -usa-120902                    June 2002

P 001006

2

WHEREAS, Philips is willing to grant Licensee a license under the relevant patents and to make available certain basic information relating to the CD Systems, on the conditions set forth herein; NOW, THEREFORE, in consideration of the mutual obligations and covenants hereinafter set forth, the parties hereto have agreed as follows:

## Article 1 - Definitions

The following terms used in this Agreement shall have the meanings set out below:

1.01   **"Disc"** shall mean a non-recordable reflective disc-shaped information carrier comprising any kind of information including, but not limited to, audio, video, text and/or data-related information, which is irreversibly stored in a layer during and as an integral part of the manufacturing process of the disc in a form which is optically readable by playback devices using a laser-beam.

1.02   **"CD-Audio Disc"** shall mean a Disc comprising audio information encoded in digital form, which is optically readable by a CD-Audio Player (as hereinafter defined) and which conforms to the CD-Audio Standard Specifications (as hereinafter defined).

1.03   **"CD-Audio Maxi-Single"** shall mean a CD-Audio Disc which, in addition, conforms to the CD-Audio Maxi-Single Standard Specifications.

1.04   **"CD-ROM Disc"** shall mean a Disc comprising information encoded in digital form, which is optically readable by a CD-ROM Player (as hereinafter defined) and which conforms to the CD-ROM Standard Specifications (as hereinafter defined).

1.05   **"Enhanced Music CD Disc/CD Extra Disc"** shall mean a Disc comprising information encoded in digital form, which is optically readable by a CD-Audio Player and which conforms to the CD-Audio Standard Specifications, a CD-ROM Player and which conforms to the CD-ROM Standard Specifications and an Enhanced Music CD Player (as hereinafter defined) which conforms to the Enhanced Music CD Standard Specifications (as hereinafter defined).

The CD-Audio Disc, the CD-Audio Maxi-Single, the CD-ROM Disc and the CD Extra Disc together are referred to as "CD-Discs".

1.06   **"CD-Audio Standard Specifications"** shall mean the specifications for the CD-Audio System, including the Subcode/Control and Display System, Channels R .W, Chapter 5.8, The CD-TEXT mode, as made available, modified or extended from time to time.

1.07   **"CD-Audio Maxi-Single Standard Specifications"** shall mean the specifications for the CD-Audio Maxi-Single system, specifying among other things a maximum playing time of 30 minutes, as made available, modified or extended from time to time. For the purpose of this Agreement, the CD-Audio Maxi-Single Standard Specifications shall be considered to form part of the CD-Audio Standard Specifications.

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\universal music and video\cd disc-joint -usa-120902                                    June 2002

P 001007

3

1.08    **"CD-ROM Standard Specifications"** shall mean the specifications for the CD-ROM System as made available, modified or extended from time to time.

1.09    **"Enhanced Music CD Standard Specifications"** shall mean the specifications for the Enhanced Music CD System as made available, modified or extended from time to time.

The CD-Audio, CD-Audio Maxi-Single, CD-ROM and Enhanced Music CD Standard Specifications together are referred to as the "CD Standard Specifications".

1.10    **"Player"** shall mean a playback device for optically reading information stored on a Disc and converting such information into electrical signals for reproduction purposes.

1.11    **"CD-Audio Player"** shall mean a Player solely capable of reproducing information stored on a CD-Audio Disc or CD-Audio Maxi-Single and converting such information into electrical signals, in accordance with the CD-Audio Standard Specifications, which electrical signals are directly capable of and intended to be used for sound reproduction through amplifiers and loudspeakers.

1.12    **"CD-ROM Player"** shall mean a Player solely capable of reproducing information stored on a CD-ROM Disc and converting such information into electrical signals, in accordance with the CD-ROM Standard Specifications, which electrical signals are directly capable of and intended to be used for the reproduction of computer related data through data handling and/or data processing equipment.

1.13    **"Enhanced Music CD Player"** shall mean a Player solely capable of reproducing information stored on a CD Extra Disc and converting such information into electrical signals, in accordance with the Enhanced Music CD Standard Specifications, which electrical signals are directly capable of and intended to be used for the reproduction of video, text and/or computer related data through data handling and/or data processing equipment.

1.14    **"Combi-Player"** shall mean a Player which is any combination of a CD-Audio Player, a CD-ROM Player and/or an Enhanced Music CD Player.

The CD-Audio Player, the CD-ROM Player, the Enhanced Music CD Player and the Combi-Player together are referred to as the "CD-Players".

1.15    **"Licensed Product"** shall mean a CD-Audio Disc, a CD-Audio Maxi-Single, a CD-ROM Disc and/or a CD Extra Disc, as correspond with the Licensed Patents selected by Licensee pursuant to Article 1.16, manufactured and/or sold in accordance with the provisions hereof, which has been duly reported and on which the royalties due hereunder are paid in accordance with the provisions of this Agreement.

1.16    **"Licensed Patents"** shall mean the patents listed in the relevant Exhibits as selected by Licensee pursuant to the Options below.

**Option A1:** Licensee chooses the essential patents listed in Exhibit E1, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-Audio Discs and/or CD-Audio Maxi Singles, which conform to the CD-Audio Standard Specifications.

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\universal music and video\cd disc-joint-usa-120902                    June 2002

P 001008

4

**Option A2:** Licensee chooses the essential patents listed in Exhibit E1 and Exhibit E2, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-ROM Discs, which conform to the CD-ROM Standard Specifications.

**Option A3:** Licensee chooses the essential patents listed in Exhibit E1, Exhibit E2 and Exhibit E3, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD Extra Discs, which conform to the Enhanced Music CD Standard Specifications.

**Option A4:** Licensee chooses, in addition to Option A1 and/or A3 the essential patents listed in Exhibit E4, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-Discs, excluding CD-ROM Discs, containing CD Text information.

**Option A5:** Licensee chooses the non-essential patents listed in Exhibit E5, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD Extra Discs.

<u>Option(s)</u>:      o A1        o A2        o A3        o A4        ⊗ A5

(please tick any combination as appropriate)

Initial: _____

The term "essential" as used in relation to patents in this Agreement shall refer to patents, the use of which is necessary (either directly or as a practical matter) for compliance with the Standard Specifications defining the relevant CD System(s).

Philips will commission an independent patent expert to review the European, Japanese and US patents listed as essential in Exhibits E1, E2, E3 and E4 in order to confirm the essentiality of such patents. In the event that such independent expert would find that any of the patents does not qualify as essential as defined in this Agreement, Philips shall delete such patent (as well as the equivalent national patents) from the relevant Exhibit and such patent will be put on the relevant Exhibit of non-essential patents. Any such finding and deletion however, shall not affect the obligation of Licensee to pay the royalty on each Licensed Product as specified in Article 5.02, provided that, in the event that the manufacture by Licensee of Licensed Products within the Territory would not infringe any of the Licensed Patents, Licensee shall have no obligation to pay royalties in respect of Licensed Products manufactured within the Territory and which are directly sold for final use within the Territory or directly exported for final use to a country in which no Licensed Patents subsist. Notwithstanding such deletion, Licensee shall retain the right to continue the use of such deleted patent(s) in accordance with this Agreement, without any additional payment, unless Licensee explicitly notifies Philips in writing of its decision to waive such right.

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\universal music and video\cd disc-joint -usa-120902                              June 2002

P 001009

5

In the event that Philips or Sony (or any of their respective Associated Companies) would have additional patents relevant to CD-Audio Discs (except for CD Text information and other than patents acquired from third parties after the date of January 1, 1983), CD-ROM Discs (other than patents acquired from third parties after the date of January 1, 1985), CD Extra Discs (other than patents acquired from third parties after the date of January 1, 1996) or the CD Text mode of CD-Discs, excluding CD-ROM Discs, (other than patents acquired from third parties after the date of October 1, 1996) in their respective patent portfolios which are essential to the manufacture, sale or other disposal of Licensed Products and which have a filing date or are entitled to a so-called priority date prior to either January 1, 1983 for CD-Audio Discs, January 1, 1985 for CD-ROM Discs, January 1, 1996 for CD Extra Discs or October 1, 1996 for the CD Text mode of CD-Discs, excluding CD-ROM Discs, but which have not been listed as essential patents in the respective Exhibits hereto, Philips will notify Licensee accordingly and such additional patents will be added to the Licensed Patents. Any patents as may be added as essential patents to any of the respective Exhibits hereto, will similarly be subject to the review by the independent patent expert in accordance with the preceding paragraph.

The patent lists provided to Licensee upon execution of the Agreement are subject to change in accordance with the provisions of this Agreement. With regard to the rights granted to Licensee hereunder, the patent lists published by Philips on its website (www.licensing.philips.com) or otherwise communicated by Philips to Licensee after the date of execution hereof shall prevail over the lists provided to Licensee upon execution of this Agreement.

1.17    "**Associated Company**" shall mean any one or more business entities (1) owned or controlled by Philips, Sony or Licensee, (2) owning or controlling Philips, Sony or Licensee, or (3) owned or controlled by the business entity owning or controlling Philips, Sony or Licensee at the material time. For the purposes of this definition a business entity shall be deemed to own and/or to control another business entity if more than 50% (fifty per cent) of the voting stock of the latter business entity, ordinarily entitled to vote in the election of directors, (or, if there is no such stock, more than 50% (fifty per cent) of the ownership of or control in the latter business entity) is held by the owning and/or controlling business entity.

1.18    "**Territory**" shall mean the geographic area known as the United States of America, its territories and possessions.

## Article 2 – Grant of Rights

Subject to the conditions of this Agreement:

2.01    For the term of this Agreement, Philips hereby grants to Licensee a non-exclusive, non-transferable license under the Licensed Patents selected by Licensee pursuant to Article 1.16 to manufacture Licensed Products within the Territory in accordance with the relevant CD Standard Specifications and to sell or otherwise dispose of Licensed Products so manufactured in all countries of the world.

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\universal music and video\cd disc-joint -usa-120902                    June 2002

**P 001010**

6

2.02    Philips, also on behalf of Sony, further agrees, for as long as this Agreement is in force and effect and Licensee is in full compliance with its obligations hereunder, to grant Licensee, upon Licensee's request, a non-exclusive, non-transferable license, either by means of a sub-license arrangement or by means of individual licenses from Philips and/or Sony respectively, on reasonable, non-discriminatory conditions, to manufacture Licensed Products in the Territory and to sell or otherwise dispose of Licensed Products so manufactured in all countries of the world, under any patents not yet licensed hereunder and which are essential to the manufacture, sale or other disposal of Licensed Products, for which Philips and/or Sony and their respective Associated Companies may hereafter acquire from third parties the free right to grant licenses. It is acknowledged and agreed that in respect of the patents as may be licensed pursuant to this Article 2.02, additional royalties may have to be paid over and above the royalties specified in Article 5.02.

2.03    Philips, also on behalf of Sony, further agrees, for as long as this Agreement is in force and effect and Licensee is in full compliance with its obligations hereunder, to grant Licensee upon Licensee's request as well as to those of Licensee's Associated Companies who so request, a non-exclusive, non-transferable license, on reasonable, non-discriminatory conditions either by means of a sub-license arrangement or by means of individual licenses from Philips and/or Sony respectively, to manufacture CD-Audio Players, CD-ROM Players, Enhanced Music CD Players and/or Combi-Players and to sell or otherwise dispose of such Players so manufactured in all countries of the world, under any and all present and future patents essential to the manufacture, sale or other disposal of such Players, for which Philips and/or Sony and their respective Associated Companies may hereafter acquire the free right to grant licenses.

2.04    In consideration of the undertakings set forth in Articles 2.01, 2.02 and 2.03 and similar undertakings by third party licensees of Philips and without prejudice to the provisions of Article 12, for a period of ten years from the Effective Date (as hereinafter defined) Licensee agrees to grant to Philips, Sony and their respective Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips or an Associated Company of Philips concerning CD-Discs, non-exclusive, non-transferable licenses, on reasonable, non-discriminatory conditions comparable to those set forth herein, to manufacture, sell or otherwise dispose of CD-Discs, under any and all present and future patents, for which Licensee or its Associated Companies have or may hereafter acquire the right to grant licenses and which are essential to the manufacture, sale or other disposal of such CD-Discs as correspond with the Licensed Patents selected by Licensee pursuant to Article 1.16 and which patents were first filed in any country of the world prior to the date of termination of this Agreement. For the avoidance of doubt, the undertaking set out in the preceding sentence shall only apply to those companies which have made the same selection pursuant to Article 1.16 as Licensee and which in that respect accept or have accepted a similar undertaking as contained in this Article 2.04.

2.05    In addition, in consideration of the undertakings set forth in Articles 2.01, 2.02, 2.03 and 2.04 and similar undertakings by third party licensees of Philips or any of its Associated Companies and without prejudice to the provisions of Article 12, for a period of ten years from the Effective Date, Licensee agrees to grant to Philips, Sony and their respective Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips or an Associated Company of Philips concerning Players, non-

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&f\company documents\universal music and video\cd disc-joint -usa-120902                June 2002

P 001011

7

exclusive, non-transferable licenses on reasonable, non-discriminatory conditions, to manufacture, sell or otherwise dispose of such CD-Audio Players, CD-ROM Players, Enhanced Music CD Players and/or Combi-Players under any and all present and future patents, for which Licensee or its Associated Companies have or may hereafter acquire the right to grant licenses and which are essential to the manufacture, sale or other disposal of such Players and which patents were first filed in any country of the world prior to the date of termination of this Agreement. For the avoidance of doubt, the undertaking set out in the preceding sentence shall only apply to those companies which accept or have accepted a similar undertaking as contained in this Article 2.05.

2.06    Philips undertakes that it will offer, at the request of any of Licensee's Associated Companies to any such Associated Company, a non-exclusive and non-transferable license under the Licensed Patents on reasonable and non-discriminatory conditions comparable to those set forth herein, to manufacture, sell or otherwise dispose of CD-Discs.

In consideration of Philips' undertaking as set out in the preceding paragraph, Licensee undertakes that all of its Associated Companies which have or may hereafter acquire patents essential to the manufacture, sale or other disposal of CD-Discs and which patents were first filed in any country of the world prior to the date of termination of this Agreement, shall make available licenses under such patents, on reasonable, non-discriminatory conditions comparable to those set forth herein to Philips, any of Philips' Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips or an Associated Company of Philips in respect of CD-Discs.

2.07    IT IS EXPRESSLY ACKNOWLEDGED AND AGREED THAT:

(I)    THE LICENSES AND LICENSE UNDERTAKINGS HEREIN CONTAINED WITH RESPECT TO THE MANUFACTURE OF LICENSED PRODUCTS DO NOT EXTEND TO MASTER RECORDING MACHINES, MACHINES, EQUIPMENT OR METHODS FOR THE REPLICATION OF DISCS, NOR TO THE MANUFACTURE OF MATERIALS OR REPRODUCTION RIGHTS FOR INFORMATION (SUCH AS AUDIO, VIDEO, TEXT AND/OR DATA-RELATED INFORMATION), CONTAINED ON DISCS TO BE PLAYED BACK ON A PLAYER/RECORDER. FURTHER, THE LICENSE UNDERTAKINGS WITH RESPECT TO THE MANUFACTURE OF RECORDING/PLAYBACK DEVICES DO NOT EXTEND TO THE MANUFACTURE OF COMPONENTS FOR RECORDING/PLAYBACK DEVICES (INCLUDING BUT NOT LIMITED TO SEMICONDUCTOR DEVI-CES, INTEGRATED CIRCUITS, LASERS, MOTORS AND LENSES), EXCEPT FOR PATENTS RELATING TO CIRCUITRY AND/OR SYSTEM ASPECTS SPECIFIC TO THE CD SYSTEMS (AND SIMILAR OPTICAL READ-OUT SYSTEMS);

(II)    THE RIGHTS AND LICENSES GRANTED UNDER THIS AGREEMENT DO NOT EXTEND TO ANY COMBINATION OF ONE OR MORE LICENSED PRODUCTS OR PLAYERS, RECORDING/PLAYBACK DEVICES WITH ANY OTHER ITEMS, PRODUCTS, SYSTEMS, STRUCTURES, EQUIPMENT OR

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\universal music and video\cd disc joint -usa-120902                    June 2002

P 001012

8

SOFTWARE OTHER THAN THE COMBINATION OF A LICENSED
PRODUCT AND A PLAYER OR RECORDING/PLAYBACK DEVICE.

### Article 3 - Standard Specifications,
### Technical Information and Support

3.01    Upon receipt of the payment provided for in Article 5.01 and the payment provided for in
Article 5.12, Philips shall make available to Licensee for use by Licensee in accordance with
the provisions hereof, a copy of the then current version of the respective CD Standard
Specifications, as correspond with the Licensed Patents selected by Licensee pursuant to
Article 1.16, together with such other information and support as Philips considers necessary
for the interpretation and/or correct application of the relevant CD Standard Specifications.

3.02    Licensee shall be notified in writing of any addition or modification to any of the relevant CD
Standard Specifications and shall be provided with relevant information in connection
therewith.

3.03    Philips and Licensee undertake to keep each other generally informed of developments or
initiatives, which may have an impact on the relevant CD Standard Specifications.

### Article 4 - Have Made

4.01    The rights granted to Licensee pursuant to Article 2 and the right to use the information
pursuant to Article 3, include the right for Licensee to have Licensed Products made for it by
third party manufacturers, duly licensed by Philips under an agreement similar to this
Agreement, provided that Licensee will properly identify such third party manufacturer in the
royalty reporting forms to be submitted to Philips hereunder, together with the quantities of
Licensed Products so purchased.

Conversely, Licensee shall refrain from purchasing or selling CD-Discs manufactured by any
third party not licensed by Philips, where such purchase or sale would constitute an act of
infringement of any of the Licensed Patents.

### Article 5 - Royalties, Reports and Payments

5.01    In consideration of the rights granted by Philips and the information to be provided by
Philips hereunder, Licensee shall, upon execution of this Agreement, make a non-refundable,
non-recoupable payment of US$ 25,000 (twenty-five thousand US Dollars) to Philips.

5.02    In further consideration of the rights granted hereunder by Philips to Licensee, Licensee
agrees to pay to Philips a royalty on each Licensed Product sold by Licensee, in which any
one or more of the Licensed Patents is (are) used, irrespective of whether such Licensed
Patent(s) is (are) used in the country of manufacture, sale or other disposal.

These royalties shall amount to:

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\universal music and video\cd disc-joint -usa-120902                    June 2002

**P 001013**

9

(a)    US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD-Audio Disc with an outer diameter greater than 90 mm; and

(b)    US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD-Audio Disc with an outer diameter smaller than 90 mm; and

(c)    US$ 0.027 (two point seven US Dollar cents) for each Licensed Product being a CD-Audio Maxi-Single; and

(d)    US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD-ROM Disc with an outer diameter greater than 90 mm; and

(e)    US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD-ROM Disc with an outer diameter smaller than 90 mm; and

(f)    US$ 0.045 (four and a half US Dollar cents) for each Licensed Product being a CD Extra Disc with an outer diameter greater than 90 mm; and

(g)    US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD Extra Disc with an outer diameter smaller than 90 mm,

such rates hereinafter referred to as "Standard Rates".

With respect to Licensed Products sold after July 1, 2002, provided that Licensee is in full compliance with its obligations under this Agreement and subject to Article 6.01, the royalties shall amount to:

(a)    US$ 0.0175 (one and three quarters of a US Dollar cent) for each Licensed Product being a CD-Audio Disc with an outer diameter greater than 90 mm; and

(b)    US$ 0.0115 (one and fifteen hundredths of a US Dollar cent) for each Licensed Product being a CD-Audio Disc with an outer diameter smaller than 90 mm; and

(c)    US$ 0.0155 (one and fifty-five hundredths of a US Dollar cent) for each Licensed Product being a CD-Audio Maxi-Single; and

(d)    US$ 0.0175 (one and three quarters of a US Dollar cent) for each Licensed Product being a CD-ROM Disc with an outer diameter greater than 90 mm; and

(e)    US$ 0.0115 (one and fifteen hundredths of a US Dollar cent) for each Licensed Product being a CD-ROM Disc with an outer diameter smaller than 90 mm; and

(f)    US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD Extra Disc with an outer diameter greater than 90 mm; and

(g)    US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD Extra Disc with an outer diameter smaller than 90 mm,

such rates hereinafter referred to as "Compliance Rates".

In the event that Licensee fails to comply at any time with any of its obligations hereunder, the Standard Rates, as applicable, shall apply to Licensee's manufacture and sale of CD-Discs instead of the Compliance Rates, as applicable, with immediate effect from the moment of such non-compliance until such moment that Licensee's non-compliance will have been remedied in full.

A Licensed Product shall be considered sold when invoiced or, if not invoiced, when delivered to a party other than Licensee.

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\universal music and video\cd disc-joint -usa-120902       June 2002

P 001014

10

No royalties shall be payable on Licensed Products purchased by Licensee on a "have made" basis in accordance with Article 4 from third party manufacturers, duly licensed by Philips, provided that Licensee can demonstrate to Philips' satisfaction, that such third party manufacturer has paid to Philips the royalties due in respect of such Licensed Products.

For the avoidance of doubt, in the event that the manufacture by Licensee of Licensed Products within the Territory would not infringe any of the Licensed Patents, Licensee shall have no obligation to pay royalties in respect of Licensed Products manufactured within the Territory and which are directly sold for final use within the Territory or directly exported for final use to a country in which no Licensed Patents subsist.

5.03    Within 30 days following 31 March, 30 June, 30 September and 31 December of each year during the term of this Agreement, Licensee shall submit to Philips (even in the event that no sales have been made) a written statement in the form as attached hereto as Exhibit C3 (Royalty Reporting Form) signed by a duly authorized officer on behalf of Licensee, setting forth with respect to the preceding quarterly period:

(1)    the quantities of CD-Discs manufactured by Licensee, specified per individual type of CD-Disc;

(2)    the quantities of CD-Discs purchased from other licensed manufacturers in accordance with the provisions of Article 4, specified per individual type of CD-Disc;

(3)    on a per-country basis, specifying for each individual type of CD-Disc:

(a)    the quantities of CD-Discs sold or otherwise disposed of, specifying the identity of the buyers and the trademarks used on or in connection with the CD-Discs;

(b)    the quantities of CD-Discs sold to other manufacturers, duly licensed by Philips, specifying the identity of such other manufacturers and the trademarks used on or in connection with the CD-Discs;

(4)    a computation of the royalties due under this Agreement.

Licensee shall pay the royalties due to Philips within 30 days after the end of each quarterly period, in such US Dollars.

5.04    In the event that Licensee fails to submit to Philips a Royalty Reporting Form for any royalty reporting period within 30 days from the end of the relevant reporting period in accordance with the provisions of Article 5.03, Licensee shall be obliged to pay to Philips within 30 days after the end of the relevant quarterly period for which the Royalty Reporting Form was not submitted, an estimated royalty (hereinafter referred to as an "Advance"), being an amount equal to the highest amount of royalties due for any royalty reporting period over the preceding eight royalty reporting periods (or over all preceding royalty reporting periods if fewer than eight). Such payment shall be treated as a non-refundable advance, primarily against the royalties and interest for the relevant royalty reporting period and then, if any sum remains, against any future royalties or other payments payable by Licensee hereunder.

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\universal music and video\cd disc-joint -usa-120902                    June 2002

P 001015

11

Licensee acknowledges and agrees that any Advance shall not be due by way of penalty but that such payment shall constitute a non-refundable advance as aforesaid. For the avoidance of doubt, such payment shall be payable without any further notice or action by Philips, legal or otherwise, and shall take effect by virtue of the failure to submit a Royalty Reporting Form on time; the payment by Licensee of an Advance shall not affect Licensee's obligation to submit a Royalty Reporting Form; the payment by Licensee of an Advance shall be without prejudice to any other rights or remedies of Philips, including, without limitation, Philips' right to charge 2% interest per month on overdue payments (including overdue payments of the Advance), and Philips' right to terminate this Agreement in accordance with its provisions. The Advance will not be set off against other sums due to Philips until a Royalty Reporting Form has been submitted in respect of the relevant royalty reporting period. In respect of any royalty reporting period for which an Advance has been paid and the Royalty Reporting Form subsequently submitted, Philips will first set off against the Advance all royalties and interest due for that period. Any remaining sum from the Advance will be set off against further royalty, interest or Advance payments due to Philips hereunder (if any).

5.05    Licensee shall submit to Philips, once per calendar year, an audit statement by its external auditors, who shall be public certified auditors, confirming that the quarterly royalty statements as submitted by Licensee to Philips for the last four quarterly periods, are true, complete and accurate in every respect. Such statement must meet Philips' requirements as specified in the Audit Guidelines attached hereto as Exhibit C1 and shall be submitted to Philips within 90 days following the end of Licensee's financial year. The correctness of this audit statement shall be verified by Philips by means of a work paper review, conducted by one of the public certified auditors selected by Philips. Notwithstanding this audit statement, Philips reserves the right to inspect the books and records of Licensee from time to time in accordance with Article 5.10.

5.06    Within 30 days following the expiration or termination of this Agreement, Licensee shall submit to Philips a certified report on the number of Licensed Products in stock at the time of expiration or termination of this Agreement. Royalties, calculated in accordance with Article 5.02 and Article 5.12, shall be due and payable on all Licensed Products manufactured prior to, but remaining in stock with Licensee on the date of expiration or termination of this Agreement. For the avoidance of doubt, this Article 5.06 shall be without prejudice to the provisions of Article 12.06.

5.07    Any payment under this Agreement which is not made on the date(s) specified herein, shall accrue interest at the rate of 2% (two per cent) per month (or part thereof) or the maximum amount permitted by law, whichever is lower.

5.08    All payments to Philips under this Agreement shall be made by transfer in such currency, convertible in the sense of Articles VIII and XIX of the Articles of Agreement of the International Monetary Fund, as designated by Philips. The rate of exchange for converting the currency of the Territory shall be the telegraphic transfer selling rate of the designated currency as officially quoted in the Territory by the officially authorized foreign exchange bank for payment of currency transactions on the day that the amount is due and payable.

5.09    All costs, stamp duties, taxes and other similar levies arising from or in connection with the conclusion of this Agreement shall be borne by Licensee. In the event that the government of

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\universal music and video\cd disc-joint -usa-120902                    June 2002

P 001016

12

a country imposes any income taxes on payments by Licensee to Philips hereunder and requires Licensee to withhold such tax from such payments, Licensee may deduct such tax from such payments. In such event, Licensee shall promptly provide Philips with tax receipts issued by the relevant tax authorities so as to enable Philips to support a claim for credit against income taxes which may be payable by Philips and/or its Associated Companies in The Netherlands and to enable Philips to document, if necessary, its compliance with tax obligations in any jurisdiction outside The Netherlands.

5.10   In order that the royalty statements provided for in this Article 5 may be verified, Licensee shall keep complete and accurate books and records and shall keep the books and records available for a period of 5 years following the manufacture, sale or other disposal of each Licensed Product.

Philips shall have the right to inspect the books and records of Licensee from time to time, in order to verify the correctness of the aforementioned royalty statements. Any such inspection shall take place no more than once per calendar year and shall be conducted by a public certified auditor appointed by Philips. Philips shall give Licensee written notice of such inspection at least 7 days prior to the inspection. Licensee shall willingly co-operate and provide all such assistance in connection with such inspection as Philips and/or the auditor may require. The inspection shall be conducted at Philips' own expense, provided that in the event that Licensee has failed to submit royalty statements and/or yearly written statement(s) by its external auditors, as provided for in Article 5.03 and Article 5.05, in respect of the period to which the inspection relates or in the event that any discrepancy or error exceeding 3% (three per cent) of the monies actually due is established, the cost of the inspection shall be borne by Licensee, without prejudice to any other claim or remedy as Philips may have under this Agreement or under applicable law.

Philips' right of inspection as set out in this Article 5.10 shall survive termination or expiration of this Agreement.

5.11   Without prejudice to the provisions of Article 5.10, Licensee shall provide all relevant additional information as Philips may reasonably request from time to time, so as to enable Philips to ascertain which products manufactured, sold or otherwise disposed of by Licensee are subject to the payment of royalties to Philips hereunder, the patents which have been used in connection with such products, and the amount of royalties payable.

5.12   As a condition precedent to the entry into force of this Agreement, Licensee shall submit to Philips a royalty statement in respect of CD-Discs manufactured and sold or otherwise disposed of by Licensee before the Effective Date of this Agreement in accordance with the provisions of Article 5.03. Within 7 days following the execution of this Agreement, Licensee shall pay to Philips the royalties on such CD-Discs, calculated by applying the royalty rates of (a) US$ 0.03 for each CD-Audio Disc or CD-ROM Disc with an outer diameter greater than 90 mm, (b) US$ 0.02 for each CD-Audio Disc or CD-ROM Disc with an outer diameter smaller than 90 mm, (c) US$ 0.027 for each CD-Audio Maxi-Single and (d) US$ 0.045 or US$ 0.048 for each CD Extra Disc, depending on the selection made by Licensee in Schedule I to the Enhanced Music CD Disc License Agreement. The royalty statement shall similarly be subject to Philips' right of audit as set out in Article 5.10. Within 45 days following the execution of this Agreement, Licensee shall submit to Philips an audit statement by its

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\universal music and video\cd disc-joint -usa-120902                          June 2002


P 001017

13

external auditors, who shall be public certified auditors, confirming that this royalty statement is true, complete and accurate in every respect.

## Article 6 – Manufacturing Equipment Identification System

6.01    Upon signing of the Agreement, Licensee shall submit to Philips an overview of its manufacturing equipment used for the manufacture of Licensed Products. Further, upon any acquisition, transfer or disposal of manufacturing equipment used for the manufacture of Licensed Products, Licensee shall submit to Philips details of any such adjustment(s) to its manufacturing equipment. Further, Licensee shall submit to Philips an overview containing all adjustments to its manufacturing equipment during the preceding year, together with and confirmed by the audit statement referred to in Article 5.05. Such overview shall be in the form as attached hereto as Exhibit C2 (Manufacturing Equipment List), signed by a duly authorized officer on behalf of Licensee. The Compliance Rates referred to in Article 5.02 shall only apply to Licensed Products manufactured by Licensee using manufacturing equipment properly identified in the Manufacturing Equipment List and shall be conditional upon Licensee submitting to Philips the audit statement meeting Philips' requirements as set out in the Audit Guidelines, in accordance with the provisions in Article 5.05. In the event that Licensee puts into use newly acquired manufacturing equipment which has been used for the manufacture of Licensed Products prior to the acquisition by Licensee, the Compliance Rates shall only apply if Licensee can demonstrate to Philips' full satisfaction, that the newly acquired manufacturing equipment originates from and has been used by a company which was properly licensed by Philips for the manufacture of Licensed Products and in full compliance with its obligations under its license agreement at the time of the acquisition of the newly acquired manufacturing equipment by Licensee. In the event that Licensee is unable to comply with the requirements under this Article 6.01, the Standard Rates shall apply to Licensee's manufacture and sale of Licensed Products instead of the Compliance Rates.

## Article 7 - Most Favourable Conditions

7.01    In the event that licenses under the patents referred to in Article 2 are granted by Philips for Licensed Products to a third party under substantially similar conditions, but at a royalty rate more favourable than the rate payable by Licensee under this Agreement, Licensee shall be entitled to the same royalty rate as applicable to such third party, provided always that this right of Licensee shall not apply in respect of cross-license agreements or other agreements providing for a consideration which is not exclusively based on payment of royalties and further provided that this right of Licensee shall not apply in respect of licenses or other arrangements made pursuant to a court decision or the settlement of a dispute between Philips and a third party, irrespective of the nature of such dispute, the terms of the court decision or the settlement terms.

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\universal music and video\cd disc-joint -usa-120902                                    June 2002

P 001018

14

## Article 8 – No Warranty and Indemnification

8.01   Whereas Philips has made efforts to ensure that the information to be supplied by it hereunder is complete and accurate, Philips makes no representation or warranty as to the accuracy or completeness of such information, nor with respect to the ability of Licensee to achieve interchangeability with respect to Licensed Products through the use of such information.

8.02   It is acknowledged by Licensee that third parties may own industrial and/or intellectual property rights in the field of CD-Discs. Philips and Sony make no warranty whatsoever that the manufacture, sale or other disposal of Licensed Products or the use of information supplied by Philips hereunder, does not infringe or will not cause infringement of any industrial and/or intellectual property rights other than Licensed Patents. Philips, Sony and their respective Associated Companies shall be fully indemnified and held harmless by Licensee from and against any and all third party claims in connection with CD-Discs manufactured, sold or otherwise disposed of by Licensee.

## Article 9 - Confidentiality

9.01   Licensee shall at all times maintain strict confidentiality with regard to the CD Standard Specifications and shall not disclose same to any third party without the prior written consent of Philips.

9.02   Without prejudice to Article 9.01, Licensee shall, during the term of this Agreement as specified in Article 12.01 and for a period of 3 years thereafter, not disclose to any third party any information acquired from Philips or any of Philips' Associated Companies in connection with this Agreement, or use such information for any other purpose than the manufacture or disposal of Licensed Products in accordance with this Agreement. This obligation shall not apply to the extent information so acquired:

(a)   was known to Licensee prior to the date on which such information was acquired from Philips or any of Philips' Associated Companies, as shown by records of Licensee or otherwise demonstrated to Philips' satisfaction;

(b)   is or has become available to the public through no fault of Licensee;

(c)   was or is received from a third party who was under no confidentiality obligation in respect of such information.

In protecting information acquired from Philips or any of Philips' Associated Companies, Licensee shall take all necessary measures and precautions, including but not limited to measures requiring its present and future employees to give suitable undertakings of secrecy both for the period of their employment and thereafter, and shall protect such information in the same manner and with the same degree of care (but no less than a reasonable degree of care) with which Licensee protects its own information of a confidential nature.

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\universal music and video\cd disc-joint -usa-120902                                    June 2002

P 001019

15

9.03    The obligations concerning confidentiality contained in Article 9.01 and Article 9.02 shall survive termination of this Agreement

9.04    Philips shall, during the term of this Agreement as specified in Article 12.01 and for a period of 3 years thereafter, not disclose to any third party any confidential information obtained by Philips in connection with Article 5.03 and/or Article 5.05, except that Philips may disclose such information to its external auditors, legal representatives and to the competent courts to the extent this is necessary for Philips in connection with the enforcement of its rights hereunder. Further, Philips shall not use such information for other purposes than to verify Licensee's compliance with its royalty reporting and payment obligations as provided in this Agreement and to enforce Philips' rights hereunder. Philips' obligations set out in this paragraph shall not apply to information referred to in sections a, b and/or c of Article 9.02.

## Article 10 - Logo

10.01    For the term of this Agreement and subject to the full and timely performance and observance by Licensee of all its undertakings and obligations hereunder, Licensee shall be entitled to use on the Licensed Products as well as in advertisements and sales literature with respect to Licensed Products sold by Licensee, a logo (hereinafter referred to as "the Logo") in accordance with the instructions laid down in the CD-Logo Guide which shall be made available to Licensee together with the Standard Specifications.

10.02    Licensee acknowledges and agrees that Philips makes no warranty whatsoever that any use of the Logo does not infringe or will not cause infringement of any third party intellectual property rights.

## Article 11 – No Assignment

11.01    This Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective assignees. It may not be assigned in whole or in part by Licensee without the prior written consent of Philips.

## Article 12 - Term and Termination

12.01    This Agreement shall enter into force on the "Effective Date", being the date first written above. In the event that validation of this Agreement is required by the competent governmental authorities, the Effective Date shall be the date of such validation. This Agreement shall remain in force for a period of 10 years from the Effective Date unless terminated earlier in accordance with the provisions of this Article 12.

12.02    Without prejudice to the provisions of Article 12.03 through 12.06, each party may terminate this Agreement at any time by means of written notice to the other party in the event that the other party fails to perform any obligation under this Agreement and such failure is not remedied within 30 days after receipt of a notice specifying the nature of such failure and requiring it to be remedied. Such right of termination shall not be exclusive of any other

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\universal music and video\cd disc-joint -usa-120902                June 2002

P 001020

16

remedies or means of redress to which the non-defaulting party may be lawfully entitled, and all such remedies shall be cumulative. Any such termination shall not affect any royalty or other payment obligations under this Agreement accrued prior to such termination.

12.03    Philips may terminate this Agreement forthwith by means of notice in writing to Licensee in the event that a creditor or other claimant takes possession of, or a receiver, administrator or similar officer is appointed over any of the assets of Licensee or in the event that Licensee makes any voluntary arrangement with its creditors or becomes subject to any court or administration order pursuant to any bankruptcy or insolvency law.

12.04    Additionally, insofar as legally permitted, Philips may terminate this Agreement at any time by means of written notice to Licensee in case Licensee or an Associated Company of Licensee has been found liable by a competent court or administrative authority to have committed an act of copyright piracy.

12.05    Philips shall have the right to terminate this Agreement forthwith or to revoke the license granted under any of Philips' or Sony's respective patents in the event that Licensee or any of its Associated Companies brings a claim for infringement of any of Licensee's or any of Licensee's Associated Companies essential patents relating to CD-Discs or CD-Players against Philips, Sony or any of their respective Associated Companies and Licensee refuses to license such patents on fair and reasonable conditions.

12.06    Upon the termination of this Agreement by Philips for any reason pursuant to Article 12.02 through 12.05, Licensee shall immediately cease the manufacture, sale or other disposal of CD-Discs in which any one or more of the Licensed Patents are used. Further, upon such termination, any and all amounts outstanding hereunder shall become immediately due and payable.

12.07    All provisions of this Agreement which are intended to survive (whether express or implied) the expiry or termination of this Agreement, shall so survive.

## Article 13 - Miscellaneous

13.01    Any notice required under this Agreement to be sent by either party shall be given in writing by means of a letter, facsimile or electronic mail directed:

in respect of Licensee, to:

Universal Music Group Manufacturing & Logistics
10 Universal City Plaza
Suite 350
University City, CA 91608
Fax: +1 (818) 733-1125

17

in respect of Philips, to:

Koninklijke Philips Electronics N.V.
c/o Philips International B.V.
Intellectual Property & Standards - Legal Department
P.O. Box 220, Building WAH-2
5600 AE  Eindhoven
The Netherlands
Fax: +31 40 2734131

with a copy to:

U.S. Philips Corporation
580 White Plains Road
Tarrytown, New York 10591
Fax: +1 (914) 332-0615

or to such other address as may have been previously specified in writing by either party to the other.

13.02   This Agreement sets forth the entire understanding and agreement between the parties as to the subject matter hereof and supersedes and replaces all prior arrangements, discussions and understandings between the parties relating thereto. Neither party shall be bound by any obligation, warranty, waiver, release or representation except as expressly provided herein, or as may subsequently be agreed in writing between the parties.

13.03   Nothing contained in this Agreement shall be construed:

(a)      as imposing on either party any obligation to instigate any suit or action for infringement of any of the patents licensed hereunder or to defend any suit or action brought by a third party which challenges or relates to the validity of any of such patents. Licensee shall have no right to instigate any such suit or action for infringement of any of the patents licensed by Philips hereunder, nor the right to defend any such suit or action which challenges or relates to the validity of any such patent licensed by Philips hereunder;

(b)      as imposing any obligation to file any patent application or to secure any patent or to maintain any patent in force;

(c)      as conferring any license or right to copy or imitate the appearance and/or design of any product of Philips, Sony or any of their Associated Companies;

(d)      as conferring any license to manufacture, sell or otherwise dispose of any product or device other than a Licensed Product.

13.04   Neither the failure nor the delay of either party to enforce any provision of this Agreement shall constitute a waiver of such provision or of the right of either party to enforce each and every provision of this Agreement.

P 001022

18

13.05    Should any provision of this Agreement be finally determined void or unenforceable in any judicial proceeding, such determination shall not affect the operation of the remaining provisions hereof, provided that, in such event, Philips shall have the right to terminate this Agreement by written notice to Licensee.

13.06    This Agreement shall be governed by and construed in accordance with the laws of The State of New York.

Any dispute between the parties hereto in connection with this Agreement (including any question regarding its existence, validity or termination) shall be submitted to any state or federal courts in The State of New York, provided always that, in case Philips is the plaintiff, Philips may at its sole discretion submit any such dispute either to the state or federal courts in the venue of Licensee's registered office, or to any of the state or federal courts in the Territory having jurisdiction. Licensee hereby irrevocably waives any objection to the jurisdiction, process and venue of any such court and to the effectiveness, execution and enforcement of any order or judgment (including, but not limited to, a default judgment) of any such court in relation to this Agreement, to the maximum extent permitted by the law of any jurisdiction, the laws of which might be claimed to be applicable regarding the effectiveness, enforcement or execution of such order or judgment.

AS WITNESS, the parties hereto have caused this Agreement to be signed on the date first written above.

KONINKLIJKE PHILIPS ELECTRONICS N.V.

Name:    R. Peters

Title:    by proxy

Date:

UNIVERSAL MUSIC GROUP MANUFACTURING & LOGISTICS

Name:

Title:    President

Date:    12/13/02

Exhibit E1 to the CD Disc Patent License Agreement

CD-Disc/CD-Audio and CD-Maxi Single part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AR | Q 080007 - | 285958 | 02-Jul-81 | | 250649 | 06-Jun-12 | Block N to K compact disc modulation code (EFM) |
| AR | Q 080009 - | 285400 | 20-May-81 | | 250648 | 04-Jun-12 | Error correctable data transmission method |
| AT | Q 080007 - | 81-A3107 | 14-Jul-81 | | 404652 | 15-May-16 | Block N to K compact disc modulation code (EFM) |
| AT | Q 080009 - | 81-A2215 | 18-May-81 | 395794 | 395794 | 15-Jul-10 | Error correctable data transmission method |
| BW | Q 080007 - | 98-00033 | 21-Apr-98 | | | 21-Apr-18 | Block N to K compact disc modulation code (EFM) |
| CA | P15.688 - | 399564 | 26-Mar-82 | | 1207443 | 08-Jul-03 | Optical readable carriers |
| CA | Q 080007 - | 381362 | 08-Jul-81 | | 1211570 | 16-Sep-03 | Block N to K compact disc modulation code (EFM) |
| ES | Q 080007 A | 514656 | 02-Aug-82 | | 514656 | 20-Jun-03 | Block N to K compact disc modulation code (EFM) |
| ES | Q 080009 - | 502320 | 19-May-81 | | 502320 | 09-Sep-02 | Error correctable data transmission method |
| US | N 006493 D | 06/868550 | 23-Apr-86 | | 5068846 | 26-Nov-08 | Video disc with disc body acting as protection |
| US | P15.688 - | 890316 | 30-Mar-82 | | 5305301 | 19-Apr-11 | Optical readable carriers |

Page 1 of 1

*All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list*

*Prindate*          21 June 2002

P 001024

Exhibit E2 to the CD Disc Patent License Agreement

CD-Disc/CD-ROM part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AT | P18.816 | 84901011.1 | 02-Aug-84 | | 52886 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| AT | Q 083025 | 84-A72769 | 29-Aug-84 | | 403223 | 15-Apr-15 | Framing of data-blocks on CD-ROM |
| AT | Q 084008 | 852004316 | 20-Mar-85 | 0156440-A2 | 549835 | 20-Mar-05 | CD-ROM Error Correction System A |
| AU | Q 083025 | 84-32584 | 31-Aug-84 | | 603761 | 31-Aug-04 | Framing of data-blocks on CD-ROM |
| AU | Q 084008 | 85-42240 | 22-Mar-85 | | 584883 | 22-Mar-05 | CD-ROM Error Correction System A |
| BE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| BR | Q 083025 | P8404319.9 | 29-Aug-84 | | P8404319.9 | 29-Aug-04 | Framing of data-blocks on CD-ROM |
| BR | Q 084008 | P8501277.7 | 21-Mar-85 | | P8501277 | 21-Mar-05 | CD-ROM Error Correction System A |
| BR | Q 086003 | P8700846.7 | 23-Feb-87 | | P8700846 | 23-Feb-07 | Real-time format switching |
| CA | P | | | | 1235812 | 28-Apr-05 | Disc playback apparatus |
| CA | Q 084008 | 477183 | 21-Mar-85 | | 1258771 | 13-Jun-06 | CD-ROM Error Correction System A |
| CA | Q 086003 | 530120 | 19-Feb-87 | | 1280208 | 12-Feb-08 | Real-time format switching |
| CH | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| CN | Q 086003 | 87100929.3 | 21-Feb-87 | 87100929-A | 1010517 | 21-Feb-07 | Real-time format switching |
| CZ | Q 084008 | 85-PV2009 | 22-Mar-85 | | 281601 | 21-Mar-05 | CD-ROM Error Correction System A |
| DE | P | 84305176.4 | 30-Jul-84 | | P3476289.2 | 30-Jul-04 | Disc playback apparatus |
| DE | P18.816 | 84901011.1 | 02-Aug-84 | | P3482291.7 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| DE | Q 083025 | P3431810.0 | 30-Aug-84 | 3431810 | 3431810 | 30-Aug-04 | Framing of data-blocks on CD-ROM |
| DE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 3575846 | 20-Mar-05 | CD-ROM Error Correction System A |
| DE | Q 086003 | P3701763.2 | 22-Jan-87 | 3701763 | 3701763 | 22-Jan-07 | Real-time format switching |
| FR | P | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| FR | P18.816 | 84901011.1 | 02-Aug-84 | | 137555 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| FR | Q 084008 | 8504297 | 22-Mar-85 | | 2561839 | 22-Mar-05 | CD-ROM Error Correction System A |
| FR | Q 086003 | 8702234 | 20-Feb-87 | | 2594896 | 20-Feb-07 | Real-time format switching |
| GB | P | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| GB | P18.816 | 84901011.1 | 02-Aug-84 | | 137555 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| GB | Q 083025 | 8421705 | 28-Aug-84 | | 2145855 | 28-Aug-04 | Framing of data-blocks on CD-ROM |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded
as an integral part of this list

Patents with reference Q 084008 are essential to CD-ROM type mode-1 discs
Patents with reference Q 086003 and P 18816 are essential to CD-ROM/XA type discs
Patents with reference Q 083025 and P are essential to all type of CD-ROM discs

Printdate        27 September 2002

P 001025

CD-Disc/CD-ROM part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| GB | Q 084008 | 8507248 | 20-Mar-85 | | 2158555 | 20-Mar-05 | CD-ROM Error Correction System A |
| GB | Q 086003 | 8704011 | 20-Feb-87 | | 2187008 | 20-Feb-07 | Real-time format switching |
| HK | Q 083025 | NOT GIVEN | 28-Aug-84 | | 0930121 | 28-Aug-04 | Framing of data-blocks on CD-ROM |
| HK | Q 084008 | NOT GIVEN | 20-Mar-85 | | 0930433 | 20-Mar-05 | CD-ROM Error Correction System A |
| IT | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| IT | Q 086003 | 87-A19447 | 20-Feb-87 | | 1215362 | 20-Feb-07 | Real-time format switching |
| JP | P | | | | 1912619 | 30-Jul-03 | Disc playback apparatus |
| JP | P18,816 | 35459/83 | 04-Mar-83 | | 19126134 | 04-Mar-03 | Method and apparatus for recording digitized infor |
| JP | Q 083025 | 83-161514 | 01-Sep-83 | 60-52961 | | 01-Sep-03 | Framing of data-blocks on CD-ROM |
| JP | Q 084008 | 84-57595 | 24-Mar-84 | 60-201575 | | 24-Mar-04 | CD-ROM Error Correction System A |
| JP | Q 086003 | 87-39997 | 23-Feb-87 | 87-217468 | | 23-Feb-07 | Real-time format switching |
| KR | Q 084008 | 85-1914 | 23-Mar-85 | 94-8742 | 81142 | 23-Mar-05 | CD-ROM Error Correction System A |
| KR | Q 086003 | 87-1501 | 23-Feb-87 | 95-7946 | 91017 | 23-Feb-07 | Real-time format switching |
| NL | P | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| NL | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| NL | Q 086003 | 8600450 | 24-Feb-86 | 8600450 | 192151 | 24-Feb-06 | Real-time format switching |
| SE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| SE | Q 086003 | 8700711-8 | 20-Feb-87 | | 465442 | 20-Feb-07 | Real-time format switching |
| SG | Q 084008 | 9290553.8 | 20-Mar-85 | | 32772 | 20-Mar-05 | CD-ROM Error Correction System A |
| SK | Q 083025 | 84-PV6607 | 03-Sep-84 | | 278585 | 03-Sep-04 | Framing of data-blocks on CD-ROM |
| SK | Q 084008 | 85-PV2009 | 21-Mar-85 | | 278568 | 21-Mar-05 | CD-ROM Error Correction System A |
| TW | Q 086003 | 76100969 | 25-Feb-87 | | 27916 | 25-Feb-07 | Real-time format switching |
| UA | Q 084008 | 3874714 | 22-Mar-85 | | 3503 | 22-Mar-05 | CD-ROM Error Correction System A |
| US | P18,816 | 656237 | 02-Mar-84 | | 4707818 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| US | Q 084008 R | 07/379627 | 13-Jul-89 | | RE33462 | 22-Mar-05 | CD-ROM Error Correction System A |
| US | Q 086003 | 07/018163 | 24-Feb-87 | | 4802169 | 24-Feb-07 | Real-time format switching |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Patents with reference Q 084008 are essential to CD-ROM type mode-1 discs
Patents with reference Q 086003 and P 18816 are essential to CD-ROM XA type discs
Patents with reference Q 083025 and P are essential to all type of CD-ROM discs

Prindux        27 September 2002

P 001026

Exhibit E3 to the CD-Disc Patent License Agreement
CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AT | S85P0059 | 85900170.3 | 30-Nov-84 | - | E76986 | 30-Nov-04 | Disc recording medium |
| AT | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | - | Mass produced multisessions disc |
| AT | S95P0806 | - | - | - | E206238 | - | Recording medium having a first management area |
| AU | N 013661 | 92-13342 | 31-Mar-92 | 92-13342  661991 | 661991 | 31-Mar-12 | Recording of content information in Lead-Out |
| AU | S85P0059 | 37412/85 | 30-Nov-84 | 37412/85 | 587963 | 30-Nov-04 | Disc recording medium |
| AU | S94P5088 | 34358/95 | 19-Oct-95 | - | 703045 | 19-Oct-15 | Mass produced multisessions disc |
| AU | S95P0806 | 40398/95 | 13-Dec-95 | 692961 | 692961 | 13-Dec-15 | Recording medium having a first management area |
| AU | S96P0005 | 22555/00 | 24-Mar-00 | - | 728279 | 23-Jan-16 | Multi-session disc having disc type code area loca |
| BR | S95P0806 | 9605999 | 21-Dec-95 | - | - | - | Recording medium having a first management area |
| CA | N 013661 | 2064511 | 31-Mar-92 | - | 2064511 | 31-Mar-12 | Recording of content information in Lead-Out |
| CA | S95P0806 | 2164801 | 08-Dec-95 | - | - | - | Recording medium having a first management area |
| CH | S85P0059 | 85900170.3 | 30-Nov-84 | - | 165320 | 30-Nov-04 | Disc recording medium |
| CH | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | - | Mass produced multisessions disc |
| CN | N 013685 | 95116035.8 | 19-Oct-95 | CN1131311A | - | - | Recording of content information in Lead-Out |
| CN | S95P0806 | 95121699 | 22-Dec-95 | CN1135633A | - | - | Recording medium having a first management area |
| CN | S96P0005 | 98104382 | 30-Jan-98 | CN1137675A | - | - | Multi-session disc having disc type code area loca |
| CZ | N 013685 | 92-PV970 | 01-Apr-92 | - | 287132 | 01-Apr-12 | CD-ROM XA Multi-session WO |
| DE | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 69226031.5 | 30-Mar-12 | Recording of content information in Lead-Out |
| DE | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 69226116.8 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| DE | S85P0059 | 85900170.3 | 30-Nov-84 | - | P3485761.3 | 30-Nov-04 | Disc recording medium |
| DE | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | - | Mass produced multisessions disc |
| DE | S95P0806 | 95115580.9 | 12-Dec-95 | DE69522917T | 69522917 | 12-Dec-15 | oduced multisessions disc for playback on audio-on |
| ES | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 2118784 | 30-Mar-12 | Recording medium having a first management area |
| ES | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | Recording of content information in Lead-Out |
| ES | S95P0806 | 95119580.9 | 12-Dec-95 | ES2163469T | 718845 | 12-Dec-15 | CD-ROM XA Multi-session WO |
| ES | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507397 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| FR | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| FR | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| FR | S85P0059 | 85900170.3 | 30-Nov-04 | 708445 | 165320 | 30-Nov-04 | Disc recording medium |

*All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list*

Printdate    21 June 2002

CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| FR | S94P5088 | 95307463.0 | 19-Oct-95 | . | . | . | Mass produced multisessions disc |
| FR | S85P0806 | 95119580.9 | 12-Dec-95 | . | 718845 | 12-Dec-15 | Recording medium having a first management area |
| FR | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | . | . | Multi-session disc having disc type code area loca |
| GB | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| GB | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| GB | S85P0059 | 85900170.3 | 30-Nov-84 | . | 165320 | 30-Nov-04 | Disc recording medium |
| GB | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | . | . | Mass produced multisessions disc |
| GB | S95P0806 | 95119580.9 | 12-Dec-95 | . | 718845 | 12-Dec-15 | Recording medium having a first management area |
| GB | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | . | . | Multi-session disc having disc type code area loca |
| HK | S85P0059 | . | 25-May-85 | . | 08151/1995 | . | Disc recording medium |
| HK | S94P5088 | 98103776.7 | 04-May-98 | . | . | . | Mass produced multisessions disc |
| HU | N 013685 | P9201055 | 30-Mar-92 | . | 216680 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| ID | S85P0806 | P-952737 | 19-Dec-95 | . | . | . | Recording medium having a first management area |
| ID | S96P0005 | P-960210 | 30-Jan-96 | 012,695A | . | . | Multi-session disc having disc type code area loca |
| IN | S85P0806 | 2287/DEL/95 | 12-Dec-95 | . | ID0004712 | 30-Jan-16 | Recording medium having a first management area |
| IN | S96P0005 | 0186/DEL/96 | 29-Jan-96 | . | . | . | Multi-session disc having disc type code area loca |
| IT | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| IT | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| IT | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | . | . | Mass produced multisessions disc |
| IT | S85P0806 | 95119580.9 | 12-Dec-95 | . | 718845 | 12-Dec-15 | Recording medium having a first management area |
| IT | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | . | . | Multi-session disc having disc type code area loca |
| JP | 84000899 | 82262598 | 30-Nov-83 | 60-119870 | 2123759 | 30-Nov-03 | Disc recording medium |
| JP | 84011554 | 59-057596 | 24-Mar-84 | 60-201575 | 2085842 | 24-Mar-04 | Method and apparatus for transmitting digital data |
| JP | 95060963 | 07311437 | 29-Nov-95 | 08-227577 | . | . | Recording medium having a first management area |
| JP | N 013409  B | 01-387556 | 20-Dec-01 | . | . | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013409  B | 01-387556 | 20-Dec-01 | . | . | 04-Jun-11 | Method of transmitting full motion |
| JP | N 013661 | 92-81010 | 02-Apr-92 | 93-89596 | 3293651 | 02-Apr-12 | Recording of content information in Lead-Out |
| JP | N 013665 | 92-79901 | 01-Apr-92 | 93-34675 | . | 01-Apr-12 | CD-ROM XA Multi-session WO |
| JP | S85P0059 | 59-057596 | 24-Mar-84 | 60-201576 | 1981160 | 24-Mar-04 | Method and apparatus for transmitting digital data |
| JP | S94P5098 | 07-270200 | 18-Oct-95 | . | . | . | Mass produced multisessions disc |

*All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list*

Page 2 of 4                                                                                                    Printdate          21 June 2002

P 001028

CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| JP | S95P0806 | 06320107 | 22-Dec-94 | - | - | | Recording medium having a first management area |
| JP | S96P005 | 07013211 | 30-Jan-95 | 08-203210 | - | | Multi-session disc having disc type code area area |
| KR | N 013661 | 92-5313 | 31-Mar-92 | 92-20420 | 256385 | 31-Mar-12 | Recording of content information in Lead-Out |
| KR | N 013685 | 92-5314 | 31-Mar-92 | 92-20418 | 242218 | 31-Mar-12 | CD-ROM XA Multi-session WO |
| KR | S85P0059 | 85-700146 | 29-Jul-85 | 85-00175 | 85120 | 30-Nov-04 | Disc recording medium |
| KR | S85P0059 | 92-702698 | 30-Oct-92 | - | 61735 | 30-Nov-04 | Disc recording medium |
| KR | S94P5088 | 95-35873 | 18-Oct-95 | - | - | | Mass produced multisessions disc |
| KR | S95P0806 | 95-72133 | 21-Dec-95 | 96-25644 | - | | Recording medium having a first management area |
| KR | S96P0005 | 96-02552 | 30-Jan-96 | 96-30119 | - | | Multi-session disc having disc type code area loca |
| MX | S95P0806 | 955172 | 11-Dec-95 | - | 189100 | 11-Dec-15 | Recording medium having a first management area |
| MY | S95P0806 | PI9503773 | 07-Dec-95 | - | - | | Recording medium having a first management area |
| MY | S96P0005 | PI9800317 | 29-Jan-96 | - | - | | Multi-session disc having disc type code area loca |
| NL | S85P0059 | 85900170.3 | 30-Nov-84 | - | 165320 | 30-Nov-04 | Disc recording medium |
| NL | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | | Mass produced multisessions disc |
| NL | S95P0806 | 951195080.9 | 12-Dec-95 | - | - | | Recording medium having a first management area |
| NL | S96P0005 | 96101956.7 | 25-Jan-96 | 724283 | - | | Multi-session disc having disc type code area loca |
| PL | S95P0806 | P312001 | 21-Dec-95 | - | 179603 | 21-Dec-15 | Recording medium having a first management area |
| PL | S99P0806 | P338168 | 28-Feb-00 | - | 179603 | 21-Dec-15 | Recording medium having a first management area |
| RU | N 013661 | 5011395 | 01-Apr-92 | - | 2072566 | 01-Apr-12 | Recording of content information in Lead-Out |
| RU | S95P0806 | 95122300 | 21-Dec-95 | - | 2162252 | 21-Dec-15 | Recording medium having a first management area |
| RU | S95P0806 | 99128046 | 30-Dec-99 | - | - | | Recording medium having a first management area |
| RU | S95P0806 | 99104165 | 03-Jan-99 | - | - | | Recording medium having a first management area |
| RU | S95P0806 | 99103927 | 03-Jan-99 | - | - | | Recording medium having a first management area |
| SE | S85P0059 | 85900170.3 | 30-Nov-84 | - | 165320 | 30-Nov-04 | Disc recording medium |
| SE | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | | Mass produced multisessions disc |
| SG | S95P0806 | 9502053 | 07-Dec-95 | - | 38882 | 07-Dec-15 | Recording medium having a first management area |
| SG | S96P0005 | 9600515 | 27-Jan-96 | - | 33669 | 27-Jan-16 | Multi-session disc having disc type code area loca |
| SK | N 013685 | 92-PV0970 | 01-Apr-92 | - | 282293 | 01-Apr-12 | CD-ROM XA Multi-session WO |
| TH | S95P0806 | 029354 | 20-Dec-95 | 22587 | - | | Recording medium having a first management area |
| TR | S95P0806 | 053122 | 21-Dec-95 | 960597 | - | | Recording medium having a first management area |

All corresponding patent applications, patent, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list          Printdate          21 June 2002

P 001029

CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---------|-----------|-----------|-------------|----------------|----------|-------------|-------|
| TW | N 013861 - | 80109966 | 19-Dec-91 | UNKNOWN 57337 | 57337 | 19-Dec-11 | Recording of content information in Lead-Out |
| TW | N 013685 - | 80109963 | 19-Dec-91 | 59397 | 59397 | 19-Dec-11 | CD-ROM XA Multi-session WO |
| TW | S94P5088 - | 83109977 | 28-Oct-94 | . | 72376 | 27-Oct-14 | Mass produced multisessions disc |
| TW | S85P0806 - | 84113465 | 16-Dec-95 | . | 86403 | 15-Dec-15 | Recording medium having a first management area |
| UA | N 013861 - | 93002573 | 15-Nov-93 | | | 15-Nov-13 | Recording of content information in Lead-Out |
| US | N 013861 V | 07/900874 | 18-Jun-92 | | 5341356 | 07-Jan-12 | Recording of content information in Lead-Out |
| US | N 013685 A | 08/180002 | 11-Jan-94 | | 5390159 | 14-Feb-12 | CD-ROM XA Multi-session WO |
| US | N 013685 B | 08/328307 | 24-Oct-94 | | 5678019 | 02-Mar-16 | CD-ROM XA Multi-session WO |
| US | N 013685 V | 08/371644 | 12-Jan-95 | | 5684786 | 04-Nov-14 | CD-ROM XA Multi-session WO |
| US | N 013709 D | 08/707845 | 09-Sep-96 | . | 5844867 | 01-Dec-15 | Decoder delay in coded video frames |
| US | S85P0059 - | 266207 | 27-Oct-88 | . | 4893193 | 09-Jan-07 | Disc recording medium |
| US | S94P5088 - | 324406 | 20-Oct-94 | . | | | Mass produced multisessions disc |
| US | S94P5088 - | 471982 | 06-Jun-95 | . | 5661715 | 20-Oct-14 | Mass produced multisessions disc |
| US | S95P0806 - | 572528 | 14-Dec-95 | . | 5754521 | 14-Dec-15 | Recording medium having a first management area |
| US | S96P0005 - | 592962 | 29-Jan-96 | . | 5778257 | 29-Jan-16 | Multi-session disc having disc type code area loca |
| VN | S95P0806 - | S-1614/SST2 | 25-Jun-00 | . | . | | Recording medium having a first management area |
| VN | S95P0806 - | S-1614/95 | 21-Dec-95 | . | . | | Recording medium having a first management area |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 4 of 4                                                                                           Prindate          21 June 2002

P 001030

Exhibit E4 to the CD Disc Patent License Agreement
CD-Disc/CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AR | N 015474 | P960104337 | 13-Sep-96 | | AR003572 | 13-Sep-16 | Transferring information via the lead-in of CD |
| AT | 95069128 | 96115085.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium having text information records |
| AT | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | E142391 | 16-Jan-09 | Repeated transfer of subcode data |
| AT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | E202234 | 09-Sep-16 | Transferring information via the lead-in of CD |
| AU | 95069128 | 65525/96 | 13-Sep-96 | | 714409 | 13-Sep-16 | Reproducing medium having text information records |
| AU | D 088009 | 89-28557 | 18-Jan-89 | 639411 | 539411 | 18-Jan-09 | Repeated transfer of subcode data |
| BE | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| BR | 95069128 | 9603629 | 20-Sep-96 | | | 22-Sep-16 | Reproducing medium having text information records |
| CA | D 088009 | 588304 | 16-Jan-89 | | 1322593 | 28-Sep-10 | Repeated transfer of subcode data |
| CH | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| CN | 95069128 | 96121105 | 22-Sep-96 | 1153981 | | 22-Sep-16 | Reproducing medium having text information records |
| CN | 95085448 | 96121626 | 02-Nov-96 | 1158481 | | 02-Nov-16 | Recording medium and its reproducing apparatus |
| CN | D 088009 | 89101069.6 | 19-Jan-89 | 1035577-A | 1023265 | 19-Jan-09 | Repeated transfer of subcode data |
| CN | D 088009 A | 92102717.6 | 19-Jan-89 | 1068673-A | 1025701 | 19-Jan-09 | Repeated transfer of subcode data |
| CZ | D 088009 | 89-PV287 | 16-Jan-89 | | 284768 | 16-Jan-09 | Disc Reproducing apparatus |
| DE | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | P69612472.6 | 03-Dec-16 | Reproducing medium having text information records |
| DE | 95069128 | 96115085.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium and its reproducing apparatus |
| DE | 95085448 | 86117539.5 | 31-Oct-96 | 772198 | | 31-Oct-16 | Recording medium and its reproducing apparatus |
| DE | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 68927053.1 | 16-Jan-09 | Repeated transfer of subcode data |
| DE | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 69613339.3 | 09-Sep-16 | Transferring information via the lead-in of CD |
| ES | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| FR | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | 783167 | 03-Dec-16 | Disc Reproducing apparatus |
| FR | 95069128 | 96115085.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium having text information records |
| FR | 95085448 | 86117539.5 | 31-Oct-96 | 772198 | | 31-Oct-16 | Recording medium and its reproducing apparatus |
| FR | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| FR | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| GB | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | 783167 | 03-Dec-16 | Disc Reproducing apparatus |
| GB | 95069128 | 96115085.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium having text information records |
| GB | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | | 31-Oct-16 | Recording medium and its reproducing apparatus |

*All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list*

Printdate          21 June 2002

P 001031

CD-Disc/CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| GB | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| GB | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| HK | D 088009 | 98108421.9 | 16-Jan-89 | | HK1007226 | 16-Jan-09 | Repeated transfer of subcode data |
| HU | 95085448 | 9603037 | 01-Nov-95 | | | 01-Nov-16 | Recording medium and its reproducing apparatus |
| ID | 95063039 | P963565 | 02-Dec-96 | | 656 | 02-Dec-16 | Disc Reproducing apparatus |
| ID | 95069128 | P962847 | 01-Nov-96 | | | 19-Nov-15 | Reproducing medium having text information records |
| ID | 95085448 | P963188 | 04-Nov-96 | | 5137 | 04-Nov-16 | Recording medium and its reproducing apparatus |
| ID | N 015474 | P-962584 | 12-Sep-96 | | | 12-Sep-10 | Transferring information via the lead-in of CD |
| IN | 95069128 | 20230DEL/96 | 16-Sep-96 | 014769-A | | 16-Sep-11 | Reproducing medium having text information records |
| IN | N 015474 | 96-1617 | 11-Sep-96 | | | 11-Sep-16 | Transferring information via the lead-in of CD |
| IT | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| IT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information the lead-in of CD |
| JP | 95063039 | 07-318956 | 07-Dec-95 | 09-161375 | | 26-Aug-16 | Disc Reproducing apparatus |
| JP | 95069128 | 07-244059 | 22-Sep-95 | 09-091680 | | 07-Dec-15 | Disc Reproducing apparatus |
| JP | 95085448 | 07-310080 | 02-Nov-95 | 09-128868 | | 22-Sep-15 | Reproducing medium having text information records |
| JP | 95100948 | 08-242059 | 26-Aug-96 | 10-64245 | | 02-Nov-15 | Recording medium and its reproducing apparatus |
| JP | D 088009 | 89-8736 | 19-Jan-89 | 90-7/176 | 3092924 | 19-Jan-09 | Repeated transfer of subcode data |
| JP | N 015474 | 97-511792 | 09-Sep-96 | 98-509270 | | 09-Sep-16 | Transferring information via the lead-in of CD |
| KR | 95063039 | 96-62692 | 07-Dec-96 | 97-50695 | | 07-Dec-16 | Disc Reproducing apparatus |
| KR | 95069128 | 96-43380 | 23-Sep-96 | 97-17230 | | 23-Sep-16 | Reproducing medium having text information records |
| KR | 95085448 | 96-51644 | 02-Nov-96 | 98-29706 | | 02-Nov-16 | Recording medium and its reproducing apparatus |
| KR | D 088009 | 89-517 | 19-Jan-89 | | 138112 | 16-Feb-13 | Repeated transfer of subcode data |
| KR | N 015474 | 97-703243 | 09-Sep-96 | | | 09-Sep-16 | Transferring information via the lead-in of CD |
| MX | 95069128 | 964179 | 19-Sep-96 | | 198099 | 19-Sep-16 | Recording medium and its reproducing apparatus |
| MX | N 015474 | 973530 | 09-Sep-96 | | | 09-Sep-16 | Transferring information via the lead-in of CD |
| MY | 95063039 | 9605148 | 07-Dec-96 | | | | Disc Reproducing apparatus |
| MY | 95069128 | 9603888 | 20-Sep-96 | | | | Reproducing medium having text information records |
| MY | N 015474 | PI9603785 | 13-Sep-96 | | | | Transferring information via the lead-in of CD |
| MY | 95069128 | 96115035.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium having text information records |
| NL | 95069126 | 54335 | 19-Sep-96 | 54335 | | | Reproducing medium having text information records |
| PH | 95069128 | | | | | | Reproducing medium having text information records |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Printdate        21 June 2002

P 001032

CD-Disc/CD-Text part

| COUNTRY | REFERENCE | | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| PT | N 015474 | - | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| RU | D 088009 | - | 4613351 | 17-Jan-89 | | 2095857 | 17-Jan-09 | Repeated transfer of subcode data |
| SE | D 088009 | - | 6920008I.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| SG | N 015474 | - | 9704856.5 | 09-Sep-96 | | 45880 | 09-Sep-16 | Transferring information via the lead-in of CD |
| SK | D 088009 | - | 89-PV0287 | 16-Jan-89 | | 280685 | 16-Jan-09 | Repeated transfer of subcode data |
| TW | 95069128 | - | 85I1577 | 21-Sep-96 | | 94512 | 20-Sep-16 | Reproducing medium having text information records |
| TW | D 088009 | - | 78100300 | 17-Jan-89 | | 47153 | 17-Jan-09 | Repeated transfer of subcode data |
| TW | N 015474 | - | 85114202 | 19-Nov-96 | 410326 | 122112 | 19-Nov-16 | Transferring information via the lead-in of CD |
| UA | D 088009 | - | 93003372 | 17-Jan-89 | | 26980 | 17-Jan-09 | Repeated transfer of subcode data |
| US | 95063039 | - | 09/515696 | 24-Feb-00 | | 5745454 | 20-Sep-16 | Disc Reproducing apparatus |
| US | 95063039 | - | 753675 | 27-Nov-96 | | 5825731 | 27-Nov-16 | Disc Reproducing apparatus |
| US | 95069128 | - | 716953 | 20-Sep-96 | | 5859821 | 30-Oct-16 | Reproducing medium having text information records |
| US | 95085448 | - | 739821 | 30-Oct-96 | | - | | Recording medium and its reproducing apparatus |
| US | D 088009 B | | 08300002 | 05-Apr-93 | | 5587979 | 17-Jan-09 | Repeated transfer of subcode data |
| US | N 015474 | - | 08/716688 | 16-Sep-96 | | 5798990 | 16-Sep-16 | Transferring information via the lead-in of CD |
| VN | 95069128 | - | SC0210/96 | 21-Sep-96 | | - | 02-Nov-10 | Recording medium and its reproducing apparatus |
| VN | 95085448 | - | SC0328/96 | 02-Nov-96 | | - | 21-Sep-10 | Reproducing medium having text information records |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list                Printdate      21 June 2002

P 001033

Exhibit E5 to the CD Disc  Patent License Agreement
CD-Disc/CD Non-essentials part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---------|-----------|-----------|-------------|----------------|----------|-------------|-------|
| AT | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | E157801 | 03-Jun-11 | Sector and Word Offset in Video Header |
| AT | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | E157801 | 03-Jun-11 | Method of transmitting full motion |
| AT | N 013709 | 91201373.7.2 | 03-Jun-91 | 0460751-A3 | E157830 | 03-Jun-11 | Decoder delay in coded video frames |
| AU | N 013257 | 91-71219 | 20-Feb-91 | 91-71219  641726 | 641726 | 20-Feb-11 | Image Data Block with hierarchical encoding level |
| BE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| BE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| BE | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| CA | N 013257 | 2035585 | 19-Feb-91 | | 2035585 | 19-Feb-11 | Image Data Block with hierarchical encoding level |
| CA | N 013409 | 2043670 | 31-May-91 | | 2043670 | 31-May-11 | Method of transmitting full motion |
| CA | N 013409 | 2043670 | 31-May-91 | | 2043670 | 31-May-11 | Sector and Word Offset in Video Header |
| CA | N 013409 | 2335403 | 31-May-91 | | 2335403 | 31-May-11 | Method of transmitting full motion |
| CA | N 013409  A | 2335403 | 31-May-91 | | 2335403 | 31-May-11 | Sector and Word Offset in Video Header |
| DE | D 087091 | 88200818.8 | 27-Apr-88 | 0290085-A2 | 3855114 | 27-Apr-08 | Motion estimation on superblocks |
| DE | N 013257 | 91200329.0 | 18-Feb-91 | 0443576-A1 | 69109346.5 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| DE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 69127506.8 | 03-Jun-11 | Method of transmitting full motion |
| DE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 69127506.8 | 03-Jun-11 | Sector and Word Offset in Video Header |
| DE | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 69127504.1 | 03-Jun-11 | Decoder delay in coded video frames |
| DK | N 013257 | 91200329.0 | 18-Feb-91 | 0443576-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| DK | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| DK | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| DK | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| ES | N 013409 | 91201337.2 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| ES | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| FI | N 013257 | 910781 | 27-Apr-88 | | 101442 | 19-Feb-11 | Image Data Block with hierarchical encoding level |
| FR | D 087091 | 88200818.8 | 27-Apr-88 | 0290085-A2 | 0290085 | 27-Apr-08 | Motion estimation on superblocks |
| FR | N 013257 | 91200329.0 | 18-Feb-91 | 0443576-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| FR | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| FR | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| FR | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| GB | D 087091 | 88200818.8 | 27-Apr-88 | 0290085-A2 | 0290085 | 27-Apr-08 | Motion estimation on superblocks |

*All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list*

Page 1 of 3

*Printdate    21 June 2002*

P 001034

CD-Disc/CD Non-essentials part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| GB | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| GB | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| GB | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| GB | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| HK | N 013257 | NOT GIVEN | 18-Feb-91 | | 0960615 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| IT | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| IT | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| IT | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| IT | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| JP | D 087091 | 88-109222 | 06-May-88 | 88-287186 | 2630809 | 06-May-08 | Motion estimation on superblocks |
| JP | N 013257 A | 91-47659 | 20-Feb-91 | 92-216288 | 3174586 | 20-Feb-11 | Image Data Block with hierarchical encoding level |
| JP | N 013257 A | 00-344804 | 13-Nov-00 | | | | Method of transmitting full motion |
| JP | N 013409 | 91-159489 | 04-Jun-91 | 92-233380 | 3280999 | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013409 | 91-159489 | 04-Jun-91 | 92-233380 | 3280999 | 04-Jun-11 | Method of transmitting full motion |
| JP | N 013409 A | 01-151175 | 21-May-01 | | | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013409 A | 01-151175 | 21-May-01 | | | 04-Jun-11 | Method of transmitting full motion |
| JP | N 013409 B | 01-387556 | 20-Dec-01 | | | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013409 B | 01-387556 | 20-Dec-01 | | | 04-Jun-11 | Decoder delay in coded video frames |
| JP | N 013709 | 91-159490 | 04-Jun-91 | 92-229464 | 3162110 | 04-Jun-11 | Decoder delay in coded video frames |
| JP | N 013709 A | 00-393982 | 26-Dec-00 | | | 04-Jun-11 | Method of transmitting full motion |
| KR | N 013409 | 91-9152 | 03-Jun-91 | | 0245962 | 04-Jun-11 | Sector and Word Offset in Video Header |
| KR | N 013409 | 91-9152 | 03-Jun-91 | | 0245962 | 03-Jun-11 | Decoder delay in coded video frames |
| KR | N 013709 | 91-9187 | 03-Jun-91 | 92-1479 | 239837 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| NL | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 03-Jun-11 | Decoder delay in coded video frames |
| NL | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| SE | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 03-Jun-11 | Method of transmitting full motion |
| SE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| SE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Decoder delay in coded video frames |
| SE | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| SG | N 013257 | 9690457.7 | 18-Feb-91 | | 30173 | 25-Apr-90 | Motion estimation on superblocks |
| US | D 087091 B | 07/590450 | 24-Sep-90 | | 5021879 | | |

*All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list*

*Piridus*    21 June 2002

P 001035

CD-Disc/CD Non-essentials part

| COUNTRY | REFERENCE | | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---------|-----------|---|-----------|-------------|----------------|----------|--------|-------|
| US | N 013257 | C | 08/647149 | 09-May-96 | | 5599476 | 16-Dec-14 | Image Data Block with hierarchical encoding level |
| US | N 013409 | A | 08/268941 | 28-Jun-94 | | 5740310 | 14-Apr-15 | Method of transmitting full motion |
| US | N 013409 | A | 08/268941 | 28-Jun-94 | | 5740310 | 14-Apr-15 | Sector and Word Offset in Video Header |
| US | N 013409 | B | 08/563799 | 28-Nov-95 | | 5745641 | 28-Apr-15 | Method of transmitting full motion |
| US | N 013409 | B | 08/563799 | 28-Nov-95 | | 5745641 | 28-Apr-15 | Sector and Word Offset in Video Header |
| US | N 013709 | B | 08/259027 | 31-Aug-94 | | 5606539 | 25-Feb-14 | Decoder delay in coded video frames |
| US | N 013709 | C | 08/616951 | 18-Mar-96 | | 5608597 | 04-Mar-14 | Decoder delay in coded video frames |
| US | N 013709 | D | 08/707845 | 09-Sep-96 | | 5844867 | 01-Dec-15 | Decoder delay in coded video frames |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Printdate    21 June 2002

# EXHIBIT D

 

## Koninklijke Philips Electronics N.V.

P.O. Box 218  5600 MD The Netherlands

Universal Music Group Manufacturing & Logistics
10 University City Plaza, Suite 350
Universal City, CA 91608

Re. **CD Disc Patent License Agreement; royalty rate adjustment**                     Date:  February 5, 2003

Dear Sirs,

Reference is made to the CD Disc Patent License Agreement effective July 1, 2002 ("the Agreement") as well as the definitions used therein, in particular to Article 5.02 to the Agreement.

It is our pleasure to inform you that, after consultation with Sony, Philips has been authorized to adjust the Compliance Rates of CD Extra Discs.

In accordance with the above, the second subsections (f) and (g) of Article 5.02 are hereby amended to read as follows:

"(f) US$0.0175 (one and three quarters of a US Dollar cent) for each Licensed Product being a CD Extra Disc with an outer diameter greater than 90 mm; and

(g) US$0.0115 (one and fifteen hundredths of a US Dollar cent) for each Licensed Product being a CD Extra Disc with an outer diameter smaller than 90 mm."

For the avoidance of doubt, the Standard Rate of CD Extra Disc with an outer diameter greater than 90 mm remains at US$0.045, and the Standard Rate of CD Extra Disc with an outer diameter smaller than 90 mm remains at US$0.03.

03 FEB 19  AM 10: 40

Koninklijke Philips Electronics N.V.
Eindhoven The Netherlands
Commercial Register Eindhoven no. 17001910

 

Page: 2

If the above properly reflects our mutual understanding, please confirm so by signing the two copies of this side letter and returning same thereafter, together with the two-signed copies of the Agreement, to us. Upon receipt thereof we will arrange for countersignature on our part.

Thank you for your co-operation.

Yours faithfully,

Koninklijke Philips Electronics N.V.

Name:    R. Peters                          $w$
Title:    by proxy
Date:

Read and Agreed

Name: Peter N Scibner
Title: President UMGmL
Date: 2/11/03

P 001005

# EXHIBIT E

55001

## CD DISC PATENT LICENSE AGREEMENT

This Agreement is entered into this _3_ day of _January_ , 2007 by and between

KONINKLIJKE PHILIPS ELECTRONICS N.V., having its registered office in Eindhoven, The Netherlands, (hereinafter referred to as "Philips" )

and
_Entertainment Distribution Company (USA) LLC_
[_____], having its registered office in [_825 8th Ave_] (hereinafter referred to as " Licensee").    _23rd Fl, NY, NY 10019_

WHEREAS, the Philips' group of companies has for many years been engaged in research and development of systems, in which signals encoded in digital form and stored on a disc are read and reproduced by means of devices using an optical read-out beam, and has acquired valuable know-how and expertise therein;

WHEREAS, one of the achievements of such research and development efforts has been a revolutionary high-fidelity sound storage and reproduction system, of which the specifications have been further defined in a joint research and development co-operation with Sony Corporation ("Sony") and which has been presented under the name "Compact Disc Digital Audio System" (CD-Audio System);

WHEREAS, on the basis of the CD-Audio System Philips and Sony have developed a further system, which has been presented under the name "Compact Disc Data System" (CD-ROM System);

WHEREAS, Philips and Sony have developed an additional multi-session CD system, which has been presented under the name " Enhanced Music Compact Disc System" ("Enhanced Music CD System" or "CD Extra System" (the CD-Audio System, the CD-ROM System and the CD Extra System are collectively referred to as "the CD Systems");

WHEREAS, Philips owns certain patents relating to the CD Systems;

WHEREAS, Licensee has requested from Philips a license under Philips' patents relating to CD-Discs (as hereinafter defined) and wishes such CD-Discs to be compatible with devices capable of playing discs, conforming to the Standard Specifications for any of the relevant CD Systems;

WHEREAS, Philips is willing to grant Licensee a license under its patents and to make available certain basic information relating to the CD Systems, on the conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual obligations and covenants hereinafter set forth, the parties hereto have agreed as follows:

2

1.    **Definitions**

The following terms used in this Agreement shall have the meanings set out below:

1.1    "Disc" shall mean a non-recordable reflective disc-shaped information carrier comprising any kind of information including, but not limited to, audio, video, text and/or data-related information, which is irreversibly stored in a layer during and as an integral part of the manufacturing process of the disc in a form which is optically readable by playback devices using a laser-beam.

1.2    "CD-Audio Disc" shall mean a Disc comprising audio information encoded in digital form, which is optically readable by a CD-Audio Player (as hereinafter defined) and which conforms to the CD-Audio Standard Specifications (as hereinafter defined). A CD-Audio Disc may, in addition to audio information, comprise CD Text information.

1.3    "CD-Audio Maxi-Single" shall mean a CD-Audio Disc which, in addition to conforming to the CD-Audio Standard Specifications, conforms to the CD-Audio Maxi-Single Standard Specifications.

1.4    "CD-ROM Disc" shall mean a Disc containing data, arranged in sectors as defined in the CD-ROM Standard Specifications (as hereinafter defined) in the chapter Digital Data Structure, Parts I to V, under the names: General data specification, Sync., Header, User data and Auxiliary data respectively, and protected against errors in accordance with the error correction system as defined in the CD-ROM Standard Specifications in the chapter Error Correction System under the name Cross Interleaved Reed-Solomon Code - "CIRC".

1.5    "CD-ROM Disc mode 1" shall mean a CD-ROM Disc with an additional error correction system for computer or other data as defined in the CD-ROM Standard Specifications in the chapter Digital Data Structure, Part VII, under the name Error Detection and Error Correction specification (a third layer error correction).

1.6    "CD-ROM Disc mode 2" shall mean a CD-ROM Disc containing data protected against errors solely by the error correction system as defined in the CD-ROM Standard Specifications in the chapter Error Correction System under the name Cross Interleaved Reed-Solomon Code – "CIRC".

1.7    "CD-ROM XA Disc sub-mode 1" shall mean a CD-ROM Disc, which is in compliance with the CD-ROM-XA Specifications (as hereinafter defined) and comprises at least one sector containing data protected by an additional error correction system for data as defined in the CD-ROM Standard Specifications in the chapter Digital Data Structure, Part VII, under the name Error Detection and Error Correction specification (a third layer error correction).

1.8    "CD-ROM XA Disc sub-mode 2" shall mean a CD-ROM Disc, which is in compliance with the CD-ROM-XA Specifications and comprises solely sectors containing data protected against errors solely by the error correction system as defined in the CD-ROM Standard Specifications in the chapter Error Correction System under the name Cross Interleaved Reed-Solomon Code – "CIRC".

3

1.9 "CD Extra Disc" shall mean a Disc conforming to the Enhanced Music CD Standard Specifications (as hereinafter defined) and which comprises first information encoded in digital form, which is optically readable by a CD-Audio Player and which conforms to the CD-Audio Standard Specifications, and second information conforming to the CD-ROM XA Specifications and which is optically readable by a CD-ROM Player or by an Enhanced Music CD Player (as hereinafter defined).

1.10 "CD Extra Disc sub-mode 1" shall mean a CD Extra Disc wherein the second information is in accordance with the data format on a CD-ROM XA Disc sub-mode 1.

1.11 "CD Extra Disc sub-mode 2" shall mean a CD Extra Disc wherein the second information is solely in accordance with the data format on a CD-ROM XA Disc sub-mode 2.

The CD-Audio Disc, the CD-Audio Maxi-Single, the CD-ROM Disc mode 1 and mode 2, the CD-ROM XA Disc sub-mode 1 and sub-mode 2 and the CD Extra Disc sub-mode 1 and sub-mode 2 are collectively referred to as "CD-Disc(s)".

1.12 "CD-Audio Standard Specifications" shall mean the specifications for the CD-Audio System, including, if applicable, the Subcode/Control and Display System, Channels R ..W, chapter 5.8, the CD-TEXT mode, as made available, modified or extended from time to time.

1.13 "CD-Audio Maxi-Single Standard Specifications" shall mean the specifications for the CD-Audio Maxi-Single system, specifying among other things a maximum playing time of 30 minutes, as made available, modified or extended from time to time. For the purpose of this Agreement, the CD-Audio Maxi-Single Standard Specifications shall be considered to form part of the CD-Audio Standard Specifications.

1.14 "CD-ROM Standard Specifications" shall mean the specifications for the CD-ROM System as made available, modified or extended from time to time.

1.15 "CD-ROM-XA Specifications" shall mean the specifications of the System Description CD-ROM XA as made available, modified or extended from time to time.

1.16 "Enhanced Music CD Standard Specifications" shall mean the specifications for the Enhanced Music CD System as made available, modified or extended from time to time. The CD-Audio Standard Specifications, the CD-Audio Maxi-Single Standard Specifications, the CD-ROM Standard Specifications, the Enhanced Music CD Standard Specifications and the CD-ROM-XA Specifications are collectively referred to as the "CD Standard Specifications".

1.17 "Player" shall mean a single spindle playback device for optically reading information stored on a Disc and converting such information into electrical signals for reproduction purposes.

1.18 "CD-Audio Player" shall mean a Player solely capable of reproducing information stored on a CD-Audio Disc or CD-Audio Maxi-Single and converting such information into electrical signals, in accordance with the CD-Audio Standard Specifications, which electrical signals are directly capable of and intended to be used for sound reproduction through amplifiers and loudspeakers.

USA-PH-CD-Audio-Text-ROM-Extra-Disc/01-2005

P 001469

4

1.19  "CD-ROM Player" shall mean a Player solely capable of reproducing information stored on any kind of CD-ROM Disc and converting such information into electrical signals, in accordance with the CD-ROM Standard Specifications, which electrical signals are directly capable of and intended to be used for the reproduction of computer related data through data handling and/or data processing equipment.

1.20  "Enhanced Music CD Player" shall mean a Player solely capable of reproducing information stored on any kind of CD Extra Disc and converting such information into electrical signals, in accordance with the Enhanced Music CD Standard Specifications, which electrical signals are directly capable of and intended to be used for the reproduction of video, text and/or computer related data through data handling and/or data processing equipment.

1.21  "Combi-Player" shall mean a Player which is any combination of a CD-Audio Player, a CD-ROM Player and/or an Enhanced Music CD Player.

The CD-Audio Player, the CD-ROM Player, the Enhanced Music CD Player and the Combi-Player are collectively referred to as the "CD-Players".

1.22  "Licensed Product(s)" shall mean

Option A:     CD-Audio Discs and/or CD-Audio Maxi Singles

Option B:     CD-Audio Discs and/or CD-Audio Maxi Singles containing CD Text information

Option C:     CD-ROM Discs mode 1

Option D:     CD-ROM Discs mode 2

Option E:     CD-ROM XA Discs sub-mode 1

Option F:     CD-ROM XA Discs sub-mode 2

Option G:     CD-Extra Discs sub-mode 1

Option H:     CD-Extra Discs sub-mode 2

Option I:     CD-Extra Discs sub-mode 1 containing CD Text information

Option J:     CD-Extra Discs sub-mode 2 containing CD Text information

Option K:     CD-Extra Discs containing video-related data in accordance with the MPEG Video System ISO DIS 11172 Standard

as selected by Licensee, manufactured and/or sold in accordance with the provisions hereof, which are duly reported and on which the royalties due hereunder are paid in accordance with the provisions of this Agreement.

**P 001470**

5

Option(s):    o A    √ B    √ C    √ D    √ E    √ F
              √ G    √ H    √ I    √ J    o K

(please tick any combination as appropriate)

Initial: _____

1.23    "Licensed Patents" shall mean any one or more of the essential patents for the manufacture and/or sale of the various types of CD-Discs, as follows:

Category I

(a)    CD-Audio Discs and/or CD-Audio Maxi Singles, as listed in Annex A1;

(b)    CD-Audio Discs and/or CD-Audio Maxi Singles containing CD Text information, as listed in Annex A1 and Annex A7;

Category II

(c)    CD-ROM Discs mode 1, as listed in Annex A1 and Annex A2;

(d)    CD-ROM Discs mode 2, as listed in Annex A1 and Annex A3;

(e)    CD-ROM XA Discs sub-mode 1, as listed in Annex A1 and Annex A4;

(f)    CD-ROM XA Discs sub-mode 2, as listed in Annex A1 and Annex A5;

Category III

(g)    CD Extra Discs sub-mode 1, as listed in Annex A1, Annex A6 and Annex A4;

(h)    CD Extra Discs sub-mode 2, as listed in Annex A1, Annex A6 and Annex A5;

(i)    CD Extra Discs sub-mode 1 containing CD Text information, as listed in Annex A1, Annex A6, Annex A4 and Annex A7;

(j)    CD-Extra Discs sub-mode 2 containing CD Text information, as listed in Annex A1, Annex A6, Annex A5 and Annex A7;

(k)    CD-Extra Discs containing video-related data in accordance with the MPEG Video System ISO DIS 11172 Standard, as listed in Annex A1, Annex A6, Annex A4 or Annex A5 as well as Annex A8.

Licensed Patents shall not include the Non-Asserted Patents (as hereinafter defined) (if any) identified as such in the relevant Annex(es).

The term "essential" as used in relation to patents in this Agreement shall refer to patents, the use of which is necessary (either directly or as a practical matter) for compliance with the Standard Specifications defining the relevant CD System(s).

P 001471

6

Philips has commissioned an independent patent expert to review the European, Japanese and US patents listed as essential in Annexes A1, A2, A3, A4, A5, A6, A7 and A8 in order to confirm the essentiality of such patents. In the event that such independent patent expert would find that any of the patents does not qualify as essential as defined in this Agreement, Philips will delete such patent (as well as the equivalent corresponding patents) from the relevant Annex and such patent will be put on a list of non-essential patents. Notwithstanding such deletion, Licensee shall retain the right to continue the use of such deleted patent(s) in accordance with the provisions of this Agreement, without any additional payment, unless Licensee explicitly notifies Philips in writing of its decision to waive such right.

In the event that Philips or any of its Associated Companies (as hereinafter defined) would have additional patents relevant to CD-Audio Discs (except for CD Text information and other than patents acquired from third parties after the date of January 1, 1983), CD-ROM Discs (other than patents acquired from third parties after the date of July 1, 1986), CD Extra Discs (other than patents acquired from third parties after the date of January 1, 1996) or the CD Text mode of CD-Discs, excluding CD-ROM Discs, (other than patents acquired from third parties after the date of October 1, 1996) in its patent portfolio which are essential to the manufacture, sale or other disposal of CD-Discs and which have a filing date or are entitled to a priority date prior to either January 1, 1983, July 1, 1986 for CD-ROM Discs, January 1, 1996 for CD Extra Discs or October 1, 1996 for the CD Text mode of CD-Discs, excluding CD-ROM Discs, but which have not been listed as essential patents in the respective Annexes hereto, Philips will notify Licensee accordingly and such additional patents will be added to the Licensed Patents and such addition shall not affect the provisions of this Agreement, including without limitation, the duration of this Agreement as specified in Clause 12.1 and the duration of the grant-back undertakings on the part of Licensee pursuant to Clause 2. Any patents as may be added as essential patents to any of the respective Annexes hereto, will similarly be subject to the review by the independent patent expert in accordance with the preceding paragraph.

The patent lists provided to Licensee upon execution of this Agreement are subject to change in accordance with the provisions of this Agreement. With regard to the rights granted to Licensee hereunder, the patent lists published by Philips on its website (www.licensing.philips.com) or otherwise communicated by Philips to Licensee after the date of execution hereof shall prevail over the lists provided to Licensee upon the execution of this Agreement.

1.24    "Non-Asserted Patents" shall mean the patents essential for the manufacture, sale or other disposal of CD-Discs, which are jointly owned by Philips and other companies and identified as such in the relevant Annex(es).

1.25    "Associated Company" shall mean any one or more business entities (1) owned or controlled by Philips or Licensee, (2) owning or controlling Philips or Licensee, or (3) owned or controlled by the business entity owning or controlling Philips or Licensee at the material time. For the purposes of this definition a business entity shall be deemed to own and/or to control another business entity if more than 50% (fifty per cent) of the voting stock of the latter business entity, ordinarily entitled to vote in the election of directors, (or, if there is no such stock, more than 50% (fifty per cent) of the ownership of or control in the latter business entity) is held by the owning and/or controlling business entity.

USA-PH-CD-Audio-Text-ROM-Extra-Disc/01-2005

P 001472

7

1.26    "Territory" shall mean the geographic area known as the United States of America, its territories and possessions.

2.    Grant of Rights

2.1    For the term of this Agreement and subject to the provisions hereof, Philips hereby grants to Licensee a non-exclusive, non-transferable license under the Licensed Patents (listed in the relevant Annex(es)) to manufacture Licensed Products as selected by Licensee pursuant to the Options of Clause 1.22 within the Territory in accordance with the relevant CD Standard Specifications and to sell or otherwise dispose of such Licensed Products so manufactured in all countries of the world.

2.2    Subject to the full and unconditional compliance by Licensee with all provisions hereof, Philips undertakes that it shall not, during the term of this Agreement assert any of the Non-Asserted Patents against the manufacture, sale or other disposal of Licensed Products by Licensee in accordance with the provisions of this Agreement. This undertaking shall be without prejudice to the position of the other co-owners as regards these jointly owned patents. Licensee agrees that, to the extent that it may already have obtained a license or an undertaking not to assert from another company under such jointly owned patents, this circumstance shall not affect the obligation of Licensee to pay the royalty as specified in Clause 5.2.

2.3    Philips further agrees, for as long as this Agreement is in force and effect and Licensee is in full compliance with its obligations under this Agreement, to grant Licensee upon Licensee's request, a non-exclusive, non-transferable license on reasonable, non-discriminatory conditions, to manufacture Licensed Products in the Territory and to sell or otherwise dispose of Licensed Products so manufactured in all countries of the world, under any patents not yet licensed hereunder and which are essential to the manufacture, sale or other disposal of Licensed Products, for which Philips and/or its Associated Companies may hereafter acquire from third parties the right to grant licenses. It is acknowledged and agreed that in respect of the patents as may be licensed pursuant to this Clause 2.3, additional royalties may have to be paid over and above the royalties specified in Clause 5.2.

2.4    Philips further agrees, for as long as this Agreement is in force and effect and Licensee is in full compliance with its obligations under this Agreement, to grant Licensee upon Licensee's request as well as to those of Licensee's Associated Companies who so request, a non-exclusive, non-transferable license, on reasonable, non-discriminatory conditions to manufacture CD-Players and to sell or otherwise dispose of such CD-Players so manufactured in all countries of the world under any and all present and future patents essential to the manufacture, sale or other disposal of CD-Players for which Philips and/or its Associated Companies have or may hereafter acquire the right to grant licenses.

2.5    In consideration of the undertakings set forth in Clauses 2.1, 2.2, 2.3 and 2.4 and similar undertakings by third party licensees of Philips or any of its Associated Companies and without prejudice to the provisions of Clause 11, Licensee agrees to grant to Philips and its Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips concerning CD-Discs, non-exclusive, non-transferable licenses, on reasonable, non-discriminatory conditions comparable to those set forth herein, to manufacture, sell or otherwise dispose of CD-Discs, as correspond with the

P 001473

8

Category of CD-Discs from which Licensee has made a selection pursuant to the Options of Clause 1.22, under any and all present and future patents, for which Licensee or its Associated Companies have or may hereafter acquire the right to grant licenses and which are essential to the manufacture, sale or other disposal of such CD-Discs and which patents were first filed or are entitled to a priority date in any country of the world prior to the date of termination of this Agreement. The duration of such licenses shall be a period ending at the expiration date of the last to expiration patent of Licensee or the relevant Associated Company of Licensee, essential to the Category of CD-Discs from which Licensee has made a selection pursuant to the Options of Clause 1.22. For the avoidance of doubt, the undertaking set out in this Clause 2.5 shall only apply to those companies which accept or have accepted a similar undertaking as given by Licensee in this Clause 2.5 and only in respect of those Categories of CD-Discs from which both Licensee and such companies have made a selection.

2.6     In addition, in consideration of the undertakings set forth in Clauses 2.1, 2.2, 2.3 and 2.4 and similar undertakings by third party licensees of Philips or any of its Associated Companies and without prejudice to the provisions of Clause 11, Licensee agrees to grant to Philips and its Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips concerning CD-Players, non-exclusive, non-transferable licenses, on reasonable, non-discriminatory conditions, to manufacture, sell or otherwise dispose of CD-Players capable of playing CD-Discs as selected by Licensee pursuant to the Options of Clause 1.22 under any and all present and future patents, for which Licensee or its Associated Companies have or may hereafter acquire the right to grant licenses and which are essential to the manufacture, sale or other disposal of such CD-Players and which patents were first filed or are entitled to a priority date in any country of the world prior to the date of termination of this Agreement. The duration of such licenses shall be a period ending at the expiration date of the last to expire patent of Licensee or the relevant Associated Company of Licensee, essential to CD-Players capable of playing CD-Discs, as correspond with the selection made by Licensee pursuant to the Options of Clause 1.22. For the avoidance of doubt, the undertaking set out in this Clause 2.6 shall only apply to those companies which accept or have accepted a similar undertaking as given by Licensee in this Clause 2.6.

2.7     Philips undertakes that it will offer, at the request of any of Licensee's Associated Companies to any such Associated Company, a non-exclusive and non-transferable license under the Licensed Patents on reasonable and non-discriminatory conditions comparable to those set forth herein, to manufacture, sell or otherwise dispose of CD-Discs.

2.8     IT IS EXPRESSLY ACKNOWLEDGED AND AGREED THAT:

(1)     THE LICENSES AND LICENSE UNDERTAKINGS HEREIN CONTAINED WITH RESPECT TO THE MANUFACTURE OF LICENSED PRODUCTS DO NOT EXTEND TO MASTER RECORDING MACHINES, EQUIPMENT OR METHODS FOR THE REPLICATION OF DISCS, NOR TO THE MANUFACTURE OF MATERIALS OR REPRODUCTION RIGHTS FOR INFORMATION (SUCH AS AUDIO, VIDEO, TEXT AND/OR DATA-RELATED INFORMATION), CONTAINED ON DISCS TO BE PLAYED BACK ON A PLAYER. FURTHER, THE LICENSE UNDERTAKINGS WITH RESPECT TO THE MANUFACTURE OF PLAYERS DO NOT EXTEND TO THE MANUFACTURE OF

P 001474

9

COMPONENTS FOR PLAYERS (INCLUDING BUT NOT LIMITED TO
SEMICONDUCTOR DEVICES, INTEGRATED CIRCUITS, LASERS,
MOTORS AND LENSES), EXCEPT FOR CIRCUITRY AND/OR SYSTEM
ASPECTS SPECIFIC TO THE CD SYSTEMS (AND SIMILAR OPTICAL
READ-OUT SYSTEMS);

(II)    THE RIGHTS AND LICENSES GRANTED UNDER THIS AGREEMENT
DO NOT EXTEND TO ANY COMBINATION OF ONE OR MORE
LICENSED PRODUCTS OR PLAYERS WITH ANY OTHER ELEMENTS,
PRODUCTS, SYSTEMS, EQUIPMENT OR SOFTWARE OTHER THAN
THE COMBINATION OF A LICENSED PRODUCT AND A CD PLAYER.

**3.    Standard Specifications, Technical Information and Support**

3.1    Upon receipt of the payment provided for in Clause 5.1 and the payment provided for in
Clause 5.12, Philips shall make available to Licensee for use by Licensee in accordance
with the provisions hereof, a copy of the then current version of the respective CD
Standard Specifications, as correspond with the Licensed Products as selected by Licensee
pursuant to the Options of Clause 1.22, together with such other information and support
as Philips considers necessary for the interpretation and/or the correct application of the
relevant CD Standard Specifications.

3.2    Licensee shall be notified in writing of any addition or modification to any of the relevant
CD Standard Specifications and shall be provided with relevant information in connection
therewith.

3.3    Philips and Licensee undertake to keep each other generally informed of developments or
initiatives which may have an impact on the relevant CD Standard Specifications.

**4.    Procurement from other Licensed Manufacturers**

4.1    The rights granted to Licensee pursuant to Clause 2 and the right to use the information
pursuant to Clause 3, include the right for Licensee to have Licensed Products made for it
by third party manufacturers, duly licensed by Philips under an agreement similar to this
Agreement, provided that Licensee will properly identify such third party manufacturer in
the royalty reporting forms to be submitted to Philips hereunder, together with the
quantities of Licensed Products so purchased.
Conversely, Licensee shall refrain from purchasing or selling CD-Discs manufactured by
any third party not licensed by Philips, where such purchase or sale would constitute an
act of infringement of any of the Licensed Patents or Non-Asserted Patents.

**5.    Royalties, Reports and Payments**

5.1    In consideration of the rights granted by Philips and the information to be provided by
Philips hereunder, Licensee shall, upon execution of this Agreement, make a non-
refundable, non-recoupable payment of US$ 5,000 (five thousand US Dollars) to Philips.

P 001475

10

5.2    In further consideration of the rights granted hereunder by Philips to Licensee, Licensee shall pay to Philips a royalty for each CD-Disc sold or otherwise disposed of by Licensee, any of Licensee's Associated Companies or an agent of Licensee, in any country where at least one of the Licensed Patents or Non-Asserted Patents essential to the type(s) of CD-Discs as selected by Licensee pursuant to the Options of Clause 1.22 exists.

These royalties shall amount to:

(a)    US$ 0.02 (two US Dollar cents) for each CD-Audio Disc with an outer diameter greater than 90 mm, if applicable, containing CD Text information;

(b)    US$ 0.0135 (one and thirty-five hundredths of a US Dollar cent) for each CD-Audio Disc with an outer diameter smaller than 90 mm, if applicable, containing CD Text information;

(c)    US$ 0.018 (one and eight tenths of a US Dollar cent) for each CD-Audio Maxi-Single, if applicable, containing CD Text information;

(d)    US$ 0.02 (two US Dollar cents) for each CD-ROM Disc (irrespective of the type) with an outer diameter greater than 90 mm;

(e)    US$ 0.0135 (one and thirty-five hundredths of a US Dollar cent) for each CD-ROM Disc (irrespective of the type) with an outer diameter smaller than 90 mm;

(f)    US$ 0.03 (three US Dollar cents) for each CD Extra Disc (irrespective of the type) with an outer diameter greater than 90 mm, if applicable, containing CD Text information; and

(g)    US$ 0.02 (two US Dollar cents) for each CD Extra Disc (irrespective of the type) with an outer diameter smaller than 90 mm, if applicable, containing CD Text information,

said rates hereinafter referred to as "Standard Rates".

With respect to CD-Discs sold on or after July 1, 2002, provided that:

a)    Licensee is in full compliance with its obligations under this Agreement; and

b)    Licensee has submitted an audit statement by its external auditors, who shall be certified public auditors as specified in the Audit Guidelines attached hereto as Annex B2, confirming that the quarterly royalty statements as submitted by Licensee to Philips for the last twelve quarterly periods, are true, complete and accurate in every respect; and such statement must meet the requirements as specified in the Audit Guidelines;

and subject to the provisions of Clause 6, Licensee may apply the following royalty rates:

(a)    US$ 0.015 (one and a half US Dollar cent) for each CD-Audio Disc with an outer diameter greater than 90 mm, if applicable, containing CD Text information;

(b)    US$ 0.01 (one US Dollar cent) for each CD-Audio Disc with an outer diameter smaller than 90 mm, if applicable containing CD Text information;

(c)    US$ 0.013 (one and three tenths of a US Dollar cent) for each CD-Audio Maxi-Single, if applicable, containing CD Text information;

(d)    US$ 0.015 (one and a half US Dollar cent) for each CD-ROM Disc (irrespective of the type) with an outer diameter greater than 90 mm;

(e)    US$ 0.01 (one US Dollar cent) for each CD-ROM Disc (irrespective of the type) with an outer diameter smaller than 90 mm;

P 001476

11

(f)    US$ 0.015 (one and a half US Dollar cent) for each CD Extra Disc (irrespective of the type) with an outer diameter greater than 90 mm, if applicable, containing CD Text information; and

(g)    US$ 0.01 (one US Dollar cent) for each CD Extra Disc (irrespective of the type) with an outer diameter smaller than 90 mm, if applicable, containing CD Text information,

said rates hereinafter referred to as "Compliance Rates".

In the event that Licensee fails to comply at any time with any of its obligations under this Agreement, the Standard Rates, as applicable, shall apply to Licensee's manufacture and sale of CD-Discs instead of the Compliance Rates, as applicable, with immediate effect from the first day of the reporting period to which the occurrence of non-compliance relates until such moment that Philips confirms in writing to Licensee that Licensee's non-compliance has been remedied in full.

A CD-Disc shall be considered sold when invoiced or, if not invoiced, when delivered to a party other than Licensee.

For the avoidance of doubt, Philips confirms that it shall not assert any of the Licensed Patents nor any of the Non-Asserted Patents against Licensee, nor against any of Licensee's customers or subsequent buyers of CD-Discs manufactured and sold by Licensee, prior to the day on which such CD-Discs are to be reported pursuant to the provisions of this Agreement, nor, provided that such CD-Discs have been duly reported in accordance with the provisions of this Agreement, prior to the day when payment of royalties in respect of CD-Discs manufactured and sold by Licensee is due in accordance with the provisions of this Agreement.

No royalties shall be payable for CD-Discs purchased by Licensee on a "have made" basis in accordance with Clause 4 from third party manufacturers, duly licensed by Philips, provided that Licensee can demonstrate to Philips' satisfaction, that such third party manufacturer has paid to Philips the royalties due in respect of such CD-Discs.

For the avoidance of doubt, in the event that the manufacture by Licensee of CD-Discs within the Territory would not infringe any of the Licensed Patents nor any of the Non-Asserted Patents, Licensee shall have no obligation to report and pay royalties in respect of CD-Discs manufactured within the Territory and which are sold for final use within the Territory or imported (either by Licensee or by a third party) into a country where no Licensed Patents or Non-Asserted Patents exist, for final use in such country.

5.3    Within 30 days following 31 March, 30 June, 30 September and 31 December of each year during the term of this Agreement, Licensee shall submit to Philips (even in the event that no sales have been made) a written statement in the form as attached hereto as Annex B1 ("Royalty Reporting Form") (or in such other form as may be subsequently communicated by Philips to Licensee), signed by a duly authorized officer on behalf of Licensee, setting forth with respect to the preceding quarterly period:

(1)    the quantities of CD-Discs manufactured by Licensee on which royalties are due in accordance with the provisions of this Agreement, specified per individual type of CD-Disc;

USA-PH-CD-Audio-Text-ROM-Extra-Disc/01-2005

P 001477

12

(2)  the quantities of CD-Discs corresponding with the CD-Discs as selected by Licensee pursuant to the Options of Clause 1.22, purchased from other licensed manufacturers in accordance with the provisions of Clause 4, on which royalties are due in accordance with the provisions of the CD Disc patent license agreement of said other manufacturers, specified per individual type of CD-Disc and per such third party manufacturer who shall be named in the Royalty Reporting Form;

(3)  on a per-country basis, specifying per individual type of CD-Disc:

(a)  the quantities of CD-Discs on which royalties are due in accordance with the provisions of this Agreement, sold or otherwise disposed of, specifying the identity of the buyers and the trademarks used on or in connection with the CD-Discs;

(b)  the quantities of CD-Discs on which royalties are due in accordance with the provisions of this Agreement, sold to other manufacturers, duly licensed by Philips, specifying the identity of such other manufacturers and the trademarks used on or in connection with the CD-Discs;

(4)  a computation of the royalties due under this Agreement.

Licensee shall pay the royalties due to Philips within 30 days after the end of each quarterly period in US Dollars to a bank account, as specified by Philips.

5.4    In the event that Licensee fails to submit to Philips a Royalty Reporting Form for any royalty reporting period within 30 days from the end of the relevant reporting period in accordance with the provisions of Clause 5.3, Licensee shall be obliged to pay to Philips within 30 days after the end of the relevant quarterly period for which the Royalty Reporting Form was not submitted, an estimated royalty (hereinafter referred to as an "Advance"), being an amount equal to the highest amount of royalties due for any royalty reporting period over the preceding eight royalty reporting periods (or over all preceding royalty reporting periods if fewer than eight). Such payment shall be treated as a non-refundable advance, primarily against the royalties and interest for the relevant royalty reporting period and then, if any sum remains, against any future royalties or other payments payable by Licensee hereunder. Licensee acknowledges and agrees that any Advance shall not be due by way of penalty, but that such payment shall constitute a non-refundable advance as aforesaid. For the avoidance of doubt, such payment shall be payable without any further notice or action by Philips, legal or otherwise, and shall take effect by virtue of the failure to submit a Royalty Reporting Form on time. The payment by Licensee of an Advance shall not affect Licensee's obligation to submit a Royalty Reporting Form and shall be without prejudice to any other rights or remedies of Philips, including, without limitation, Philips' right to charge 2% (two per cent) interest per month on overdue payments (including overdue payments of the Advance), and Philips' right to terminate this Agreement in accordance with its provisions. The Advance will not be set off against other sums due to Philips until a Royalty Reporting Form has been submitted in respect of the relevant royalty reporting period. In respect of any royalty reporting period for which an Advance has been paid and the Royalty Reporting Form subsequently submitted, Philips will first set off against the Advance all royalties and interest due for that period. Any remaining sum from the Advance will be set off against further royalty, interest or Advance payments due to Philips hereunder (if any).

P 001478

13

5.5    Licensee shall submit to Philips, once per calendar year, an audit statement by its external auditors, who shall be certified public auditors as specified in the Audit Guidelines attached hereto as Annex B2, confirming that the quarterly royalty statements as submitted by Licensee to Philips for the last four quarterly periods, are true, complete and accurate in every respect. Such statement must meet the requirements as specified in the Audit Guidelines and shall be submitted to Philips within 90 days following the end of Licensee's financial year. The correctness of this audit statement may be verified by Philips by means of a work paper review, conducted by one of the certified public auditors selected by Philips. Licensee shall procure that its auditors provide full cooperation with said work paper review. Notwithstanding this audit statement, Philips reserves the right to inspect the books and records of Licensee from time to time in accordance with Clause 5.10.

The requirement to submit an audit statement by its external auditors as contained in the preceding paragraph only applies to those licensees who are entitled to apply the Compliance Rates in accordance with the provisions of this Agreement.

5.6    Within 30 days following the expiration or termination of this Agreement, Licensee shall submit to Philips a certified report on the number of CD-Discs as selected by Licensee pursuant to the Options of Clause 1.22, on which royalties are due in accordance with the provisions of this Agreement, in stock at the time of expiration or termination of this Agreement. Royalties, calculated in accordance with Clause 5.2 and Clause 5.12, shall be due and payable for all such CD-Discs manufactured prior to, but remaining in stock with Licensee on the date of expiration or termination of this Agreement. For the avoidance of doubt, this Clause 5.6 shall be without prejudice to the provisions of Clause 11.6.

5.7    Any payment under this Agreement which is not made on the date(s) specified herein, shall accrue interest at the rate of 2% (two per cent) per month (or part thereof) or the maximum amount permitted by law, whichever is lower.

5.8    All payments to Philips under this Agreement shall be made by transfer in US Dollar or in such other currency, convertible in the sense of Articles VIII and XIX of the Articles of Agreement of the International Monetary Fund, as designated by Philips. The rate of exchange for converting the currency (if other than US Dollar) of the Territory shall be the telegraphic transfer selling rate of the designated currency as officially quoted in the Territory by the officially authorized foreign exchange bank for payment of currency transactions on the day that the amount is due and payable.

5.9    All costs, stamp duties, taxes and other similar levies arising from or in connection with the conclusion of this Agreement shall be borne by Licensee. In the event that the government of a country imposes any taxes on payments by Licensee to Philips hereunder and requires Licensee to withhold such tax from such payments, Licensee may deduct such tax from such payments. In such event, Licensee shall promptly provide Philips with tax receipts issued by the relevant tax authorities so as to enable Philips to support a claim for credit against income taxes which may be payable by Philips and/or its Associated Companies in The Netherlands and to enable Philips to document, if necessary, its compliance with tax obligations in any jurisdiction outside The Netherlands.

5.10    In order that the royalty statements provided for in this Clause 5 may be verified, Licensee shall keep complete and accurate books and records relating to the manufacture and sale or other disposal of the CD-Discs as correspond with the CD-Discs as selected by

P 001479

14

Licensee pursuant to the Options of Clause 1.22 for which at least one Licensed Patent or Non-Asserted Patent remains in force in any country of the world and shall keep the books and records available for a period of 5 years following the manufacture, sale or other disposal of each CD-Disc.

Philips shall have the right to inspect the books and records of Licensee from time to time, in order to verify the correctness of the aforementioned royalty statements. Any such inspection shall take place no more than once per calendar year and shall be conducted by a certified public auditor appointed by Philips. Philips shall give Licensee written notice of such inspection at least 7 days prior to the inspection. Licensee shall willingly co-operate and provide all such assistance in connection with such inspection as Philips and/or the auditor may require. The inspection shall be conducted at Philips' own expense, provided that in the event that Licensee has failed to submit royalty statements and/or yearly written statement(s) by its external auditors, as provided for in Clause 5.3 and Clause 5.5, in respect of the period to which the inspection relates or in the event that any discrepancy or error exceeding 3% (three per cent) of the monies actually due is established, in addition to Licensee's obligation promptly to make up for such underpayment, the cost of the inspection shall be borne by Licensee, without prejudice to any other claim or remedy as Philips may have under this Agreement or under applicable law.

Philips' right of inspection as set out in this Clause 5.10 shall survive termination or expiration of this Agreement.

5.11    Without prejudice to the provisions of Clause 5.10, Licensee shall provide all relevant additional information as Philips may reasonably request from time to time, so as to enable Philips to ascertain which products manufactured, sold or otherwise disposed of by Licensee are subject to the payment of royalties to Philips hereunder, the patents which have been used in connection with such products, and the amount of royalties payable.

5.12    **OPTIONAL:**
**CHOOSE BETWEEN OPTIONS A AND B**

**DELETE WORDING IN BOLD AND CLAUSE WHICH IS NOT APPLICABLE**

Option A: from joint agreement to Philips only

As a condition precedent to the entry into force of this Agreement, Licensee shall pay to Philips the total amount of royalties due for the use of Philips' and Sony's patents in respect of its production and sale of CD-Discs for which no royalties have been paid to Philips under a patent license agreement covering the use of the patents of Philips and Sony prior to the date of execution of this Agreement.

The aforementioned amount shall be calculated by Philips on the basis of the number of CD-Discs manufactured and sold by Licensee prior to the date of execution hereof, by applying the royalty rates of:

(a)    US$ 0.03 (three US Dollar cents) for each CD-Audio Disc with an outer diameter greater than 90 mm, if applicable, containing CD Text information or CD-ROM Disc (irrespective of the type) with an outer diameter greater than 90 mm;

P 001480

15

(b) ~~US$ 0.02 (two US Dollar cents) for each CD-Audio Disc with an outer diameter~~
smaller than 90 mm, if applicable, containing CD Text information or CD-ROM
Disc (irrespective of the type) with an outer diameter smaller than 90 mm;

(c) US$ 0.027 (two point seven US Dollar cents) for each CD-Audio Maxi-Single, if
applicable, containing CD Text information;

(d) US$ 0.048 (four point eight US Dollar cents) for each CD Extra Disc, if so
selected by Licensee in Schedule I to the Enhanced Music CD Disc License
Agreement, if applicable, containing CD Text information;

(e) US$ 0.045 (four and a half US Dollar cents) for each CD Extra Disc (irrespective
of the type) with an outer diameter greater than 90 mm, if applicable, containing
CD Text information; and

(f) US$ 0.03 (three US Dollar cents) for each CD Extra Disc (irrespective of the
type) with an outer diameter smaller than 90 mm, if applicable, containing CD
Text information.

The above rates are effective for CD-Discs sold after June 30, 2000.
CD-Audio Discs and CD-ROM Discs having an outer diameter greater than 90 mm sold
prior to July 1, 1998 are subject to a royalty rate of US$ 0.045; if sold after June 30, 1998
and prior to July 1, 1999 such Discs are subject to a royalty rate of US$ 0.04; and if sold
after June 30, 1999 and prior to July 1, 2000 such Discs are subject to a royalty rate of
US$ 0.035.

Philips will determine the number of CD-Discs manufactured and sold by Licensee prior
to the date of execution hereof on the basis of Licensee's Royalty Reporting Forms and,
where available, the external auditor's statement submitted under the aforementioned
patent license agreement. Where such reports are not available, Philips will determine the
number of CD-Discs on the basis of information contained in Licensee's annual reports,
or, where annual reports are not available, Philips will make said determination on the
basis of market information obtained from independent market intelligence sources.

**Option B: from unlicensed to Philips only**
As a condition precedent to the entry into force of this Agreement, Licensee shall submit
to Philips a royalty statement in respect of those CD-Discs as correspond with the CD-
Discs as selected by Licensee pursuant to the Options of Clause 1.22 and in which any
one or more of the Licensed Patents and/or any one or more of the Non-Asserted
Patents existing at the time is (are) used, manufactured and sold or otherwise disposed of
by Licensee before the Effective Date (as hereinafter defined) of this Agreement in
accordance with the provisions of Clause 5.3.

Within 7 days following the execution of this Agreement, Licensee shall pay to Philips the
royalties for such CD-Discs, calculated by applying the royalty rates of:

(a) US$ 0.02 (two US Dollar cents) for each CD-Audio Disc with an outer diameter
greater than 90 mm, if applicable, containing CD Text information or CD-ROM
Disc (irrespective of the type) with an outer diameter greater than 90 mm;

(b) US$ 0.0135 (one and thirty-five hundredths of a US Dollar cent) for each CD-
Audio Disc with an outer diameter smaller than 90 mm, if applicable, containing
CD Text information or CD-ROM Disc (irrespective of the type) with an outer
diameter smaller than 90 mm;

(c) US$ 0.018 (one and eight tenths of a US Dollar cent) for each CD-Audio Maxi-
Single, if applicable, containing CD Text information;

USA-PH-CD-Audio-Text-ROM-Extra-Disc/01-2005

P 001481

16

(d)  US$ 0.03 (three US Dollar cents) for each CD Extra Disc (irrespective of the type) with an outer diameter greater than 90 mm, if applicable, containing CD Text information; and

(e)  US$ 0.02 (two US Dollar cents) for each CD Extra Disc (irrespective of the type) with an outer diameter smaller than 90 mm, if applicable, containing CD Text information.

The royalty statement shall similarly be subject to Philips' right of audit as set out in Clause 5.10. Within 45 days following the execution of this Agreement, a Licensee who requests to be allowed to apply the Compliance Rates in accordance with Clause 5.2 shall submit to Philips an audit statement by its external auditors, who shall be certified public auditors, confirming that this royalty statement is true, complete and accurate in every respect. Such statement must meet the requirements as specified in the Audit Guidelines.

6.    **Manufacturing Equipment Identification System**

6.1   Upon signing of this Agreement, Licensee shall submit to Philips an overview of its manufacturing equipment currently used, or which is technically capable of being used for the manufacture of CD-Discs. Further, upon any acquisition, transfer or disposal of manufacturing equipment used, or which is technically capable of being used for the manufacture of CD-Discs, Licensee shall submit to Philips details of any such adjustment(s) to its manufacturing equipment. Further, Licensee shall submit to Philips an overview containing all adjustments to its manufacturing equipment during the preceding year, together with and confirmed by the audit statement referred to in Clause 5.5. Such overview shall be in the form as attached hereto as Annex B3 ("Manufacturing Equipment List"), signed by a duly authorized officer on behalf of Licensee.

6.2   The Compliance Rates referred to in Clause 5.2 shall only apply to CD-Discs manufactured by Licensee using manufacturing equipment properly identified in the Manufacturing Equipment List and shall be conditional upon Licensee submitting to Philips the audit statement meeting the requirements as set out in the Audit Guidelines, in accordance with the provisions in Clause 5.5. In the event that Licensee puts into use newly acquired manufacturing equipment which has been used, or which was technically capable of being used for the manufacture of CD-Discs prior to the acquisition by Licensee, the Compliance Rates shall only apply if Licensee confirms to Philips that the newly acquired manufacturing equipment originates from and has been used, or was technically capable of being used by a company which was properly licensed by Philips for the manufacture of CD-Discs at the time of the acquisition of the newly acquired manufacturing equipment by Licensee or that the equipment concerned has not been used by any other entity or person directly or indirectly under the same ultimate control as Licensee. In the event that Licensee is unable to comply with the requirements under this Clause 6, the Standard Rates shall apply to Licensee's manufacture and sale of CD-Discs instead of the Compliance Rates.

7.    **Most Favourable Rate**

7.1   In the event that licenses under the patents referred to in Clause 2 are granted by Philips for CD-Discs, as correspond with the selection made by Licensee pursuant to the Options of Clause 1.22, to a third party under substantially similar conditions, but at a royalty rate

P 001482

17

more favourable than the rate payable by Licensee under this Agreement, Licensee shall be entitled to the same royalty rate as applicable to such third party, provided always that this right of Licensee shall not apply in respect of cross-license agreements or other agreements providing for a consideration which is not exclusively based on the payment of royalties and further provided that this right of Licensee shall not apply in respect of licenses or other arrangements made pursuant to a court decision or the settlement of a dispute between Philips and a third party, irrespective of the nature of such dispute, the terms of the court decision or the settlement terms.

8.    **No Warranty and Indemnification**

8.1    Whereas Philips has made efforts to ensure that the information to be supplied by it hereunder is complete and accurate, Philips makes no representation or warranty as to the completeness or accuracy of such information, nor with respect to the ability of Licensee to achieve interchangeability with respect to CD-Discs through the use of such information.

8.2    It is acknowledged by Licensee that third parties may own industrial and/or intellectual property rights in the field of CD-Discs. Philips makes no warranty whatsoever that the manufacture, sale or other disposal of CD-Discs or the use of information supplied by Philips hereunder, does not infringe or will not cause infringement of any industrial and/or intellectual property rights other than the Licensed Patents. Philips and its Associated Companies shall be fully indemnified and held harmless by Licensee from and against any and all third party claims in connection with CD-Discs manufactured, sold or otherwise disposed of by Licensee.

9.    **Confidentiality**

9.1    Licensee shall at all times maintain strict confidentiality with regard to the CD Standard Specifications and shall not disclose same to any third party without the prior written consent of Philips.

9.2    Without prejudice to Clause 9.1, Licensee shall, during the term of this Agreement as specified in Clause 11.1 and for a period of 3 years thereafter, not disclose to any third party any information acquired from Philips or any of Philips' Associated Companies in connection with this Agreement, or use such information for any purpose other than the manufacture and disposal of CD-Discs in accordance with the provisions of this Agreement. This obligation shall not apply to the extent information so acquired:

(a)    was known to Licensee prior to the date on which such information was acquired from Philips or any of Philips' Associated Companies, as shown by records of Licensee or otherwise demonstrated to Philips' satisfaction;

(b)    is or has become available to the public through no fault of Licensee;

(c)    was or is received from a third party who was under no confidentiality obligation in respect of such information.

18

In protecting information acquired from Philips or any of Philips' Associated Companies, Licensee shall take all necessary measures and precautions, including but not limited to measures requiring its present and future employees to give suitable undertakings of secrecy both for the period of their employment and thereafter, and shall protect such information in the same manner and with the same degree of care (but no less than a reasonable degree of care) as Licensee applies to its own information of a confidential nature.

9.3    The obligations concerning confidentiality contained in Clause 9.1 and Clause 9.2 shall survive termination of this Agreement.

9.4    Philips shall, during the term of this Agreement as specified in Clause 11.1 and for a period of 3 years thereafter, not disclose to any third party any confidential information obtained in connection with Clause 5.3, Clause 5.5, Clause 5.6, Clause 5.12 and/or Clause 6, except that Philips may disclose such information to its external auditors, legal representatives and to the competent courts to the extent this is necessary for Philips in connection with the enforcement of its rights hereunder. Further, Philips shall not use such information for other purposes than to verify Licensee's compliance with its royalty reporting and payment obligations as provided in this Agreement and to enforce Philips' rights hereunder. Philips' obligations set out in this paragraph shall not apply to information referred to in sections (a), (b) and/or (c) of Clause 9.2.

**10.    No Assignment**

10.1    This Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective assignees. It may not be assigned in whole or in part by Licensee without the prior written consent of Philips.

**11.    Term and Termination**

11.1    This Agreement shall enter into force on the "Effective Date", being the date first written above. In the event that validation of this Agreement is required by the competent governmental authorities, the Effective Date shall be the date of such validation. Unless terminated earlier in accordance with the provisions of this Clause 11, this Agreement shall remain in force until the expiration date of the last to expire Licensed Patent or Non-Asserted Patent in the Territory essential to CD-Discs as selected by Licensee pursuant to the Options of Clause 1.22.

Upon the expiration of all Licensed Patents and Non-Asserted Patents in the Territory essential to CD-Discs as selected by Licensee pursuant to the Options of Clause 1.22, Philips shall not assert any of the essential Licensed Patents nor any of the Non-Asserted Patents against Licensee or Licensee's customers, provided that Licensee has entered into a contractual arrangement with Philips providing for the situation that, although such CD-Discs manufactured by Licensee are no longer covered by any of the essential Licensed Patents nor any of the Non-Asserted Patents in the Territory, such CD-Discs are being imported by Licensee or a third party into one or more other countries in which one or more of said essential Licensed Patents or one or more of the Non-Asserted Patents subsist.

19

11.2   Without prejudice to the provisions of Clause 11.3 through Clause 11.6, each party may terminate this Agreement at any time by means of a written notice to the other party in the event that the other party fails to perform any obligation under this Agreement and such failure is not remedied within 30 days after receipt of a notice specifying the nature of such failure and requiring it to be remedied. Such right of termination shall not be exclusive of any other remedies or means of redress to which the non-defaulting party may be lawfully entitled and all such remedies shall be cumulative. Any such termination shall not affect any royalty or other payment obligations under this Agreement accrued prior to such termination.

11.3   Philips may terminate this Agreement forthwith by means of a written notice to Licensee in the event that a creditor or other claimant takes possession of, or a receiver, administrator or similar officer is appointed over any of the assets of Licensee, or in the event that Licensee makes any voluntary arrangement with its creditors or becomes subject to any court or administration order pursuant to any bankruptcy or insolvency law.

11.4   Additionally, insofar as legally permitted, Philips may terminate this Agreement at any time by means of a written notice to Licensee in case Licensee or an Associated Company of Licensee has been found liable by a competent court or administrative authority to have committed an act of copyright piracy.

11.5   Philips shall have the right to terminate this Agreement forthwith or to revoke the license granted under any of Philips' or any of its Associated Companies' patents in the event that Licensee or any of its Associated Companies brings a claim of infringement of any of Licensee's or any of Licensee's Associated Companies' essential patents relating to CD-Discs or CD-Players against Philips or any of its Associated Companies and Licensee refuses to license such patents on fair and reasonable conditions.

11.6   Upon the termination of this Agreement by Philips for any reason pursuant to Clause 11.2 through Clause 11.5, Licensee shall immediately cease the manufacture, sale or other disposal of CD-Discs in which any one or more of the Licensed Patents are used. Further, upon such termination, any and all amounts outstanding hereunder shall become immediately due and payable.

11.7   All provisions of this Agreement which are intended to survive (whether express or implied) the expiry or termination of this Agreement, shall so survive.

12.    Miscellaneous

12.1   Licensee acknowledges that Philips may make modifications to the wording of the standard version of the CD Disc Patent License Agreement in future. Licensee shall at all times have the option of entering into the latest version of the CD Disc Patent License Agreement as published by Philips on its website or otherwise communicated by Philips to Licensee after the Effective Date of this Agreement.

12.2   Any notice required under this Agreement to be sent by either party shall be given in writing by means of a letter, facsimile or electronic mail directed:

20

in respect of Licensee, to:

*Entertainment Distribution Company (USA) LLC*
*825 Eighth Ave*
*N.Y., N.Y. 10019*
*Attn. CFO*
*Fax 212-333-8544*

in respect of Philips, to:

Koninklijke Philips Electronics N.V.
c/o Philips Intellectual Property & Standards - Legal Department
Building WAH-2
P.O. Box 220
5600 AE Eindhoven
The Netherlands
Fax: +31 40 2734131

with a copy to:

Philips Intellectual Property & Standards
345 Scarborough Road
Briarcliff Manor, NY 10510-8001

or to such other address as may have been previously specified in writing by either party to the other.

12.3    This Agreement sets forth the entire understanding and agreement between the parties as to the subject matter hereof and supersedes and replaces all prior arrangements, discussions and understandings between the parties relating thereto. No variation of this Agreement shall be binding upon either party unless made in writing and signed by an authorized representative of each of the parties hereto.

12.4    Nothing contained in this Agreement shall be construed:

(a)     as imposing on either party any obligation to instigate any suit or action for infringement of any of the patents licensed hereunder or to defend any suit or action brought by a third party which challenges or relates to the validity of any such patents. Licensee shall have no right to instigate any such suit or action for infringement of any of the patents licensed by Philips hereunder, nor the right to defend any such suit or action which challenges or relates to the validity of any such patent licensed by Philips hereunder;

(b)     as imposing any obligation to file any patent application, to secure any patent or to maintain any patent in force;

(c)     as conferring any license or right to copy or imitate the appearance and/or design of any product of Philips or any of its Associated Companies;

(d)     as conferring any license to manufacture, sell or otherwise dispose of any product or device other than a Licensed Product.

P 001486

21

12.5    Neither the failure nor the delay of either party to enforce any provision of this Agreement shall constitute a waiver of such provision or of the right of either party to enforce each and every provision of this Agreement.

12.6    Should any provision of this Agreement be finally determined void or unenforceable in any judicial proceeding, such determination shall not affect the operation of the remaining provisions hereof, provided that, in such event, Philips shall have the right to terminate this Agreement by means of a written notice to Licensee.

12.7    This Agreement shall be governed by and construed in accordance with the laws of The State of New York.

Any dispute between the parties hereto in connection with this Agreement (including any question regarding its existence, validity or termination) shall be submitted to any state or federal courts in The State of New York, provided always that, in case Philips is the plaintiff, Philips may, at its sole discretion, submit any such dispute either to the state or federal courts in the venue of Licensee's registered office, or to any of the state or federal courts in the Territory having jurisdiction. Licensee hereby irrevocably waives any objection to the jurisdiction, process and venue of any such court and to the effectiveness, execution and enforcement of any order or judgment (including, but not limited to, a default judgment) of any such court in relation to this Agreement, to the maximum extent permitted by the law of any jurisdiction, the laws of which might be claimed to be applicable regarding the effectiveness, enforcement or execution of such order or judgment.

AS WITNESS, the parties hereto have caused this Agreement to be signed on the date first written above.

KONINKLIJKE PHILIPS ELECTRONICS N.V.

[LICENSEE] Entertainment Distribution Company (USA) LLC

Name: H. Sprucers
Title: By Proxy

Name: Thomas Costabilg
Title: GVP & COO

Annex A1 to the CD Disc Patent License Agreement
Essential PH patents relevant to CD Disc / CD-General pat

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | | TITLE |
|---|---|---|---|---|---|---|---|---|---|
| AR | Q 080007 . | 285958 | 02-Jul-81 | | 06-Jun-87 | 250849 | 06-Jun-12 | Non-Asserted Patent | Block N to K compact disc modulation code (EFM) |
| AR | Q 080009 . | 285400 | 20-May-81 | | 04-Jun-87 | 250848 | 04-Jun-12 | Non-Asserted Patent | Error correctable data transmission method |
| AT | Q 080007 . | 81-A3107 | 14-Jul-81 | | 25-Jan-89 | 404652 | 15-May-16 | Non-Asserted Patent | Block N to K compact disc modulation code (EFM) |
| AT | Q 080009 . | 91-A7215 | 18-May-91 | 395784 | 25-Mar-93 | 395784 | 15-Jul-10 | Non-Asserted Patent | Error correctable data transmission method |
| BW | Q 080007 . | 98-00033 | 21-Apr-80 | | 02-Oct-02 | BWP/02/000 | 21-Apr-18 | Non-Asserted Patent | Block N to K compact disc modulation code (EFM) |
| US | N 006493 D | 06/689550 | 23-Apr-86 | | 26-Nov-91 | 5068846 | 26-Nov-08 | | Video disc with disc body acting as protection |
| US | N 006493 K | | | | | | 26-Mar-08 | | Video disc with disc body acting as protection |

Version date : 14 April 2005

P 001488

Annex. A2 to the CD Disc Patent License Agreement

Essential PH patents relevant to CD Disc / CD-ROM Mode 1 part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | | TITLE |
|---------|-----------|-----------|-------------|----------------|------------|----------|-------------|--|-------|
| AT | Q 083025 | 84-42768 | 29-Aug-84 | | 26-Dec-97 | 403223 | 15-Apr-15 | Non-Asserted Patent | Framing of data-blocks on CD-ROM |
| CA | Q 084008 | 477163 | 21-Mar-85 | | 13-Jun-89 | 1255771 | 13-Jun-06 | Non-Asserted Patent | CD-ROM Error Correction System A |

*Version date : 14 April 2005*

P 001489

Annex A3 to the CD Disc Patent License Agreement

Essential PH patents relevant to CD Disc / CD-ROM Mode 2 part

| COUNTRY | FILING REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | | TITLE |
|---|---|---|---|---|---|---|---|---|---|
| AT | O 083025 | 94-A2769 | 29-Aug-84 | | 29-Dec-87 | 403223 | 15-Apr-15 | Non-Asserted Patent | Framing of data-blocks on CD-ROM |

Version date : 14 April 2005

Page 1 of 1

P 001490

Annex A4 to the CD Disc Patent License Agreement

Essential PH patents relevant to CD Disc / CD-ROM XA Sub-mode 1 (Mode 2 Form 1) part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | | TITLE |
|---------|-----------|-----------|-------------|----------------|------------|----------|-------------|---|-------|
| AT | Q 083025 | 64-A27893 | 29-Aug-84 | | 29-Dec-87 | 403223 | 15-Apr-15 | Non-Asserted Patent | Framing of data-blocks on CD-ROM |
| BR | Q 086003 | PI8700948 7 | 23-Feb-87 | | 30-May-95 | PI8700948 | 23-Feb-07 | Non-Asserted Patent | Real-time format switching |
| CA | Q 084008 | 477183 | 21-Mar-85 | | 13-Jun-89 | 1255771 | 13-Jun-06 | Non-Asserted Patent | CD-ROM Error Correction System A |
| CA | Q 086003 | 530120 | 19-Feb-87 | | 12-Feb-91 | 1280208 | 12-Feb-08 | Non-Asserted Patent | Real-time format switching |
| CN | Q 086003 | 87100928.3 | 21-Feb-87 | 87100928-A | 13-Mar-81 | 1010517 | 21-Feb-07 | Non-Asserted Patent | Real-time format switching |
| DE | Q 086003 | P3701763.2 | 22-Jan-87 | 3701763 | 22-May-97 | 3701763 | 22-Jan-07 | Non-Asserted Patent | Real-time format switching |
| FR | Q 086003 | 9702234 | 20-Feb-87 | | 22-Aug-88 | 7594098 | 20-Feb-07 | Non-Asserted Patent | Real-time format switching |
| GB | Q 086003 | 8700011 | 20-Feb-87 | | 06-Dec-89 | 2187008 | 20-Feb-07 | Non-Asserted Patent | Real-time format switching |
| IT | Q 086003 | 97-A19447 | 20-Feb-87 | | 09-Feb-80 | 1215362 | 20-Feb-07 | Non-Asserted Patent | Real-time format switching |
| JP | Q 086003 | 81-39937 | 23-Feb-87 | 87-217408 | 19-Dec-87 | 2730224 | 23-Feb-07 | Non-Asserted Patent | Real-time format switching |
| KR | Q 086003 | 87-1501 | 23-Feb-87 | 85-7948 | 30-Oct-95 | 81017 | 23-Feb-07 | Non-Asserted Patent | Real-time format switching |
| NL | Q 086003 | 8600450 | 24-Feb-86 | 8600450 | 04-Feb-97 | 192151 | 24-Feb-06 | Non-Asserted Patent | Real-time format switching |
| SE | Q 086003 | 8700711-8 | 20-Feb-87 | | 08-Jun-92 | 465442 | 20-Feb-07 | Non-Asserted Patent | Real-time format switching |
| TW | Q 086003 | 76100969 | 25-Feb-87 | | 28-Mar-88 | 27916 | 25-Feb-07 | Non-Asserted Patent | Real-time format switching |
| US | Q 086003 | 07/016153 | 24-Feb-87 | | 31-Jan-80 | 4902169 | 24-Feb-07 | Non-Asserted Patent | Real-time format switching |

Version date : 14 April 2001

P 001491

Annex A5 to the CD Disc Patent License Agreement

Essential PH patents relevant to CD Disc / CD-ROM XA Sub-mode 2 (Mode 2 Form 2) part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | | TITLE |
|---------|-----------|-----------|-------------|----------------|------------|----------|-------------|---|-------|
| AT | Q 086026 | 84-42769 | 28-Aug-84 | | 28-Oct-87 | 403223 | 15-Apr-15 | Non-Asserted Patent | Framing of data-blocks on CD-ROM |
| BR | Q 086003 | PI8700846.7 | 23-Feb-87 | | 30-May-95 | PI8700846 | 23-Feb-07 | Non-Asserted Patent | Real-time format switching |
| CA | Q 086003 | 530120 | 19-Feb-87 | | 12-Feb-91 | 1280208 | 12-Feb-08 | Non-Asserted Patent | Real-time format switching |
| CH | Q 086003 | 87100929.3 | 21-Feb-87 | 87100929-A | 13-Mar-91 | 1010517 | 21-Feb-07 | Non-Asserted Patent | Real-time format switching |
| DE | Q 086003 | P3701763.2 | 22-Jan-87 | 3701763 | 22-May-97 | 3701763 | 22-Jun-07 | Non-Asserted Patent | Real-time format switching |
| FR | Q 086003 | 8700234 | 20-Feb-87 | | 22-Aug-88 | 2594996 | 20-Feb-07 | Non-Asserted Patent | Real-time format switching |
| GB | Q 086003 | 8704011 | 20-Feb-87 | | 08-Dec-88 | 2187008 | 20-Feb-07 | Non-Asserted Patent | Real-time format switching |
| IT | Q 086003 | 87-A19447 | 20-Feb-87 | | 08-Feb-90 | 1215592 | 20-Feb-07 | Non-Asserted Patent | Real-time format switching |
| JP | Q 086003 | 87-39997 | 23-Feb-87 | 67-217468 | 19-Dec-07 | 2730024 | 23-Feb-07 | Non-Asserted Patent | Real-time format switching |
| KR | Q 086003 | 87-1501 | 23-Feb-87 | 95-1946 | 30-Oct-95 | 91017 | 23-Feb-07 | Non-Asserted Patent | Real-time format switching |
| NL | Q 086003 | 8600450 | 24-Feb-86 | 8600450 | 04-Feb-87 | 192151 | 24-Feb-08 | Non-Asserted Patent | Real-time format switching |
| SE | Q 086003 | 8700711-8 | 20-Feb-87 | | 08-Jan-82 | 465442 | 20-Feb-07 | Non-Asserted Patent | Real-time format switching |
| TW | Q 086003 | 76100989 | 25-Feb-87 | | 28-Mar-88 | 27916 | 25-Feb-07 | Non-Asserted Patent | Real-time format switching |
| US | Q 086003 | 07/018163 | 24-Feb-87 | | 31-Jan-89 | 4807169 | 24-Feb-07 | Non-Asserted Patent | Real-time format switching |

Version date : 14 April 2003

P 001492

Annex A6 to the CD Disc Patent License Agreement
Essential PH patents relevant to CD Disc / CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---------|-----------|-----------|-------------|----------------|---|------------|----------|-------------|-------|
| AU | N 01366! - | 92-13942 | 31-Mar-92 | 92-13942 | 661991 | 18-Feb-95 | 661991 | 31-Mar-12 | Recording of content information in Lead-Out |
| CA | N 01366! - | 2064511 | 31-Mar-92 | | | 01-Jan-02 | 2064511 | 31-Mar-12 | Recording of content information in Lead-Out |
| DE | N 01366! - | 92200893.3 | 30-Mar-92 | 0507397-A3 | | 01-Jul-98 | 69226031.5 | 30-Mar-12 | Recording of content information in Lead-Out |
| ES | N 01366! - | 92200893.3 | 30-Mar-92 | 0507397-A3 | | 01-Jul-98 | 2110784 | 30-Mar-12 | Recording of content information in Lead-Out |
| FR | N 01366! - | 92200893.3 | 30-Mar-92 | 0507397-A3 | | 01-Jul-98 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| GB | N 01366! - | 92200893.3 | 30-Mar-92 | 0507397-A3 | | 01-Jul-98 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| IT | N 01366! - | 92200893.3 | 30-Mar-92 | 0507397-A3 | | 01-Jul-98 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| JP | N 01366! - | 92-81010 | 02-Apr-92 | 93-86596 | | 05-Apr-02 | 3292651 | 02-Apr-12 | Recording of content information in Lead-Out |
| KR | N 01366! - | 92-5313 | 31-Mar-92 | 92-20420 | | 22-Feb-00 | 256385 | 31-Mar-12 | Recording of content information in Lead-Out |
| RU | N 01366! - | 5011995 | 01-Apr-92 | | | 27-Jan-97 | 2072656 | 01-Apr-12 | Recording of content information in Lead-Out |
| TW | N 01366! - | 80109966 | 19-Oct-91 | UNKNOWN 57337 | | 04-Nov-92 | 57337 | 19-Dec-11 | Recording of content information in Lead-Out |
| UA | N 01366! - | 93002573 | 15-Nov-93 | | | | | 15-Nov-13 | Recording of content information in Lead-Out |
| US | N 01366! V | 07/900674 | 18-Jun-92 | | | 23-Aug-94 | 5341356 | 07-Jan-12 | Recording of content information in Lead-Out |
| US | N 01370G D | 08/707945 | 09-Sep-96 | | | 01-Dec-98 | 5844667 | 01-Dec-15 | Decoder delay in codes video frames |

Version date : 14 April 2003

Page 1 of 1

P 001493

Annex A7 to the CD Disc Patent License Agreement
Essential PH patents relevant to CD Disc / CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| AR | N 01547.4 | P960104337 | 13-Sep-96 | | 30-Aug-00 | AR003672 | 13-Sep-16 | Transferring information via the lead-in of CD |
| AT | D 08800.9 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 04-Sep-96 | E142391 | 16-Jan-09 | Repeated transfer of subcode data |
| AT | N 01547.4 | 96027834.0 | 09-Sep-96 | 0792504-A1 | 13-Jun-01 | E202234 | 09-Sep-16 | Transferring information via the lead-in of CD |
| AU | D 08800.5 | 59-23557 | 13-Jun-89 | 639411 | 06-Dec-93 | 639411 | 16-Jan-09 | Repeated transfer of subcode data |
| BE | N 01547.4 | 96027834.0 | 09-Sep-96 | 0792504-A1 | 13-Jun-01 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| CA | D 08800.9 | 598534 | 16-Jan-89 | | 29-Sep-93 | 1322593 | 29-Sep-10 | Repeated transfer of subcode data |
| CH | D 08800.9 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 04-Sep-96 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| CN | D 08800.9 | 89101069.6 | 18-Jan-89 | 1035577-A | 10-Oct-93 | 1033285 | 16-Jan-09 | Repeated transfer of subcode data |
| CN | D 08800.9 A | 92102717.6 | 18-Jan-89 | 1096873-A | 01-Jun-94 | 1025701 | 18-Jan-09 | Repeated transfer of subcode data |
| CZ | D 08800.9 | 89-PV287 | 16-Jan-89 | | 21-Dec-98 | 284788 | 16-Jan-09 | Repeated transfer of subcode data |
| DE | D 08800.9 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 04-Sep-96 | 68920083.3 | 16-Jan-09 | Repeated transfer of subcode data |
| DE | N 01547.4 | 96027834.0 | 09-Sep-96 | 0792504-A1 | 13-Jun-01 | 66610393.3 | 09-Sep-16 | Transferring information via the lead-in of CD |
| ES | N 01547.4 | 96027834.0 | 09-Sep-96 | 0792504-A1 | 13-Jun-01 | 0792504 | 16-Sep-16 | Transferring information via the lead-in of CD |
| FR | D 08800.6 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 04-Sep-96 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| FR | N 01547.4 | 96027834.0 | 09-Sep-96 | 0792504-A1 | 13-Jun-01 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| GB | D 08800.9 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 04-Sep-96 | 0325325 | 16-Jun-09 | Repeated transfer of subcode data |
| GB | N 01547.4 | 96027834.0 | 09-Sep-96 | 0792504-A1 | 13-Jun-01 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| HK | D 08800.9 | 98106421.9 | 16-Jan-89 | | 01-Apr-99 | HK1007226 | 16-Jan-09 | Repeated transfer of subcode data |
| ID | N 01547.4 | P-962584 | 12-Sep-96 | 014759-A | 12-Jul-02 | ID0000895 | 12-Sep-16 | Transferring information via the lead-in of CD |
| IN | N 01547.4 | 96-1617 | 11-Sep-96 | | 28-May-04 | 191449 | 11-Sep-15 | Transferring information via the lead-in of CD |
| IN | N 01547.4 A | 03-285 | 11-Sep-96 | | | | 11-Sep-16 | Transferring information via the lead-in of CD |
| IN | N 01547.4 B | 03-286 | 11-Sep-96 | | | | 11-Sep-16 | Transferring information via the lead-in of CD |
| IN | N 01547.4 C | 03-287 | 11-Sep-96 | | | | 11-Sep-16 | Transferring information via the lead-in of CD |
| IT | D 08800.9 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 04-Sep-96 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| IT | N 01547.4 | 96027834.0 | 09-Sep-96 | 0792504-A1 | 13-Jun-01 | 0792504 | 08-Sep-16 | Transferring information via the lead-in of CD |

*Version date : 14 April 2005*

P 001494

Essential PH patents relevant to CD Disc / CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| JP | D 068009 | 69-8736 | 19-Jan-89 | 90-7176 | 28-Jul-00 | 3092924 | 19-Jan-09 | Repeated transfer of subcode data |
| JP | N 015474 | 97-511762 | 09-Sep-98 | 99-509270 | | | 09-Sep-16 | Transferring information via the lead-in of CD |
| KR | D 068009 | 89-517 | 19-Jan-89 | | 16-Feb-99 | 136112 | 16-Feb-13 | Repeated transfer of subcode data |
| KR | N 015474 | 10:1997-C010724 | 09-Sep-98 | 10:1997-C010534 | 04-Mar-04 | 0423169 | 09-Sep-16 | Transferring information via the lead-in of CD |
| MX | N 015474 | 973530 | 09-Sep-98 | | 15-Mar-04 | 219389 | 09-Sep-16 | Transferring information via the lead-in of CD |
| MY | N 015474 | PI9603785 | 13-Sep-96 | | | | | Transferring information via the lead-in of CD |
| PT | N 015474 | 96327934.0 | 09-Sep-98 | 0792504-A1 | 13-Jun-01 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| RU | D 068009 | 4813351 | 17-Jan-89 | | 10-Nov-97 | 2095667 | 17-Jan-09 | Transferring information via the lead-in of CD |
| SE | D 068009 | 89200081.1 | 16-Jan-89 | | 04-Sep-96 | 0325225 | 16-Jan-09 | Repeated transfer of subcode data |
| SG | N 015474 | 9704956 5 | 09-Sep-96 | C325325-A3 | 16-Nov-99 | 45860 | 09-Sep-16 | Transferring information via the lead-in of CD |
| SK | D 068009 | 89-PV/0297 | 16-Jan-89 | | 14-Mar-00 | 280665 | 18-Jan-09 | Repeated transfer of subcode data |
| TW | D 068009 | 78100360 | 17-Jan-89 | | 03-Sep-91 | 47153 | 17-Jan-09 | Repeated transfer of subcode data |
| TW | N 015474 | 85114202 | 19-Nov-96 | 410326 | 13-Mar-01 | 122112 | 19-Nov-16 | Transferring information via the lead-in of CD |
| UA | D 068009 | 93003377 | 17-Jan-89 | | 28-Feb-00 | 26980 | 17-Jan-09 | Repeated transfer of subcode data |
| US | D 068009  B | 08/300072 | 05-Apr-93 | | 24-Dec-96 | 5587979 | 17-Jan-09 | Repeated transfer of subcode data |
| US | N 015474 | 09/716669 | 16-Sep-96 | | 25-Aug-98 | 5798690 | 16-Sep-16 | Transferring information via the lead-in of CD |

Version date : 14-April 2005

P 001495

Annex A8 to the CD Disc Patent License Agreement

Essential PH patents relevant to CD Disc / CD-Extra Video part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| AT | D 086327 | 87201717.3 | 10-Sep-87 | 0260748-A3 | 13-Jul-94 | E109597 | 10-Sep-07 | Coefficient encoder in transform encoding |
| AT | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 03-Sep-97 | E157801 | 03-Jun-11 | Sector and word offset in video block header |
| AT | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 03-Sep-97 | E157630 | 03-Jun-11 | Decoder delay in coded video frames |
| AU | N 013257 | 91-71219 | 20-Feb-91 | 91-71219 641726 | 25-Jun-94 | 641726 | 20-Feb-11 | Image data block with hierarchical encoding level |
| BE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 03-Sep-97 | 0460764 | 03-Jun-11 | Sector and word offset in video block header |
| BE | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 03-Sep-97 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| CA | N 013257 | 2036595 | 19-Feb-91 | | 16-Jan-01 | 2036595 | 19-Feb-11 | Image data block with hierarchical encoding level |
| CA | N 013409 A | 2335403 | 31-May-91 | | 19-Mar-02 | 2335403 | 31-May-11 | Sector and word offset in video block header |
| CN | D 086327 | 87106940 | 12-Sep-87 | 87106940-A | 22-May-91 | 1011459 | 12-Sep-07 | Coefficient encoder in transform encoding |
| DE | D 086327 | 87201717.3 | 10-Sep-87 | 0260748-A3 | 13-Jul-94 | 37500269.9 | 10-Sep-07 | Coefficient encoder in transform encoding |
| DE | N 013257 | 91200329.0 | 16-Feb-91 | 0443678-A1 | 03-May-95 | 69100346.6 | 16-Feb-11 | Image data block with hierarchical encoding level |
| DE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 03-Sep-97 | 59127506.8 | 03-Jun-11 | Sector and word offset in video block header |
| DE | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 03-Sep-97 | 69127500.1 | 03-Jun-11 | Decoder delay in coded video frames |
| DK | N 013257 | 91200329.0 | 19-Feb-91 | 0443678-A1 | 03-May-95 | 0443676 | 19-Feb-11 | Image data block with hierarchical encoding level |
| DK | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 03-Sep-87 | 0460764 | 03-Jun-11 | Sector and word offset in video block header |
| DK | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 03-Sep-87 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| ES | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 03-Sep-87 | 0460764 | 03-Jun-11 | Sector and word offset in video block header |
| FI | N 013257 | 910791 | 19-Feb-91 | | 15-Jun-98 | 101442 | 19-Feb-11 | Image data block with hierarchical encoding level |
| FR | D 086327 | 87201717.3 | 10-Sep-87 | 0260748-A3 | 13-Jul-94 | 0260748 | 10-Sep-07 | Coefficient encoder in transform encoding |
| FR | D 087091 | 89200818.8 | 27-Apr-89 | 0290085-A2 | 20-Mar-96 | 0290085 | 27-Apr-08 | Motion estimation on superblocks |
| FR | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 03-May-95 | 0443676 | 18-Feb-11 | Image data block with hierarchical encoding level |
| FR | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 03-Sep-87 | 0460764 | 03-Jun-11 | Sector and word offset in video block header |
| FR | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 03-Sep-87 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| GB | D 086327 | 87201717.3 | 10-Sep-87 | 0260748-A3 | 13-Jul-94 | 0260748 | 10-Sep-07 | Coefficient encoder in transform encoding |
| GB | D 087091 | 89200818.8 | 27-Apr-89 | 0290085-A2 | 20-Mar-96 | 0290085 | 27-Apr-08 | Motion estimation on superblocks |

Page 1 of 3

*Version date : 14 April 2005*

P 001496

Essential PH patents relevant to CD Disc / CD-Extra Video part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| GB | N 013257 | 91200328 0 | 18-Feb-91 | 0443676-A1 | 03-May-95 | 0443676 | 18-Feb-11 | Image data block with hierarchical encoding level |
| GB | N 013409 | 91201373 7 | 03-Jun-91 | 0460764-A1 | 03-Sep-97 | 0460764 | 03-Jun-11 | Sector and word offset in video block header |
| GB | N 013709 | 91201337 2 | 03-Jun-91 | 0460751-A3 | 03-Sep-97 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| HK | N 013257 | NOT GIVEN | 18-Feb-91 | | 11-Apr-96 | 0860616 | 18-Feb-11 | Image data block with hierarchical encoding level |
| IT | D 086327 | 87201717 3 | 10-Sep-87 | 0260748-A3 | 13-Jul-94 | 0260748 | 10-Sep-07 | Coefficient encoder in transform encoding |
| IT | N 013257 | 91200328 0 | 18-Feb-91 | 0443676-A1 | 03-May-95 | 0443676 | 18-Feb-11 | Image data block with hierarchical encoding level |
| IT | N 013409 | 91201372 7 | 03-Jun-91 | 0460764-A1 | 03-Sep-97 | 0460764 | 03-Jun-11 | Sector and word offset in video block header |
| IT | N 013709 | 91201337 2 | 03-Jun-91 | 0460751-A3 | 03-Sep-97 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| JP | D 086327 | 87-228698 | 14-Sep-87 | 69-132550 | 31-Oct-97 | 2711865 | 14-Sep-07 | Coefficient encoder in transform encoding |
| JP | D 007081 | 88-106222 | 06-May-88 | 88-287186 | 25-Apr-97 | 3630608 | 06-May-08 | Motion estimation on superblocks |
| JP | N 013257 | 91-47559 | 20-Feb-91 | 92-216298 | 30-Mar-01 | 3174598 | 20-Feb-11 | Image data block with hierarchical encoding level |
| JP | N 013257 A | 00-344694 | 13-Nov-00 | 01-166447 | | | | Image data block with hierarchical encoding level |
| JP | N 013409 A | 01-151175 | 21-May-01 | 02-077784 | 24-Jan-03 | 3392834 | 04-Jun-11 | Sector and word offset in video block header |
| JP | N 013409 B | 01-337556 | 20-Dec-01 | 02-262242 | 24-Jan-03 | 3392942 | 04-Jun-11 | Sector and word offset in video block header |
| JP | N 013709 A | 00-393992 | 26-Dec-00 | 01-223892 | | | | Decoder delay in coded video frames |
| KR | D 086327 | 97-12122 | 12-Sep-87 | | 23-Jul-97 | 118868 | 17-Apr-12 | Coefficient encoder in transform encoding |
| KR | N 013409 | 91-9152 | 04-Jun-91 | 97-5575 | 02-Dec-89 | 6245982 | 04-Jun-11 | Sector and word offset in video block header |
| KR | N 013709 | 91-9167 | 04-Jun-91 | 82-1479 | 22-Oct-89 | 239637 | 04-Jun-11 | Decoder delay in coded video frames |
| NL | D 086327 | 87201717 3 | 10-Sep-87 | 0260748-A3 | 13-Jul-94 | 0260749 | 10-Sep-07 | Coefficient encoder in transform encoding |
| NL | N 013257 | 91200329 0 | 18-Feb-91 | 0443676-A1 | 03-May-95 | 0443676 | 18-Feb-11 | Image data block with hierarchical encoding level |
| NL | N 013709 | 91201337 2 | 03-Jun-91 | 0460751-A3 | 03-Sep-97 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| SE | D 086327 | 87201717 3 | 10-Sep-87 | 0260748-A3 | 13-Jul-94 | 0260748 | 10-Sep-07 | Coefficient encoder in transform encoding |
| SE | N 013257 | 91200328 0 | 18-Feb-91 | 0443676-A1 | 03-May-95 | 0443676 | 18-Feb-11 | Image data block with hierarchical encoding level |
| SE | N 013409 | 91201373 7 | 03-Jun-91 | 0460764-A1 | 03-Sep-97 | 0460764 | 03-Jun-11 | Sector and word offset in video block header |
| SE | N 013709 | 91201337 2 | 03-Jun-91 | 0460751-A3 | 03-Sep-97 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| SG | N 013257 | 9600467 7 | 18-Feb-91 | | 26-May-96 | 30175 | 18-Feb-11 | Image data block with hierarchical encoding level |
| TW | D 086327 | 76105691 | 23-Sep-87 | | 28-Mar-90 | 35350 | 23-Sep-07 | Coefficient encoder in transform encoding |

Version date : 14-April 2005

P 001497

Essential PH patents relevant to CD Disc / CD-Extra Video part

| COUNTRY | REFERENCE | | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|---|
| US | D 006327 | - | 07/006177 | 11-Sep-87 | | 13-Feb-90 | 4901075 | 11-Sep-07 | Coefficient encoder in transform encoding |
| US | N 013257 | C | 08/047149 | 09-May-86 | | 15-Dec-87 | 5598476 | 16-Dec-14 | Image data block with hierarchical encoding level |
| US | N 013409 | B | 08/563799 | 28-Nov-95 | | 28-Apr-98 | 5745641 | 28-Apr-15 | Sector and word offset in video block header |
| US | N 013709 | C | 08/616651 | 18-Mar-96 | | 04-Mar-97 | 5608697 | 04-Mar-14 | Decoder delay in coded video frames |
| US | N 013709 | D | 08/707845 | 09-Sep-96 | | 01-Dec-98 | 5844867 | 01-Dec-15 | Decoder delay in coded video frames |

*Version date : 14 April 2001*

*Page 3 of 3*

P 001498

# EXHIBIT F

US005068846C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (5512th)

# United States Patent
Kramer

(10) **Number:**         US 5,068,846 C1
(45) **Certificate Issued:**     Sep. 19, 2006

(54) **REFLECTIVE, OPTICAL RECORD CARRIER**

(75) Inventor: **Pieter Kramer**, Eindhoven (NL)

(73) Assignee: **U.S. Philips Corporation**, New York, NY (US)

**Reexamination Request:**
No. 90/007,336, Dec. 8, 2004

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | **5,068,846** |
| Issued: | **Nov. 26, 1991** |
| Appl. No.: | **06/858,550** |
| Filed: | **Apr. 23, 1986** |

**Related U.S. Application Data**

(63) Continuation of application No. 06/146,554, filed on May 5, 1980, now abandoned, which is a continuation of application No. 05/949,919, filed on Oct. 10, 1978, now abandoned, which is a continuation of application No. 05/772,914, filed on Feb. 28, 1977, now abandoned, which is a continuation of application No. 05/344,867, filed on Mar. 26, 1973, now abandoned.

(30) **Foreign Application Priority Data**

Sep. 2, 1972    (NL) ............................................. 7211999

(51) **Int. Cl.**
*G11B 7/24*         (2006.01)

(52) **U.S. Cl.** .............................. **369/275.1**; 369/109.01; 369/275.5

(58) **Field of Classification Search** .................. 365/113, 365/120; 369/93–94, 107, 275.1, 111, 275.4, 369/125, 275.5, 109.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,898,040 | A | 2/1933 | Eldred |
| 3,174,140 | A | 3/1965 | Hagopian et al. |
| 3,198,880 | A | 8/1965 | Toulon |
| 3,626,386 | A | 12/1971 | Feinlieb |
| 3,635,551 | A | 1/1972 | Szymber |

*Primary Examiner*—Minh Nguyen

(57)         **ABSTRACT**

A record carrier for information, for example video and/or audio information, in the form of a disk-shaped carrier substrate provided with an optical structure in accordance with the information is described. By making the optical structure radiation-reflecting and the substrate radiation-transmitting, whilst the surface of the substrate more remote from the optical structure forms both the entrance face and the exit face for the read radiation, and by coating a surface of the optical structure more remote from the substrate with an additional layer, a simple record carrier is obtained which is well protected against dust particles and damage.



US 5,068,846 C1

1

**EX PARTE
REEXAMINATION CERTIFICATE
ISSUED UNDER 35 U.S.C. 307**

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

2

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims 1 to 7 is confirmed.

\* \* \* \* \*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KONINKLIJKE PHILIPS ELECTRONICS N.V. and U.S. PHILIPS CORPORATION, | |
| Plaintiffs, | Civil Action No. 08-cv-04070-SCR |
| v. | **CERTIFICATE OF SERVICE** |
| ENTERTAINMENT DISTRIBUTION COMPANY (USA) LLC et al., | |
| Defendants. | |

STATE OF NEW YORK    )
                     )SS.:
COUNTY OF NEW YORK  )

     I, Christopher J. Houpt, a member of the Bar of this Court, hereby certify that on

Thursday, June 12, 2008, I caused a true copy of Plaintiffs' First Amended Complaint to be

served by hand delivery upon

     Ivan Kavrukov
     COOPER & DUNHAM LLP
     1185 Avenue of the Americas
     New York, New York 10036

New York, New York
June 12, 2008

                                 Christopher J. Houpt